UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA    *ORIGINAL*

Before The Honorable JEFFREY S. WHITE, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial - EXCERPT** |
| | ) | |
| Plaintiff, | ) | **Volume 3** |
| | ) | |
| vs. | ) | NO. CR 17-00462 JSW |
| | ) | |
| JOB TORRES HERNANDEZ, | ) | **Pages 1 - 47** |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, March 5, 2019 |

**REPORTER'S TRANSCRIPT OF EXCERPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          David L. Anderson, Esq.
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  JONATHAN U. LEE,
                        RAVI T. NARAYAN,
                        Assistant United States Attorneys

For Defendant:          Law Offices of Austin R. Dove
                        555 W. 5th Street, 35th Floor
                        Los Angeles, California  90017
                   BY:  AUSTIN R. DOVE, ATTORNEY AT LAW

                        Law Offices of Brian H. Getz
                        888 Kearny Street, Suite 850
                        San Francisco, California  94108
                   BY:  BRIAN H. GETZ, ATTORNEY AT LAW

Reported By:            Raynee H. Mercado
                        CSR. No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## I N D E X

**GOVERNMENT'S WITNESSES**                                       **PAGE**      **VOL.**

Bodine, Robert

Direct Examination by Mr. Narayan                                  3            3

--o0o--

1    Tuesday, March 5, 2019                              EXCERPT

2                          *      *      *      *      *

3               MR. NARAYAN:  Your Honor, the government calls Robert

4    Bodine.

5               THE COURT:  Please come forward, sir.

6                    (Pause in the proceedings.)

7               THE CLERK:  Up there, please, sir.

8         Raise your right hand, please.

9                              ROBERT BODINE,

10   called as a witness for the PLAINTIFF, having been duly sworn,

11   testified as follows:

12              THE CLERK:  Thank you.  Please be seated.

13        State and spell your full name for the record.

14              THE WITNESS:  Robert C. Bodine, R-o-b-e-r-t, C,

15   Christopher, Bodine, B-o-d-i-n-e.

16              THE CLERK:  Thank you.

17                           DIRECT EXAMINATION

18   BY MR. NARAYAN:

19   Q.  Sir, I want to start by giving the jury an opportunity to

20   get to know who you are.

21        Where were you born?

22   A.  Fremont, California.

23   Q.  Did you grow up in the Bay Area?

24                    (Off-the-record discussion.)

25              THE COURT:  Pull the microphone in.  Thank you, sir.

BODINE - DIRECT / NARAYAN

1        **THE WITNESS:**  Excuse me?

2        **THE COURT:**  Speak into microphone, please.

3        **THE WITNESS:**  Oh.

4        **THE COURT:**  Thank you.

5    BY MR. NARAYAN:

6    **Q.**  You had said that you were born in Fremont.  And I asked

7    you if you grew up in the Bay Area.

8        Could you repeat your answer.

9    **A.**  Yeah, my whole entire life.

10   **Q.**  Do you currently live on the East Coast?

11   **A.**  Yes, sir.

12   **Q.**  And approximately how long ago did you move to the

13   East Coast?

14   **A.**  About a year ago.

15   **Q.**  What do you do for a living?

16   **A.**  I restore old cars.

17   **Q.**  Do you, in fact, own a restoration shop?

18   **A.**  Yes, I do.

19   **Q.**  And is that your livelihood?

20   **A.**  Yes.

21   **Q.**  Sir, throughout your adult life, have you worked in

22   various forms of auto repair and construction work?

23   **A.**  Yes.

24   **Q.**  Are you -- Do you have experience in the area of

25   construction and auto repair?

BODINE - DIRECT / NARAYAN

1    **A.**  Yes.

2    **Q.**  What skills do you have that have led to these jobs?

3    **A.**  Heavy machine operation, driving forklifts, tow truck,

4    machinery, transportation, paint, dry wall.

5    **Q.**  Sir, are you -- are you married?

6    **A.**  Yes.

7    **Q.**  Do you have children?

8    **A.**  Yes.

9    **Q.**  Now, while you were living in the Bay Area and working in

10    the general area you -- you discussed, did you meet someone

11    named Job Torres Hernandez?

12    **A.**  Joe Torres, but yeah.  He went by "Joe," not "Job," but

13    yes.

14    **Q.**  How did you know him?

15    **A.**  Joe.

16    **Q.**  Joe Torres?

17    **A.**  Yes.

18    **Q.**  Do you see the person that you know as Joe Torres here in

19    the courtroom today?

20    **A.**  Yeah.  Yes.

21    **Q.**  Could you describe where he is and what he's wearing?

22    **A.**  He's wearing a purple sweater with a gray shirt, sitting

23    to my left with a -- at -- I don't know -- the table over

24    there.

25         **MR. NARAYAN:**  May the record reflect that the witness

1   has identified the defendant?

2           THE COURT:  Yes.

3   BY MR. NARAYAN:

4   Q.  About when did you first meet the defendant?

5   A.  I met Joe in the early '90's.  We worked at NB Industries

6   restoring -- or not restoring, but painting buses and

7   fixing -- painting tractors at the Alameda Naval Base.

8   Q.  After working together in the early '90's, did you stay in

9   touch with the defendant?

10  A.  Off and on, periodically, yeah.

11  Q.  Was that in a friendship or social capacity or more of a

12  work capacity?

13  A.  In the beginning, it was social, and then it turned

14  into -- or social friendship, and then it turned into trying

15  to do business together as far as working on cars together and

16  stuff like that.

17  Q.  And did that continue through the 2000's and past 2010?

18  A.  Yes.

19  Q.  Is it fair to say that you got to know the defendant

20  fairly well during that time?

21  A.  We were friends, consider each other brothers, I guess

22  you'd say.  I mean, we said it to each other a lot, that we

23  were like brothers.

24  Q.  Is that still true today?

25  A.  Yeah.

1   **Q.**   Sir, at some point in 2015, did you have a conversation

2   with the defendant about work he was doing on a Marriott

3   property?

4   **A.**   Yes.

5   **Q.**   Did he reach out to you to discuss that?

6   **A.**   Yes.

7   **Q.**   And was this conversation in person or over the phone?

8   **A.**   Originally, it was over the phone.  Then we met in person,

9   had lunch, and went and talked about the job that he was going

10  to be doing.

11  **Q.**   Okay.  Let's talk about the phone conversation first.

12      What do you recall the defendant saying during that phone

13  conversation?

14  **A.**   I need your help.  You can make a lot more money helping

15  me with this construction job than you will doing the cars.

16  And when do you want to meet up so we can talk about it?

17  **Q.**   Did he tell you what the construction job was?

18  **A.**   On the phone, no.  In person, yes.

19  **Q.**   Okay.  Let's move forward to the meeting you had in person

20  where you said you had lunch.

21      What did the defendant tell you during that conversation

22  about this job?

23  **A.**   That he had gotten a job through -- doing the Marriott

24  Hotel in San Francisco, and that he was going to be doing

25  painting, carpeting, revamping retired or dilapidated hotel.

BODINE - DIRECT / NARAYAN

1   **Q.** During that conversation, did the subject of how much

2   money he expected come up?

3   **A.** Yeah.  Yes.

4   **Q.** And what, if anything, did the defendant say about that?

5   **A.** He'd be making close to about $500,000 if all went well.

6   **Q.** Did he ask you to -- to help him with this job?

7   **A.** Yeah.  He wanted me to be a foreman to kind of help run

8   the crews and do the painting and stuff.

9   **Q.** Did you agree to work with him?

10  **A.** Yes.

11  **Q.** And what exact -- what work did you exactly agree to do?

12  **A.** That I was going to help him with the company and run --

13  run the different jobs with him to get stuff done, picking up

14  material, going to different job sites, stuff like that.

15  **Q.** Did the defendant discuss with you what he was going to

16  pay you for -- for that work?

17  **A.** We talked about a salary.  We talked about hourly wages.

18  It was just random talking of different things.

19  **Q.** And what were the salary, hourly wages you discussed?

20  **A.** We talked about doing minimum of $50,000 a year.  Then we

21  talked about hourly, like, 20-something bucks an hour.

22  **Q.** At the time that you had this conversation over lunch with

23  the defendant, what was the status of the -- the Marriott job?

24  Had it begun yet?

25  **A.** It had already been started, yes.

BODINE - DIRECT / NARAYAN

1  **Q.**  And what work did you agree to do specifically with

2  respect to the Marriott job, if -- if any?

3  **A.**  To just delivering materials and stuff, and then he had to

4  finish a job that was in San Rafael doing some excavation, and

5  there was another job he was doing where there was some

6  flooring and painting and stuff.

7  **Q.**  So we been talking about the Marriott job.  You mentioned

8  a job site in San Rafael.

9      What was the third one that you mentioned?

10 **A.**  It was in, like -- I want to say it was, like, Martinez,

11 Albany area, something like that.

12 **Q.**  And did you help in some capacity with all of those jobs?

13 **A.**  Yes.

14 **Q.**  The thing you mentioned was that you delivered materials.

15     Is that the main capacity in which you helped with these

16 jobs?

17 **A.**  For the Marriott or -- for the Marriott, I delivered -- we

18 went to Home Depot, picked up paint and supplies for the guys,

19 and stuff like that.

20     As far as like on the Martinez job, I ran the excavators

21 and brought the guys to and from the job sites.

22 **Q.**  When you say "the guys," are you talking about the people

23 that --

24 **A.**  Workers.

25 **Q.**  -- job sites?

BODINE - DIRECT / NARAYAN

1  **A.**   Workers, different guys that worked for Joe.

2  **Q.**   In the course of taking people to and from -- the workers

3  to and from the job site, did you gain some familiarity with

4  the workers?

5  **A.**   Yes.

6  **Q.**   Approximately how many workers would you say that you

7  either interacted with or -- or transported for the defendant?

8  **A.**   Interacted with on the job --

9          **MR. DOVE:**   Objection, Your Honor.  Compound.

10          **THE COURT:**   Sustained.

11  BY MR. NARAYAN:

12  **Q.**   Let's start with approximately how many workers you -- you

13  transported, if you could describe that for us.

14  **A.**   Usually when we went to San Rafael, it would be myself and

15  three other guys.

16  **Q.**   And what about with respect to the Marriott job?

17  **A.**   The Marriott job, it was mostly just me and Joe in his

18  personal vehicle, and we'd drive to the place and deliver

19  materials and go check on different other prospective jobs and

20  stuff like that in the San Francisco area.

21  **Q.**   In your -- did you ever assist in taking the workers home

22  at night?

23  **A.**   No.  Oh, from the jobs that I was working on away from

24  Joe?  Yes.  Like, if we went to San Rafael and worked on a

25  job, we'd all get in the same car, go home.

 1  **Q.**  Did you become familiar in doing this work for the

 2  defendant with a property at 2140 Dunn Road?

 3  **A.**  Yes.

 4  **Q.**  And what was the property at 2140 Dunn Road?

 5  **A.**  Originally the property at 2140 Dunn Road was when he was

 6  getting -- he was in the beginnings of the Marriott.  I had

 7  found that building.  We were talk- -- and I'd showed it to

 8  him, that it was for sale by owner, and we talked about buying

 9  it.  Or he talked -- I talked about going to one of my friends

10  and having them lend me the money to buy it.  And then he said

11  he was interested in buying it and he was thinking about

12  getting it.

13  **Q.**  Do you know if he ultimately bought it?

14  **A.**  I believe so, yes.

15  **Q.**  During this period of time that you were assisting with

16  these three jobs, did you have occasion to be at that property

17  on 2140 Dunn Road?

18  **A.**  When he got 2141 -- 2140 Dunn Road, we emptied the place

19  from the people that were there before.  They got evicted or

20  whatever you want to call it.  And we moved all the stuff and

21  did dump runs and took everything out of there.  And then we

22  started fixing the place up.

23  **Q.**  Did you see any of the workers that you'd mentioned living

24  at the property on Dunn Road?

25  **A.**  When he first purchased the property, no.  But in the --

1    cleaning up the place and everything and once he started

2    running the business out of there, yes, people stayed there.

3    **Q.**  Was there another commercial property that the defendant

4    had, if you know, on Foley Road?

5    **A.**  That wasn't his property, but yes, there was -- we did

6    work at Foley --

7    **Q.**  Could you describe the property at Foley?

8    **A.**  I'd say it's a 30- to 40,000-square-foot commercial

9    building.  And it was -- originally, he was using it for

10   producing foam and doing the foam work for different places.

11   And then somewhere along the lines, he took a business partner

12   and started converting it into some kind of office.

13   **Q.**  During this period of time that you were working with the

14   defendant, did you have occasion to visit the property at

15   Foley Road?

16   **A.**  Yes.

17   **Q.**  Did you go inside of it?

18   **A.**  Yes.

19   **Q.**  Did you see whether workers were living at the property on

20   Foley Road?

21   **A.**  Yes.

22   **Q.**  And were they?

23   **A.**  Yes.

24   **Q.**  Were there times that you were asked to transport water in

25   between any of these sites that we've discussed?

1    **A.**   Yes.

2    **Q.**   Could you describe that, please?

3    **A.**   Well, on Dunn Road, the -- the water had been turned off

4    because the bill hadn't been paid and so we were taking waters

5    (sic) from Foley -- from Foley and from another job site,

6    was -- I want to believe Alpine and taking it there.

7        Then there was also -- for Foley, the water bill hadn't

8    been paid or -- or the water main getting put in -- some kind

9    of big water thing, but there was people staying there, and we

10   had to take water 'cause there was no running water, so if you

11   went to the bathroom, you had to use a bucket to flush the

12   toilet.

13   **Q.**   That point about no running water at Foley, how do you

14   know that?

15   **A.**   At Foley?

16   **Q.**   Yes.

17   **A.**   Because we excavated the sewer line or some kind of water

18   line, 'cause there -- they cut up the whole floor inside the

19   whole building to put new lines in.

20   **Q.**   During this period of time that you were assisting in some

21   capacity at least with the Marriott job, how often were you

22   with the defendant?

23   **A.**   On the Marriott job?  On a weekly basis, I'd say we were

24   together two days out of the week.

25   **Q.**   And on a day that you would be together, take us through

1  an example of that of -- of how long you would be together and

2  how much time you would be spending together?

3  **A.**   I would show up to Dunn Road or to Foley, and then we'd

4  get in his truck.  We'd drive -- he either stop and get

5  Starbucks, whatever.  Then we'd drive to San Francisco, and

6  then we'd stop by the Marriott.  Then spend, hmm, maybe an

7  hour and a half, two hours there.  I'd sit in the car because

8  he didn't -- for the parking reasons.  And then he'd come out.

9  And then we'd go to different other prospective job sites

10  around that area for -- and we'd get home, hmm, 6:00, 7:00

11  o'clock at night.

12  **Q.**   During those days together, did you have occasions to talk

13  about the status of the -- the job sites?

14  **A.**   Yes.

15  **Q.**   Did you have opportunities to observe what Mr. Torres was

16  doing during those hours you were spending together?

17  **A.**   What do you mean by "observe what he was doing," like who

18  he was talking to or what --

19  **Q.**   Let me ask you a -- a better question, or a more specific

20  question at least.

21       Did you ever observe Mr. Torres pick up checks during this

22  period of time?

23  **A.**   On occasions, yes.  By they weren't at the actual Marriott

24  site.  They were at some other building down in San Francisco.

25  **Q.**   Could you describe an occasion on which you saw the

1  defendant pick up a check?

2  **A.**  We went to the Marriott, and then he said we had to go to

3  this other spot that was I'd say six, seven streets away.  It

4  was a big building.  He went in there and came without a check

5  in a white envelope.  And then he's, like, okay, okay, we need

6  to go to the bank.  We need to go deposit this.  And that was

7  it.

8      I mean, as far as dollar amounts, it's kind of random, but

9  I want to say --

10          **MR. DOVE:**  There's no question pending on that --

11          **THE COURT:**  Sustained.  Just ask another question.

12  BY MR. NARAYAN:

13  **Q.**  Let's go with a "yes" or "no" question here.

14      Do you know -- without telling us the conclusion, do you

15  know the dollar amount of any of these checks that the

16  defendant picked up?

17  **A.**  Yes.

18  **Q.**  And, again, without telling us the amount, how do you know

19  the amount?

20  **A.**  Two occasions -- two or three occasions he showed me the

21  check.  And on other occasions, he showed me the bank account

22  statements because we were asking about our money.

23  **Q.**  Let's talk about the occasions that he showed you the

24  check.

25      What would the amount -- what were those amounts?

1   **A.**   One check that I've seen was over $50,000.  You want exact

2   amount?  It was like 50,000 -- 50,400 and $900 (sic).

3   **Q.**   Something in the $50,000 range?

4   **A.**   Correct.

5   **Q.**   You've said that there were multiple examples that you saw

6   the check.

7       Can you give us another example that you remember?

8   **A.**   When we were going for -- are you talking about for the

9   Marriott, or are you just talking about random checks in

10  general?

11  **Q.**   Let's for now, just so we're clear on the record about

12  time period, let's talk about the general time period during

13  the Marriott job.

14  **A.**   As far as the Marriott job, I maybe saw one check.  And

15  that check was the 54,900-and-something dollars.

16  **Q.**   During that time period, was that the -- the only check

17  that you recall seeing?

18  **A.**   From the Marriott, correct.  Yes.

19  **Q.**   We'll -- Just so we do this in order, we'll circle back

20  and talk about the other checks later.  But I have some other

21  questions about the Marriott job.

22      Did you observe the defendant spending money during the

23  time of the Marriott job?

24          **MR. DOVE:**  Objection, relevance, Your Honor.

25          **THE COURT:**  Just a moment.

1                    (Pause in the proceedings.)

2            **THE COURT:**  Overruled.  You may answer.

3            **THE WITNESS:**  Yes.  So when he'd get checks, he'd go

4    buy, like -- when they were doing San Francisco job, Marriott,

5    he went and bought four Chevy Colorado's for different guys.

6    **BY MR. NARAYAN:**

7    **Q.**  Let me stop you there and ask you how you know that he

8    bought those four Chevy Colorado's?

9    **A.**  Because he told us.

10   **Q.**  Are there other examples during this period of time of the

11   defendant making purchases?

12   **A.**  He went to -- there was a company that was going out of

13   business, and he went and bought almost all of the tools and

14   everything that the place had.

15           **MR. DOVE:**  Objection, Your Honor, foundation.

16   Speculation.

17           **THE COURT:**  What are you basing your knowledge about

18   the defendant supposedly making these payments -- or these

19   purchases?  How do you know that?

20           **THE WITNESS:**  Because I was there with him.

21           **THE COURT:**  There at the place where the --

22           **THE WITNESS:**  Where he bought the stuff, correct.

23           **THE COURT:**  Excuse me.  Where the tools -- you were

24   there at the place where the tools were purchased by the

25   defendant?

```
 1            THE WITNESS:  Correct.

 2            THE COURT:  Overruled.

 3   BY MR. NARAYAN:

 4   Q.  Could you please finish your answer with respect to the

 5   purchase of tools.

 6   A.  What he bought?  He bought a 50-gallon -- just random.

 7   It's just a 50-gallon drum full of brooms, a 50-gallon drum

 8   full of shovels.  Saws.  There was some scaffolding.  There

 9   was a black enclosed trailer.  He gave the guy -- he gave the

10   guy a check and said he'd be back to finish collecting the

11   rest of tools, which some of the stuff we left were ladders,

12   construction tools, and then we went back two days later and

13   picked up the rest of the stuff.

14   Q.  Was there an occasion, Mr. Bodine, where you assisted in

15   removing items from a warehouse in -- from the warehouse in

16   Hayward?

17            MR. DOVE:  Your Honor, I'm going to object.  May we

18   approach briefly with sidebar on this issue?

19            THE COURT:  All right.  We're going to -- I told you

20   occasionally we have to talk about legal matters.  We're not

21   talking about what's on Netflix tonight.  We're talking about

22   the case, so you can stand while we're talking.  We're going

23   to be piping static into the jury box so you can't hear what

24   we're saying.  But you can stand, but please be silent when

25   you're standing -- if you wish.
```

1          Do you need the court reporter for this?

2               MR. DOVE:  Yes, please.

3               THE COURT:  All right.  Please bring -- Let's wait

4     until the court reporter gets over there so we don't have a

5     tendency to talk before she's there.

6               (Sidebar on the record as follows:)

7               THE COURT:  All right.  Since this is the first

8     sidebar, I actually motioned for the defendant to come over,

9     and I heard Mr. Dove say that we'll waive it.  Have you

10    discussed the defendant -- with the defendant his right to be

11    present at this as well as any other sidebar?

12               MR. DOVE:  Yes, Your Honor.  Pursuant to Rule 47,

13    I've done so, and on this particular sidebar as well, as well

14    as the scope of trial for any sidebar.

15               THE COURT:  And has he waived his right to be here?

16               MR. DOVE:  Yes, he has.

17               THE COURT:  All right.  Very well.

18         So what's your --

19               MR. DOVE:  Well, I only -- my objection is to the

20    report.  I don't want to -- I hate to make a discovery -- but

21    I -- discussion, but the only report I have is the one that

22    discusses Robert Bodine, nothing about materials, the

23    transactions, going to the border to pick up individuals on

24    several occasions but nothing about these transactions that

25    are being discussed now.

1      Is there another report that I missed somehow or --

2          **THE COURT:**  All right.  But wait.  So the point is

3    you're alleging that you're claiming that the government

4    failed to make disclosure of these transactions and that

5    somehow that's a violation of the government's discovery

6    obligations?

7          **MR. DOVE:**  Yes.

8          **THE COURT:**  What's your offer of proof?

9          **MR. NARAYAN:**  Your Honor, the -- I see the report

10   that Mr. Dove is referring to.  And that's a report

11   identifying Jonathan Bodine, which is the brother of this

12   defendant.  There are many reports that at the time they were

13   written refer to a source of information and identifier.  We

14   previously produced the identities of the sources of

15   information.

16      Consistent with my Jencks disclosure, I sent an email to

17   Mr. Dove and Mr. Getz saying -- essentially memorializing, you

18   know, I want to be clear and confirm the government's Jencks

19   disclosures.  And I said, "source of information A", "source

20   of information A" referred for the reports is Robert Bodine.

21   And I have that email, which I said, please confirm that, you

22   know, you have these items and confirm your understanding.  I

23   also have further disclosure about how he -- being a source of

24   information, and we'll cover that later.

25          **THE COURT:**  All right.  So just to get my Bodines

1    straight.  Is Robert this gentlemen?

2              MR. NARAYAN:  Robert is this witness.

3              THE COURT:  Okay.  And you're saying that in a report

4    concerning individual A, it -- it disuses transactions about

5    which this witnessed is testifying.

6              MR. NARAYAN:  There are several interview reports of

7    this witness that don't refer to him by name but refer to him

8    by "a source of information" and that talk about many of the

9    matters that we are going to cover today.

10       And I have disclosed that he -- for the purposes of

11   understanding discovery, that he was that source of

12   information.

13             THE COURT:  All right.  So the point is here, to just

14   sort of focusing on a legal aspect of it, the government is

15   obliged to turn over all Jencks and all *Brady* and Giglio and

16   any Rule 16 discovery.  But they're not -- unless there's a

17   bill of particulars which is ordered, they're not required to

18   tell the defendant every transaction about which there'll be

19   testimony from a witness -- if a report omitted what the

20   witness is saying, then that's the stuff that impeachment is

21   for by omission or inconsistent statement is made of.  There's

22   no really no -- there's no other obligation.  The government

23   is not required to disclose information to you except in

24   certain forums, and they've represented that they have turned

25   over everything that they're required to do.

1    So if it ever -- if it comes up that they didn't, then

2    I'll consider whatever appropriate remedial action, if any,

3    may be necessary.

4        **MR. DOVE:**  May I ask for clarification from counsel?

5        **THE COURT:**  Yes.

6        **MR. DOVE:**  Was that the CD that you gave me on --

7    last week and you said that that -- when you say there's

8    additional information about sources of information, is that

9    the CD that you gave me last week at -- when we had our final

10   meet-and-confer?

11       **MR. NARAYAN:**  No, it's not the CD that I gave you

12   last week.  This was a -- well, a prior disclosure that prior

13   counsel made to Mr. Garcia originally, and then it was me

14   following up.  I believe I sent you an email on -- over the

15   weekend to confirm several Jencks matters.  I believe I sent

16   you on Sunday around noon with a list of things I wanted to

17   confirm --

18       **MR. LEE:**  The universe.

19       **MR. NARAYAN:**  -- Jencks disclosures.

20       **THE COURT:**  All right.  Well, look, I'm going to cut

21   this off right now because you all can meet and confer -- you

22   know, we're going to be breaking in about 45 minutes -- about

23   the status of this.

24       To the extent that you believe, Mr. Dove, that there is a

25   Jencks violation, remember, the remedy -- technically Jencks

1  is not producible until after the witness testifies under

2  direct, so there's no violation.  If it's *Brady* material, that

3  may or may not be -- may be a different situation.  But for

4  now, I haven't heard anything as to conclude the court is

5  required to take any action.

6      But I would suggest that there may be just some confusion

7  about who is whom and what's been turned over.  And I think

8  you can deal with that on a break or after we're done so we

9  don't hold up the jury.

10         **MR. DOVE:**  May I request, then, given the hour,

11  we're -- I think court said you would break at 12:15 --

12         **THE COURT:**  Correct.

13         **MR. DOVE:**  I'm at -- I don't know -- other than what

14  he's said, I'm not sure how deep I can go into

15  cross-examination.  I'd ask for leave -- for this witness to

16  be brought back tomorrow as a witness 'cause I don't think I

17  can properly cross-examine him.

18         **THE COURT:**  How much more time do you have on direct?

19  Are you finished -- will you finish with him on direct for the

20  rest of the time?

21         **MR. NARAYAN:**  I believe so.  I believe I at least

22  have another half hour, possibly closer to an hour left of the

23  witness.

24         **THE COURT:**  There must be something you can -- even

25  without what you're asking for, I'm sure you have plenty of

1    hours in your quibble with this guy.

2              **MR. DOVE:**  Just what I gather the -- from this right

3    here.

4                        (Simultaneous colloquy.)

5              **THE COURT:**  Why don't you at this point -- and if as

6    and when we're done with time -- you say, hey, I can't do any

7    more, I'll understand, and then we'll break early.

8         But I want you to use that advisedly 'cause I'm sure you

9    have plenty of other stuff with this guy.

10             **MR. DOVE:**  Yes, Your Honor.

11             **MR. NARAYAN:**  May I just -- one thing, Your Honor,

12   and that's even though we're not required to do the bill of

13   particulars, I'm happy -- and we are happy to point out to

14   Mr. Dove exactly which reports were --

15             **THE COURT:**  I think --

16             **MR. NARAYAN:**  -- cross-examination.  We have no

17   objection to --

18             **THE COURT:**  Okay.  As a courtesy, I think that's --

19             **MR. NARAYAN:**  Happy to do that.

20             **MR. DOVE:**  -- I ask -- this might even speed things

21   up a little bit more.  If you have the reports that -- if you

22   have a duplicate copy of reports that you're basing your

23   examination on now, I can look at them at counsel's table.

24   I'll multi-task and prepare for cross while the record's

25   happening.

1      **MR. NARAYAN:**  Yeah, I can.  I can right now give

2  Mr. Dove some copies --

3      **THE COURT:**  Can you give that sort of sub rosa?  I

4  don't want to take a break now.  Let's just go on and see

5  where we are.

6      **MR. DOVE:**  Okay.

7      **MR. LEE:**  Thank you.

8      **THE COURT:**  Thanks.

9              (End sidebar on the record.)

10     (The following proceedings were heard in the presence of

11  the jury:)

12     **THE COURT:**  All right.  Proceed.  Thank you for your

13  patience, ladies and gentlemen.

14  **BY MR. NARAYAN:**

15  **Q.**  Earlier, you spoke about a property at Dunn Road.  Is that

16  right?

17  **A.**  Yeah.

18  **Q.**  Was there an occasion were you assisted with the removal

19  of several items from Dunn Road to move them to a different

20  location?

21  **A.**  Yes.  Yes.

22  **Q.**  Was that during the time the Marriott job was going on?

23  **A.**  Yes.

24  **Q.**  All right.  I want to -- before I ask you to describe

25  that, I want to talk about how that came to be.

1    Do you recall receiving a text message from the defendant?

2    **A.**  Yes.  Yes.

3    **Q.**  Could you move just a little bit closer --

4         **THE COURT:**  Yeah, just so you know, sir, the court

5    reporter gets your -- she doesn't actually hear your voice

6    except through the microphone.

7         **THE WITNESS:**  Okay.

8         **THE COURT:**  And so she can't hear what you're

9    saying -- she has headphones on or an ear plug -- unless you

10   speak right into the microphone.

11        **THE WITNESS:**  Okay.

12        **THE COURT:**  We can hear you fine, but she may not be

13   able to.

14        **THE WITNESS:**  Okay.

15        **THE COURT:**  Thank you, sir.

16   **BY MR. NARAYAN:**

17   **Q.**  I think your last answer was that you did indeed receive a

18   text message from Mr. Torres; is that right?

19   **A.**  Correct.

20   **Q.**  Now can you tell us what the text message said?

21   **A.**  Call me now.

22   **Q.**  Did you call Mr. Torres in response to the text message?

23   **A.**  Yes.

24   **Q.**  Could you please describe the conversation you had with

25   him.

1   **A.**   I got a text message that says call now.   That's kind of

2   just the way Joe is.   If something's going wrong, he'll text

3   now, call me now and that's it.   So I called him, what's going

4   on.   He said get to Dunn Road.   You need to help Bonbon and

5   couple of guys move some stuff.

6      And then we ended up moving -- I had to go back and pick

7   up my car trailer, and then we moved mattresses and whole

8   bunch of stuff out of Dunn Road.

9   **Q.**   Where did you take the mattresses to?

10  **A.**   Some of the mattresses we took back to the mattress store

11  that's just around the corner, put them in front of their

12  dumpster.   And then other stuff we took to Foley.

13  **Q.**   That was the same property at Foley that you mentioned a

14  little while ago?

15  **A.**   Yes.

16  **Q.**   In addition to mattresses, were there any other items that

17  you assisted in removing from that Dunn Road warehouse?

18  **A.**   There was black trash bags, but that was about it.   I

19  mean, there was just black trash bags, mattresses, and random

20  stuff, like people's stuff.

21  **Q.**   Do you know what was in the trash bags?

22  **A.**   I can make an assumption.   It was their clothes --

23  **Q.**   If you don't know, that's fine.   If you don't know, that's

24  fine.

25            **THE COURT:**   Just tell what you say saw and what you

1    heard.  Don't tell us what you assume.

2              **THE WITNESS:**  Okay.

3              **THE COURT:**  Next question, please.

4    BY MR. NARAYAN:

5    Q.  When you went to the Dunn Road warehouse after this phone

6    conversation with the defendant, who was there that was

7    assisting with this?

8    A.  It was Bonbon.  His name's Jorge -- I don't know his real

9    last name, so we -- we all used nicknames.  It's just our

10   thing.

11        It was Bonbon, Eric, me, Julio, and two other guys.

12   Q.  And from what you saw, who was doing what?

13   A.  Bonbon and Julio and Eric were moving stuff out of the

14   center shop location where everybody stayed, where the bunk

15   beds and everything were.

16   Q.  Did you take one of your vehicles to assist with this?

17   A.  I said that.  I took my truck and trailer.

18   Q.  And how many truckloads of items did you end up

19   transporting?

20   A.  I took -- as far as the mattresses and stuff to the

21   mattresses place, we took one load.  It was the bed of my

22   truck and the trailer.  And then to Dunn Road, it was in the

23   bed of my truck, probably seven or eight big black trash bags.

24   On the trailer was seven or eight mattresses.  And then after

25   that, it was just plywood and stuff to -- like that.

1  **Q.**  Now, after this took place, did you ever have a

2  conversation with the defendant about it?

3  **A.**  As far as -- yeah, he said -- I asked him, well, what's

4  that all about.  He said, oh, a bunch of stuff went wrong down

5  in San Francisco, and the City's coming down on me.

6  **Q.**  How soon after this incident did that conversation take

7  place?

8  **A.**  That night.

9  **Q.**  Where were you and the defendant when you had that

10  conversation?

11  **A.**  We were in front of the Dunn Road shop closer to the --

12  the street by where the stop sign is in Napa (sic).

13  **Q.**  Now, after the work on the Marriott job was over, did you

14  assist the defendant with any other work?

15  **A.**  Yeah, I had -- still helped him with some construction

16  jobs.  And then he started -- I went back to work at my shop,

17  and then he was still doing his jobs.  And then he got the

18  contract for Silver Towers.

19          **THE COURT:**  Sustained.

20      Ask another question, please.  Thank you.

21  **BY MR. NARAYAN:**

22  **Q.**  I want to be clear about -- about timing.  When --

23  approximately when do you recall that the work on the Marriott

24  ended?  If you do.

25  **A.**  I -- I don't have the exact date on the top of my head,

1  no.

2  **Q.**  Let's do it this way:  How long after the work on the

3  Marriott shop ended did you go back to your shop to do your

4  work?

5  **A.**  Probably a month and a half, two months.

6  **Q.**  During the time that you were back at your shop, were you

7  continuing to work with Mr. Torres in any way?

8  **A.**  Yeah, we'd -- he'd come by my shop, talk, and I got this

9  job going on.  I need your help moving this, and so I would go

10 move a bobcat on my -- with my truck and trailer to a

11 different job, stuff like that.

12 **Q.**  Earlier, you said that the defendant had made some

13 statements to you about what he was going to pay you.

14     Up to this point that we're at in the time line, was he

15 paying you?

16 **A.**  Not all of what we agreed upon and stuff like that.  It

17 was periodic -- it was sporadic.  We'd have to sit there and

18 either go to his house on A Street or -- no, D street -- on D

19 Street, or we'd line up on Fridays at the shop on Dunn Road or

20 Foley --

21 **Q.**  You said --

22 **A.**  -- and then --

23 **Q.**  I'll interrupt you for a second.

24     You said "we would line up outside," outside the house.

25 Who is we?

1    **A.**  All the workers.  All the employees.

2    **Q.**  And on -- in saying, "we would line up," how often did

3    that happen?

4               **MR. DOVE:**  Objection, vague as to time.

5               **THE COURT:**  Sustained.  Try to pin down the time as

6    much as the witness can possibly do.  Thank you.

7    **BY MR. NARAYAN:**

8    **Q.**  All right.  Do I understand correctly that the time you

9    went back to your shop, you said was about two months after

10   the work on the Marriott job ended?

11              **MR. DOVE:**  That misstates the testimony, Your Honor.

12              **THE COURT:**  Overruled.

13       Is that correct?

14              **THE WITNESS:**  Yes.

15              **THE COURT:**  All right.  Overruled.

16   **BY MR. NARAYAN:**

17   **Q.**  These instances where you said that you would line up, you

18   and others would line up outside of the defendant's house, can

19   you give us a sense of just when this took place relative to

20   the work of the Marriott job before we go any further?

21   **A.**  Wasn't just relative to the Marriott job.  It's forever.

22   We'd line up either at Foley or Dunn or at his house, and we'd

23   be -- basically on Friday's, he'd disappear from noon to 7:00,

24   8:00 o'clock at night, so we knew we had to be there early in

25   the morning to where he would show up and -- and then we'd all

1  get -- I don't know.  I guess single file lined up, you could

2  say.  And then he'd call us individually, hey, okay.  Here

3  turn in your hours from -- you know, your hours from last

4  week.  And then, okay, look, I only have this much.  I'm going

5  to give you this, but I'll get you next -- and --

6  **Q.**  How often would this happen?

7  **A.**  I just explained to you.  Every week, every Friday, we

8  would go and line up either at his house or at Dunn, at Foley.

9  Every week.  Or D Street.

10  **Q.**  Did you -- in the course of doing that, did you have

11  occasion to observe the way that defendant would respond to

12  other workers requesting payment?

13       **MR. DOVE:**  Objection, that's vague, Your Honor,

14  "other workers."

15       **THE COURT:**  Why don't you be more -- in this case, in

16  light of the objection, a little bit more direct in the

17  question.

18       Sustained.

19  **BY MR. NARAYAN:**

20  **Q.**  Do you recall witnessing a conversation between the

21  defendant and a worker from Guatemala?

22  **A.**  Yes.

23       **THE COURT:**  We didn't hear you.  Speak into the

24  microphone.

25       **THE WITNESS:**  Yes.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1        **THE COURT:**  Thank you.

2    **BY MR. NARAYAN:**

3    Q.  Before we get into the contents of that conversation, I'll

4    ask you a few foundational questions.

5        Approximately when did this conversation take place?

6    A.  Where he got in a argument about money?  I mean, he'd get

7    in arguments about money all the time.  But the particular one

8    you're asking about, that was right after the -- the police

9    had come or -- I don't know what you'd call them -- the people

10   came down from the City of San Francisco.

11   Q.  Okay.

12       Where did this conversation take place?

13   A.  At the Dunn Road shop.

14   Q.  Where within the Dunn Road shop?

15   A.  On the -- in front of the second roll-up door.  The first

16   roll-up door would be his office area.  And then the second

17   roll-up door was a smaller -- where they did metal working and

18   stuff.  There's a shower and stuff in there.  And then the

19   back -- then next to that was another shop.  And next to that

20   was another shop.  So the silver metal fabrication shop with

21   the shower.

22   Q.  One more foundational question.  Who was present during

23   this conversation?

24   A.  On the property would be 15 to 20 guys.  In close

25   proximity of where it happened, it was myself, Joe, the guy --

1   I don't remember the guy's name.  We just had a nickname for

2   him.  But Guatemalan guy, and then there was one other

3   person -- probably Bonbon was there.

4   **Q.**  Could you describe what the defendant said during that

5   conversation?

6   **A.**  It was basically the four of us in kind of like a almost a

7   circle situation.  And the guy was complaining that he still

8   hadn't gotten his money and he's done working for Joe, and

9   he's -- he's going back home.  He just needs his money and

10  he's tired of waiting.

11  **Q.**  What did the defendant say in response to that?

12  **A.**  You know the problems I'm having.  Why -- why are you

13  doing this?  You know who I know.  Just give me more time.

14  And, you know, don't make a scene.

15  **Q.**  Do you recall anything else from that conversation?

16  **A.**  It's kind of comical, but he said he was going to call the

17  immigration on the guy.  He goes, you know, you're not legal,

18  so why are you going to -- what are you going to do?  Who are

19  you going to go see?  Who's going to help you?

20  **Q.**  I want to make sure that with that last point, we

21  understand exactly what you heard the defendant say.

22      So what did you hear the defendant say?

23  **A.**  "The defendant"?  You mean Joe?

24  **Q.**  What did you hear Mr. -- Mr. Torres say?

25  **A.**  Joe said, you know, what -- who are you going to go --

BODINE - DIRECT / NARAYAN

1  who's going to help you?  Nobody's going to help you.  If

2  you -- you want me to call immigration on you?  I'll help you

3  that way.  You'll get a free ticket home.  You know who I

4  know.  You know what I know.

5  **Q.**  That last part, the "you know who I know."

6  **A.**  Um-hmm.

7  **Q.**  Were there other occasions that you heard the defendant

8  make similar statements?

9  **A.**  Yeah.  All the time.

10  **Q.**  How often?

11  **A.**  The -- it's kind of asking how often do you get paid from

12  Joe.  It's -- on a weekly basis almost, I'd say.

13  **Q.**  And is this something you heard on a weekly basis him say

14  to workers?

15  **A.**  Yeah.

16  **Q.**  Okay.  Before you started talking about some checks that

17  you witnessed the defendant pick up.  And I stopped you before

18  we got into all of them.  I want to go into that now.

19       What other checks did you see the defendant pick up?

20  **A.**  He picked up checks from a guy named Steve in Burlingame.

21  He picked up checks from -- place in San Francisco.  He picked

22  up checks from a company that this lady Robin worked for that

23  he was doing construction work on their -- I don't know if --

24  I guess it'd be like condos or commercial buildings.

25  **Q.**  Let me stop you there and -- and break that down.  The

1  first one you mentioned, picking up a check from a person

2  named Steve in Burlingame.

3     How do you know that he picked up that check?

4  **A.**  Because he told me he was picking up the check.  And then

5  he was going to go to the bank and cash it and we were all

6  going to get paid.

7  **Q.**  When -- when did that happen?

8  **A.**  Like, a day of the week?  It was on --

9  **Q.**  Give us the best sense that you have of when that happened

10  even if it's in reference to another event.

11  **A.**  So at the Burlingame job, we were moving stuff and needed

12  dumpsters and stuff.  And we were getting gravel delivered and

13  doing concrete work.  And I proceeded to call Joe and say,

14  hey, you know, we need to get these dumpsters out.  We need

15  more money.  We need to get the dumpsters and the gravel.

16     He said okay.  I'm on my way.  I'm going to -- Felipe's

17  going to take me, and then I'm going to get a check from Steve

18  'cause Steve's going to China.  And it was -- that was on a

19  Wednesday afternoon.

20  **Q.**  Is that a check that you saw?

21  **A.**  Yes.

22  **Q.**  And how much was the check for?

23  **A.**  26,000.

24  **Q.**  Was there an occasion -- were there any occasions in which

25  you saw him pick up larger checks than that?

1   **A.**  I think there was one time he picked up a check from -- it

2   was at the Greyhound station.  It was, like, a hundred and --

3   like, a $150,000.  That was for, like, Silver Towers.

4   **Q.**  Okay.

5       At some point, did you learn about a -- you just

6   mentioned -- at some point, did you learn about a job in

7   San Jose that the defendant was going to work on?

8   **A.**  Yes.

9   **Q.**  And what job was that?

10  **A.**  Silver Towers.

11  **Q.**  And how did you learn about that job?

12  **A.**  There was a guy named Jack that was from the Marriott job

13  that was at Joe's shop, and they were talking about he had

14  left the Marriott company and Joe --

15          **MR. DOVE:**  Objection.  It's hearsay as to this other

16  person Jack.

17          **THE COURT:**  Let's establish who was present during

18  this conversation to address the objection.

19          **MR. NARAYAN:**  Yes, Your Honor.

20  **Q.**  You were beginning to describe a conversation.  Before we

21  get into the contents of the conversation, can you tell us who

22  was there.

23  **A.**  We were at the -- so you want me to tell you, like, where

24  we're at the Dunn -- okay.  We're at the Dunn shop --

25          **THE COURT:**  No, no.  We're asking -- he's asking

1    you -- so you're about to talk about a conversation.  We just

2    want to know -- if anybody who saw *Hamilton* -- who was in the

3    room --

4                **THE WITNESS:**  Okay.

5                **THE COURT:**   -- for the conversation.

6                **THE WITNESS:**  Yeah, we were at the Dunn shop on the

7    back side.  And it was myself, Big Jack, Joe, Little Jack,

8    Felipe, Bonbon, and another person.

9    **BY MR. NARAYAN:**

10   **Q.**  Let me ask follow-up questions about Big Jack and Little

11   Jack.

12        Do you know their full names?

13   **A.**  No.  Like I said before, we all have nicknames for

14   everybody.

15   **Q.**  Do you know if there's a relation between Big Jack and

16   Little Jack?

17   **A.**  Yeah, they're -- they're father/son.

18   **Q.**  What did Big Jack and Little Jack look like?

19   **A.**  Big burly guy with a beard, like a logger.

20   **Q.**  That's Big Jack?

21   **A.**  That's Big Jack.  Little jack's a smaller version with a

22   beard and red hair.

23   **Q.**  This came up in -- you brought this up in response to a

24   question about the job in San Jose.

25        Can you tell us what, if anything, the defendant said

1    during that conversation about the job in San Jose.

2    **A.**  They were talking about how Jack had started for the --

3    the construction company.  Joe was in the process of doing the

4    bidding to get the water removal.  And he was trying to get a

5    brick laying -- or stone mason job.

6    **Q.**  And what did the defendant say about -- about that job?

7    **A.**  That the -- to get a contract, all you needed was one

8    union mason, but he had to be, like, higher up on the -- the

9    masonry scale.  And then as long as that, he could train the

10   guys and they wouldn't have to be union.

11   **Q.**  Were Big Jack and Little Jack there for this conversation?

12   **A.**  I believe Big Jack was.  I think Little Jack had gone to

13   go get something to eat.

14   **Q.**  This San Jose job --

15   **A.**  Silver Tower.

16   **Q.**  You said -- can you say that into the microphone?

17   **A.**  Silver Towers.

18   **Q.**  The Silver Towers job, do you know when in time that job

19   took place?

20   **A.**  As far as which part?  As far as them doing --

21                    (Simultaneous colloquy.)

22         **THE WITNESS:**  -- the grinding of the concrete, or as

23   far as the brick-laying job?

24   **BY MR. NARAYAN:**

25   **Q.**  To the extent that you can, walk us through month, year,

 1    or even season when those things took place.

 2    A.   Worse guy about --

 3              MR. DOVE:  Narrative --

 4                    (Simultaneous colloquy.)

 5              THE COURT:  All right.  Then you need lead him a

 6    little bit then so we don't have a narrative.

 7         Ask leading questions as long as they're reasonable.

 8              MR. NARAYAN:  Yes, Your Honor.

 9              THE COURT:  Just --

10              THE WITNESS:  I'm not good with months and years

11    so --

12              THE COURT:  Okay.  Well, we'll try to --

13         Go ahead.

14    BY MR. NARAYAN:

15    Q.   Did that job take place in -- in early 2017?

16    A.   Yes.

17    Q.   So would this conversation that you just described for

18    us -- would that have taken place in about early 2017?

19    A.   I'd say about the summertime if I -- the season, yeah.

20    Q.   Now, sir, at some point in 2017 around the time of this

21    conversation, did you learn that the federal government was

22    investigating Mr. Torres?

23    A.   Hmm, no.

24    Q.   Did -- did you end up having meetings with agents from

25    Homeland Security?

1  **A.**  Yes.

2  **Q.**  And was that at about this time?  In 2017?

3  **A.**  Of when they were doing the contract and all that stuff

4  for the Silver towers?  No.

5  **Q.**  I'll ask -- I'll ask a better question.

6  I'm asking about the -- the timing of when you started to

7  have meetings with agents with Homeland Security.

8  Did that take place in 2017?

9  **A.**  Yes.

10  **Q.**  Do you recall about when in 2017 those meetings took

11  place -- these meetings took place?  And it's okay if you

12  don't.

13  **A.**  It was after my brother got arrested for -- in front of

14  Joe's shop.

15  **Q.**  And when would that have been?

16  **A.**  It was right around his son's birthday, so it would be the

17  first -- like, July.

18  **Q.**  Around that time, did you have multiple meetings with

19  agents with Homeland Security?

20  **A.**  Yes.

21  **Q.**  When those meetings took place, was work ongoing on this

22  Silvery (sic) Towers job that you mentioned?

23  **A.**  Yes.

24  **Q.**  And did you agree to become a source of information for

25  Homeland Security and provide information?

BODINE - DIRECT / NARAYAN

1  **A.**  Yes.

2  **Q.**  And over the course of those meetings, were you asked

3  questions about what you knew about what -- Mr. Torres?

4  **A.**  Yes.  Yes.

5  **Q.**  Did you ultimately receive payment from Homeland Security

6  for being a source of information at that time?

7  **A.**  Yeah.  To cover my brother's lawyer.

8  **Q.**  How much did you receive from Homeland Security?

9  **A.**  Thousand dollars.

10  **Q.**  Do you remember about when that was?

11  **A.**  It was -- think it was a little bit before Christmastime.

12  **Q.**  I want to follow up on an aspect of the conversation you

13  recounted for us with Big Jack, Little Jack, and the Silvery

14  Towers incident.  You said that the defendant made reference

15  to a -- a union worker.

16  Did you have other conversations with the defendant about

17  the need to hire union workers?

18          **MR. DOVE:**  Objection, relevance.

19          **THE WITNESS:**  Yes.

20          **MR. DOVE:**  -- Your Honor.

21          **THE COURT:**  Overruled.

22          **THE WITNESS:**  Yes.

23  BY MR. NARAYAN:

24  **Q.**  Did you have conversations with the defendant about what

25  types of workers he would hire?

 1   **A.**  Well, you only needed one union worker to get the

 2   contract, so then basically any random person could be trained

 3   to do the --

 4           **MR. DOVE:**  Speculation, Your Honor.

 5           **THE COURT:**  Overruled.

 6      Let's just confine your answer to what Mr. -- the person

 7   you know as Joe told you.

 8      Did he tell you these things?

 9           **THE WITNESS:**  He told me that as long as you have one

10   union worker, then you can have any random person be a laborer

11   and assist the union guy and you can still get the contract.

12           **THE COURT:**  Overruled.

13   BY MR. NARAYAN:

14   **Q.**  Around that time, did you have a conversation with the

15   defendant about where he intended to get his other workers?

16      "Yes" or "no."

17   **A.**  Yes.

18   **Q.**  When -- when did that conversation take place?

19   **A.**  It was during the water removal but before the stone mason

20   started.  It was -- It was a overcast season, so it was

21   probably like wintertime-ish.

22   **Q.**  And where did that conversation take place?

23   **A.**  At the Dunn Road shop.

24   **Q.**  Who was there for that conversation that you remember?

25   **A.**  Yes, Bonbon, Joe, Moses, Felipe, couple other guys.

1  **Q.**  Moses, do you know if he has any relation to the

2  defendant?

3  **A.**  That's his brother.

4  **Q.**  What did the defendant say during this conversation?

5  **A.**  It was -- we were talking about placing the ads on the

6  newspaper to get a -- a union stone mason.

7  **Q.**  If anything, what else did he say?

8  **A.**  That we needed to place ads on Craig's List and stuff like

9  that to get workers, because he's going to need at least 20 to

10  30 guys to do brick laying, cutting the bricks, stacking the

11  bricks, and making mortar, and doing rebar.

12  **Q.**  Did you assist with drafting the advertisement?

13  **A.**  I assisted in the second draft 'cause the first one looked

14  like a two-year-old wrote it.

15  **Q.**  What --

16  **A.**  Basically it was an ad that --

17  Can I talk or no?  'Cause you're getting all panicky.

18  **THE COURT:**  Wait for the next question.

19  BY MR. NARAYAN:

20  **Q.**  In the course of you providing assistance with this

21  newspaper advertisement, what did the defendant say to you

22  about the newspaper advertisement?

23  **A.**  Showed me something that he had written up.  Like I said

24  before, it looked like a two-year-old wrote it, so I rewrote

25  the ad for him that sounded professional and that could

1   actually have people apply for a job instead of thinking it

2   was a Craig's List scam.

3   **Q.**  Did he say where he wanted to recruit workers from?

4   **A.**  From Mexico.  I mean -- but that's an ongoing thing since

5   I first met Joe when I had my --

6   **Q.**  Let me stop you there.

7           **THE COURT:**  Yeah, wait for the next question, please.

8   **BY MR. NARAYAN:**

9   **Q.**  Let's focus on -- on this conversation.  What did he say

10  that you recall about workers from Mexico?

11  **A.**  That you could get three workers for the price of one guy

12  from the U.S.

13  **Q.**  Was there a -- another occasion in which he -- the

14  defendant asked for your assistance in transporting workers?

15  **A.**  Yes.  He asked me if I'd have my brother and mother --

16  **Q.**  Let's -- Let me ask you a few more foundational questions.

17  All right?

18      The conversation you were about to tell us about, when did

19  that take place?

20  **A.**  It was in the beginning -- beginning of Silver Towers

21  water removal, and when it actually transpired of being

22  actually done was when he got the contract for the stone mason

23  job.

24  **Q.**  Was that the stone mason job at --

25  **A.**  Silver Towers.

1    **Q.**   -- Silver Towers.

2          And who was there during this conversation?

3    **A.**   It was myself, Joe, Moses, my brother, Felipe, and Bonbon.

4    **Q.**   Where did that conversation take place?

5    **A.**   Dunn Road, the far back building that Joe was making his,

6    like, little office thing for a while.

7    **Q.**   For the record, what's your brother's name?

8    **A.**   Jonathan Bodine.

9    **Q.**   What did the -- what did defendant say during this

10   conversation?

11   **A.**   That I need to go pick people up from Mexico and bring

12   them here, San Diego.  So basically, you'd run up there, pick

13   them up, and bring them back.  But I need you to rent a car

14   to -- that way your -- it's a different car every time.

15   **Q.**   Did you agree to do that?

16   **A.**   My brother did, yes.

17                    (Pause in the proceedings.)

18          **MR. NARAYAN:**  No further questions, Your Honor.

19          **THE COURT:**  All right.  If it's okay with you,

20   Mr. Dove, we're a few minutes before adjourning, and I want to

21   instruct the jury, so it would be -- is it acceptable to begin

22   your cross-examination tomorrow?

23          **MR. DOVE:**  Yes, Your Honor.

24          **THE COURT:**  Very well.  Thank you.

25          You may step down and you're required to be back here

1    tomorrow before 8:00 o'clock.  All right?

2        Thank you, sir.

3            (Witness leaves the witness stand.)

4              (Pause in the proceedings.)

5                *     *     *     *     *

6

7              **CERTIFICATE OF REPORTER**

8

9        I certify that the foregoing is a correct *excerpt(s)*

10   from the record of proceedings in the above-entitled matter.

11

12   _____

13       Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14            Saturday, March 9, 2019

15

16

17

18

19

20

21

22

23

24

25