UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ORIGINAL

Before The Honorable JEFFREY S. WHITE, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 3** |
| | ) | |
| vs. | ) | NO. CR 17-00462 JSW |
| | ) | |
| JOB TORRES HERNANDEZ, | ) | **Pages 376 - 524** |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Tuesday, March 5, 2019 |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          David L. Anderson, Esq.
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  JONATHAN U. LEE,
                        RAVI T. NARAYAN,
                        Assistant United States Attorneys

For Defendant:          Law Offices of Austin R. Dove
                        555 W. 5th Street, 35th Floor
                        Los Angeles, California  90017
                   BY:  AUSTIN R. DOVE, ATTORNEY AT LAW

                        Law Offices of Brian H. Getz
                        888 Kearny Street, Suite 850
                        San Francisco, California  94108
                   BY:  BRIAN H. GETZ, ATTORNEY AT LAW

Reported By:            Raynee H. Mercado
                        CSR. No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

I N D E X

| GOVERNMENT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| Lopez Contreras, Arnoldo | | |
| Direct Examination by Mr. Narayan | 390 | 3 |
| Cross-Examination by Mr. Dove | 426 | 3 |
| | | |
| Bodine, Robert | | |
| Direct Examination by Mr. Narayan | 474 | 3 |

E X H I B I T S

| TRIAL EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 15, pages 44, 45, 46 | | | 411 | 3 |

--oOo--

```
 1    Tuesday, March 5, 2019                          7:51 a.m.
 2                    P R O C E E D I N G S
 3        (The following proceedings were heard out of the presence
 4    of the jury:)
 5            THE CLERK:  Calling case No. CR-17-462, United States
 6    versus Job Torres Hernandez.
 7        Counsel, please step to the podiums, state your
 8    appearances.
 9            MR. LEE:  Good morning, Your Honor.  Jonathan Lee
10    appearing for the United States.
11            THE COURT:  Good morning.
12            MR. LEE:  Along with Ravi Narayan.  I apologize.
13            THE COURT:  That's fine.
14            MR. DOVE:  Good morning, Your Honor.  Austin Dove on
15    behalf of Job Torres Hernandez.
16            THE COURT:  I understand that the government has a
17    matter it wishes to bring before the court.
18            MR. LEE:  Yes, Your Honor.  We raised with the
19    defense that in cross-examination of the first witness today,
20    another victim witness, if the defense is going to pursue some
21    of those same lines of questioning as yesterday suggesting
22    that there's a motive or some sort of fabrication of testimony
23    going on, we intended to elicit prior consistent statements
24    under Rule 801.
25        And my understanding from discussion -- discussing with
```

1    Mr. Dove is that he does not object to that principle.  He has

2    questions about whether it would actually come to pass that

3    there would be a prior consistent statement, which, of course,

4    is a fair point.

5            THE COURT:  All right.  And just so that we're all on

6    the same -- literally and figuratively on the same page, we're

7    talking about Federal Rule Evidence 801(d)(1)(B), which

8    says --

9            MR. LEE:  Correct.

10           THE COURT:  -- which defines a prior statement of a

11   witness as not hearsay if it's consistent with the declarant's

12   testimony and is offered to rebut an express or implied charge

13   against the declarant of recent fabrication or improper

14   influence or motive.

15       So what's your position on what the government's talking

16   about?

17           MR. DOVE:  My position is it would be limited in

18   scope to rebutting something of the same nature or in the same

19   subject matter, so that if a witness were to talk about

20   something extraneous and I would -- you know, I could rebut

21   something extraneous, with whatever.  But if they were talking

22   about the color -- for example, the car going through the

23   light --

24           THE COURT:  Slow down.

25           MR. DOVE:  Yes.  So if a witness testifies that the

1   light was green and then he later on testifies to some other

2   person, the police officer, the light was red, then I could --

3   there could be a rebuttal with a prior consistent statement in

4   that.

5       But if it's something external to that -- in other words,

6   if I just generally discredit him, the prior consistent

7   statement would have to be something not generally -- that I

8   didn't -- let me try this another way --

9          **THE COURT:**  No, I understand.

10         **MR. DOVE:**  Yes.  It has to be something I took on,

11  not --

12         **THE COURT:**  Yeah, so the hypothetic would be -- and I

13  think Mr. Dove is exactly right.  Let's say -- I'll just --

14  putting it more in the context of this case, but then using

15  Mr. Dove's analogy, let's say, you know, the defendant gets up

16  and says, I'm -- not the defendant -- sorry -- the witness

17  gets up and says the light was red, and Mr. Dove brings out

18  that, you know, they were granted some sort of immunity or

19  special immigration status and -- with an implicit idea that

20  he's doing it therefore as a quid pro quo or to please the

21  government.

22      If that -- in the same hypothetical, that witness had said

23  before -- and an offer was made -- exactly what the witness

24  says today, i.e., that the light is red, then you would be

25  able to bring out that the witness said before the alleged

1    inducement to change testimony that the light was red.

2        What Mr. Dove is saying, that doesn't open the door to

3    anything the person said that bolsters, you know, his or her

4    testimony today.  It has to be confined to the area of the

5    inconsistency.

6        Do you agree with that proposition?

7            **MR. LEE:**  I agree when we're talking about the -- the

8    point of inconsistency, but the rule also explains, as the

9    court pointed out, that if there's a charge either express or

10   implied of some improper influence or motive -- and so any

11   time -- if Mr. Dove in his cross-examination suggests that

12   this witness is trying to help the government and is saying

13   things that have never been said before, the door is open on

14   those kinds of statements in cross-examination.

15           **THE COURT:**  Well, things that have never been said

16   before -- so now you're kind of expanding but not changing the

17   principle of my hypothetical, where if Mr. Dove says, wait a

18   minute.  You're saying now -- I'll just make it up.  I don't

19   know what the --

20       Let's say -- let's say that the witness says now, the

21   defendant beat me up, 'cause that was brought up yesterday.

22   And he's never said that before, you know -- or -- no, strike

23   that.  He says beaten up and, you know, and Mr. Dove --

24   Mr. Dove says, well, you never said that before.  You only

25   made that up or said that after the government granted you

1    whatever they granted you.

2        If the witness had said, Mr. -- the defendant had beaten

3    me up before that inducement was made, then I think under the

4    principle of this rule, it comes out.

5        But you can't simply say -- I don't think this rule goes

6    far enough, and I would have problems under *Crawford vs.*

7    *Washington* if you said, well, once Mr. Dove or Mr. Getz

8    impeaches a witness, you have the right to bring up every

9    statement he made in the past before the inducement whether or

10   not there was a suggestion of a particular type of

11   confrontational impeachment.  I don't agree with that.

12        **MR. LEE:**  And that's not our position.  That's not

13   our intention.

14        What we heard yesterday was a line of attack that

15   suggested that witnesses were shaping their testimony in a way

16   to help the government.  However that's presented, by

17   direction or implication, if there's a prior statement that

18   this witness has made that's consistent with the testimony

19   that was given here that Mr. Dove is addressing in that line

20   of cross-examination, then we feel it's within the scope and

21   can be used under 801 --

22        **THE COURT:**  I don't agree with that at all.  I think

23   it's only if -- if Mr. Dove generally impeaches a witness, you

24   know, just goes to through all the bias and then, you know, in

25   the classic, you know, paradigm for impeachment, confirm,

```
 1    confront and -- confirm, credit, and confront, if the -- if
 2    the confront piece relates to a particular subject matter --
 3    and Mr. Dove was very -- you know, yesterday did say, wait a
 4    minute, did you remember say, blah, blah, blah before?  And
 5    the witness -- I think he said -- doesn't matter what he said.
 6    But if that question is asked, you know, about "X" before,
 7    then I think that opens the door to the prior consistent
 8    statement on "X."
 9         But you can't go in just -- if what you said was correct,
10    Mr. Lee, then it means any time a witness is impeached, any
11    prior -- which happens in every case that I've tried where
12    there's a government witness, especially a cooperator or
13    somebody who's been --
14         MR. LEE:  I'm -- I don't think I'm expressing myself
15    very well, because I don't think I -- that we disagree with
16    the court's observations at all.  It's -- the suggestion -- it
17    may come about, it may not, we'll have to see what happens in
18    the cross-examination.  But if the implication is directed at
19    this witness's testimony that we're hearing something today
20    that -- that was never said before there was any perceived
21    benefit given --
22         THE COURT:  I agree.  Then if he did, in fact, say
23    that before, before the alleged event that induced the
24    witness, then I think that statement is fair game for a prior
25    consistent statement.
```

1    I assume you agree with that.

2        **MR. DOVE:**  Yes.  But provided I would probably never

3    say something as broad as -- you know, opening up the entire

4    universe of statements that were said.

5        I would narrow it to the specific facts that I'm referring

6    to whether it was --

7        **THE COURT:**  Which is what you -- excuse me.  Which is

8    what you did yesterday.

9        **MR. DOVE:**  Yes.

10       **THE COURT:**  So I think maybe the devil's in the

11   details.

12       Now, one question I have for you, and we're not -- the

13   good news is we want to, shall we say, reinforce good behavior

14   'cause the jury's been here, all of them, for about the last

15   10 or 15 minutes so I want to get started on time.

16       But the question -- do you intend to bring in collateral

17   evidence of the prior statement?  Or just simply elicit on,

18   say, redirect the alleged prior consistent statement?

19       **MR. LEE:**  We have both forms of evidence for what

20   I'm -- what we have in mind.  We have --

21       **THE COURT:**  If -- well, Let me say this.  If, as, and

22   when -- we're not there yet -- that would be another witness.

23   If the government wishes at some point to bring in collateral

24   evidence of -- collateral proof of the prior statement, i.e.,

25   you know, an agent saying, you know, the witness told me blah,

1   blah, blah before we offered him a special visa, I'd want to

2   hear more argument to see what the defense's position is about

3   whether collateral evidence -- collateral proof of a prior

4   consistent statement, you know, comes in, 'cause I don't --

5   what I don't want to do is -- I also have 403 obligations as

6   far as not opening up mini-trials on every one of these

7   witnesses 'cause we'll never get done, and we're -- we're

8   dealing with a lot of time.

9       So -- so I don't want to start creating issues where none

10  exists, but keep in mind that it's possible that I may in my

11  discretion depending upon how well you bring out the prior

12  consistent statement that I allow, if I do, to bring in

13  collateral -- you know, evidence of it.

14      For example, if you on redirect, say, ask the witness --

15  and I'd allow you to lead, didn't you tell the agents this

16  beforehand and the witness says yes, I think that's the end of

17  the story.  And -- but if the witness doesn't remember or not

18  says, you know, no, then -- then maybe I allow it.

19      So I don't want to get into that now, but I just want to

20  frame the issue, you know, for later.

21          **MR. LEE:**  Yes, Your Honor.

22          **THE COURT:**  But anything else from the government?

23          **MR. LEE:**  No, Your Honor.

24          **THE COURT:**  Mr. Dove?

25          **MR. DOVE:**  No, sir.

1          **THE COURT:**  Okay.  What I plan on doing unless

2    there's -- I think there's no objection -- is the same

3    interpreter here that was here yesterday that we had the

4    discussion about the phone?

5          **MR. NARAYAN:**  Yes, Your Honor.  She's here.

6          **THE COURT:**  All right.  So I'm going to tell the jury

7    why she has her phone, what she's doing with it so that they

8    don't feel like I've made some -- like she's texting or, you

9    know, friends or something like that.  And I found it

10   distracting.  I noticed it.  And in light of this court's kind

11   of draconian statements about electronics in the courtroom, I

12   don't want them to think that somehow she's privileged or

13   she's not interested in what's going on, so I'm going to do

14   that.

15      Do you have any objection to that?

16          **MR. NARAYAN:**  No.  No objection.

17          **THE COURT:**  All right.  'Cause I have to say, it's

18   unusual in the court's experience.  For example, the official

19   court reporter (sic) doesn't use her phone, and I've never

20   seen that before in 16 -- almost 17 years.  So I'm not saying

21   it's wrong or right.  I'm just saying it's unusual.

22      Do you have any objection to that Mr. Dove?

23          **MR. DOVE:**  No, Your Honor.

24          **THE COURT:**  All right.

25          **MR. NARAYAN:**  May I inquire on one point?

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1              THE COURT:  Yeah.  Fast because I want to move
 2    forward.
 3              MR. NARAYAN:  Yes.  And that's just that we have with
 4    our case agent been using text message as a way to make sure
 5    that the next witness is timely outside of the courtroom with
 6    other agents who are transporting the witnesses.
 7              THE COURT:  That's fine.
 8              MR. NARAYAN:  Is that okay from counsel table?
 9              THE COURT:  As long as the phone is silenced, 'cause,
10    you know, we all know when a phone goes off or even when
11    somebody walks in the courtroom, but we can't -- that's
12    constitutional everybody's head turns, so that's fine.
13         And I'm glad you raised that 'cause I don't really want
14    there to be any gap in time between the time we finish one
15    witness and the next one gets on because if we add those up --
16    I understand, you know, you want to keep them separate and
17    wherever, but they need to be on -- you know, I think that
18    methodology's a good one, so I actually applaud that.
19              MR. NARAYAN:  Yes, Your Honor.
20              THE COURT:  And you can do the same thing if you're
21    in the same situation, Mr. Dove.
22         All right.  Let's bring in the jury, please.  Thank you.
23              THE CLERK:  Excuse me, Your Honor.  Whoever's phone
24    just binged, please silence it.
25              THE COURT:  I heard it, too.  Somebody's message just
```

```
1     dinged.  Just turn it off.  It's safe.  I don't even bring my

2     phone into the courtroom here for that reason.

3         Okay.  Let's bring them in.  Thank you.

4             THE CLERK:  All rise for the jury.

5         (The following proceedings were heard in the presence of

6     the jury:)

7             THE COURT:  Please be seated.

8         Good morning, ladies and gentlemen.

9             JURORS:  Good morning.

10            THE COURT:  Thank you very much for your punctuality.

11        I wanted to bring one thing to your attention that I

12    noticed and you may have noticed it as well, that -- you know,

13    we have basically two interpreters working at the same time

14    when we have -- in the trial.  So when we have a

15    Spanish-speaking witness, we have an interpreter who

16    interprets for the court, and then we have another interpreter

17    who interprets for everybody else, including the defendant in

18    the courtroom.

19        And I noticed when the witness was testifying that the

20    interpreter was sitting right next to him, had her phone in

21    front of her and she was looking at it.  And I wanted to let

22    you know that she's not super woman who can text her

23    significant other or play video games while doing the very

24    difficult job of interpreting.  It's actually a glossary that

25    she's able to access online so that she gets the -- the
```

interpretation perfect, especially if there are idioms or

things of that nature.

    So you might see that, and, you know, I have a very strict

rule about prohibiting phones in the courtroom or making sure

that they're turned off completely so as not to distract the

dignity of the proceedings.  And -- but she gets an exception

because that's part of her job and it's just to help in the

interpretation.  So I wanted you to know that.

    And let's have the government call their next witness,

please.

        **MR. NARAYAN:**  Yes Your Honor.  The government calls

Arnoldo Lopez Contreras.

        **THE COURT:**  All right.

                (Pause in the proceedings.)

        **THE COURT:**  Please come forward, sir.

        **THE CLERK:**  Raise your right hand, please.

                    <u>**ARNOLDO LOPEZ CONTRERAS**</u>,

called as a witness for the PLAINTIFF, having been duly sworn,

testified as follows:

        **THE CLERK:**  Thank you.  Please be seated and state

and spell your full name for the record.

        **THE WITNESS:**  (Through the interpreter) Arnoldo Lopez

Contreras, A-r-n-a -- A-r-n-o-l-d-o.  Lopez, L-o-p-e-z,

Contreras, C-o-n-t-r-e-r-a-s.

        **THE CLERK:**  Thank you.

```
 1          THE COURT:  (Speaking Spanish.)

 2          THE WITNESS:  (Speaking Spanish.)

 3                     DIRECT EXAMINATION

 4   BY MR. NARAYAN:

 5   Q.  Good morning, sir.

 6   A.  Good morning.

 7   Q.  I want to start by just giving the jury an opportunity to

 8   get to know you a little bit.

 9        How old are you, sir?

10   A.  (Through the interpreter) Forty-five.

11   Q.  Where were you born?

12   A.  (Through the interpreter) I was born in the city of

13   Navojoa, Sonora, Mexico.

14   Q.  Is that also where you grew up?

15   A.  (Through the interpreter) Yes.

16   Q.  Where do you live now?

17   A.  (Through the interpreter) I live in the city of

18   Pleasanton.

19   Q.  Here in Northern California?

20   A.  (Through the interpreter) Yes.

21   Q.  Sir, are you married?

22   A.  (Through the interpreter) I'm divorced.

23   Q.  And do you have any children?

24   A.  (Through the interpreter) Two daughters.

25   Q.  How old are your children?
```

1    **A.**   (Through the interpreter) The oldest is 15, and the

2    youngest is 8.

3    **Q.**   Are your children here with you in the United States?

4    **A.**   (Through the interpreter) No, they're with their mother in

5    Tijuana.

6    **Q.**   You said that you now live in Pleasanton, California.

7    What is your occupation?

8    **A.**   (Through the interpreter) I'm a construction worker.

9    **Q.**   You've told us that you were born in Mexico but that

10   you're now working in the United States.

11        Do you have a legal work permit that permits you to now

12   work in the United States?

13   **A.**   (Through the interpreter) Yes.

14   **Q.**   And is that because you are given a work permit by

15   Homeland Security in connection with your status as a victim

16   in this case?

17   **A.**   (Through the interpreter) That's right.

18   **Q.**   I want to back up now and talk about how we got to that

19   point.

20        You said you were born in Mexico but that you now live in

21   the United States.  When did you come to the United States?

22   **A.**   (Through the interpreter) I crossed over the 25th of July

23   of 2015.

24   **Q.**   Did you come to the United States in response to a job

25   opportunity?

1   **A.**   (Through the interpreter) That's right.

2   **Q.**   Was the job opportunity to work in the United States?

3   **A.**   (Through the interpreter) Yes.

4   **Q.**   How did you learn about the job opportunity?

5   **A.**   (Through the interpreter) A newspaper ad.

6   **Q.**   Would you recognize that newspaper ad if I showed it to

7   you?

8   **A.**   (Through the interpreter) Absolutely, yes.

9          **MR. NARAYAN:**   Your Honor, permission to publish

10   Exhibit 14, which has already been admitted.

11          **THE COURT:**   Granted.

12                    (Exhibit published.)

13   **BY MR. NARAYAN:**

14   **Q.**   Sir, do you recognize Exhibit 14, which just came on the

15   screen in front of you?

16   **A.**   (Through the interpreter) Yes.

17   **Q.**   How do you recognize Exhibit 14?

18   **A.**   (Through the interpreter) I underlined the telephone

19   number on this ad.  And in my newspaper over there, I put a

20   little face on the right side.

21   **Q.**   What newspaper did you see this ad in?

22   **A.**   (Through the interpreter) The newspaper is *Frontera*.

23   **Q.**   Is that a newspaper in Mexico?

24   **A.**   (Through the interpreter) Yes.

25   **Q.**   And if you know, where in Mexico is that newspaper

1   published?

2   **A.**   (Through the interpreter) Yes.

3   **Q.**   Where in Mexico is that newspaper published?

4   **A.**   (Through the interpreter) It's published in the city of

5   Tijuana, the state of Baja, California.

6   **Q.**   At the time that you saw this advertisement, were you

7   living in Tijuana?

8   **A.**   (Through the interpreter) Yes.

9   **Q.**   Were you living in a particular neighborhood in Tijuana?

10  **A.**   (Through the interpreter) I lived in a complex called the

11  Virreyes.  That's its name.

12  **Q.**   You said that you underlined the number in the job

13  advertisement.

14      Did you call the number?

15  **A.**   (Through the interpreter) Yes.

16  **Q.**   And I don't want to get into the contents of that phone

17  conversation, but did you ultimately accept a job as a result

18  of this advertisement?

19  **A.**   (Through the interpreter) Yes.

20  **Q.**   And did you agree to come to the United States to work?

21  **A.**   (Through the interpreter) That's right.

22  **Q.**   In what city did you cross the border?

23  **A.**   (Through the interpreter) The city of San Ysidro.

24  **Q.**   What documents did you present in order to be able to

25  cross the border?

1   **A.**   (Through the interpreter) A tourist visa.

2   **Q.**   Did that tourist visa permit you to visit the United

3   States but not to work in the United States?

4           **MR. DOVE:**   Well, that's leading.  Excuse me, Your

5   Honor.  Objection, leading.

6           **THE COURT:**   I will overrule the objection.  I would

7   give a little bit more leeway.  The objection is well taken,

8   but I think when we're dealing -- under the circumstances,

9   I'll give the government a little bit more leeway.  And if I

10  feel like it's getting out of hand, you know, you continue to

11  object and I will at the appropriate time sustain the

12  objection.  Thank you.

13      So I'll overrule that objection for now.

14      And, ladies and gentlemen, what "leading" means is when

15  you are questioning your witness as Mr. -- this person is the

16  government's witness, you're supposed to ask open-ended

17  questions, who, what, when, where, why and how, like a

18  journalist.

19      When you're cross-examining, you want the witness to give

20  the specific answer you want and you're entitled to do that so

21  you ask a leading question starting with a pronoun or a noun.

22  "You did this."  "The dog has fleas, doesn't it?"  As opposed

23  to, "what does the dog have?"  So that's the difference

24  between leading and not leading.  And that's what we're

25  referring to here.

1      Proceed.  Sorry.

2  **BY MR. NARAYAN:**

3  **Q.**  Just -- Just so we're clear for the record, you said that

4  you came across on a tourist visa; is that right?

5  **A.**  (Through the interpreter) That's right.

6  **Q.**  When you crossed the border at San Ysidro, did you

7  eventually make your way further north into the United States?

8  **A.**  (Through the interpreter) That's right.

9  **Q.**  And where in the United States did you travel to?

10  **A.**  (Through the interpreter) Up to the city of Hayward.

11  **Q.**  How did you get to Hayward?

12  **A.**  (Through the interpreter) Transport that was made

13  available by the person who was contracting my work at that

14  time.

15  **Q.**  And is that the person that you talked with on the phone?

16  **A.**  (Through the interpreter) The person with whom I spoke on

17  the phone wasn't the one who drove the car but an employee of

18  his.

19          **MR. DOVE:**  May I object, Your Honor, on --

20          **THE COURT:**  Sustained.  Lack of foundation.

21          **THE INTERPRETER:**  If the interpreter could correct.

22  Not "car" but "vehicle."

23          **MR. DOVE:**  All right.  Move to strike the response.

24          **THE COURT:**  Motion's granted, and the jury will

25  disregard the last answer.

1    BY MR. NARAYAN:

2    Q.   Who drove the car that transported you to Hayward?

3    A.   (Through the interpreter) His last name is Ruiz and that

4    person is an employee of the person who contracted with me.

5             MR. DOVE:   Objection, Your Honor, on the same basis.

6             THE COURT:   I'll sustain the objection and tell the

7    jury disregard the last answer.

8         You need lay a foundation as to -- if you can as to how

9    the witness knows the status of this driver.

10            MR. NARAYAN:   I'll just move on to the next subject

11   area, Your Honor.

12            THE COURT:   Very well.   Thank you very much.

13   BY MR. NARAYAN:

14   Q.   Did you eventually arrive in Hayward, California?

15   A.   (Through the interpreter) That's right.

16   Q.   Do you remember what time of day or night you arrived in

17   Hayward?

18   A.   (Through the interpreter) About 9:30, we were arriving at

19   the residence.

20   Q.   9:30?

21            THE INTERPRETER:   "The address."

22            THE WITNESS:   (Through the interpreter) Of the night.

23   BY MR. NARAYAN:

24   Q.   Where in Hayward did you arrive?

25   A.   (Through the interpreter) We arrived at an

```
1   establishment --

2           THE INTERPRETER:  May the interpreter clarify, Your

3   Honor?

4           THE COURT:  Yes.

5      (Discussion between the interpreter and the witness in

6   Spanish.)

7           THE WITNESS:  (Through the interpreter) We arrived at

8   a place where there was work going on with foam.

9   BY MR. NARAYAN:

10  Q.  Do you remember what street that was on?

11  A.  (Through the interpreter) Dune (phonetic).  Dune?

12      Would you like me to spell it?

13  Q.  Yes, please.

14  A.  (Through the interpreter) D-u-n-n.

15  Q.  After you arrived in Hayward, did there come a point that

16  you met someone named Job Torres Hernandez?

17  A.  (Through the interpreter) I met him the next day.

18  Q.  Do you remember when the next day you met him?

19  A.  (Through the interpreter) Sunday.  In the morning.

20  Q.  So the morning after you arrived.

21  A.  (Through the interpreter) I'm sorry.  I'd like to correct

22  what I said.

23      I did meet him the same day that I arrived at night.  But

24  we didn't talk at all.  I just saw him.  It was the next day

25  that I spoke with him.
```

1    **Q.**  Do you see the person you met here in the courtroom today?

2    **A.**  (Through the interpreter) Yes, I do.

3    **Q.**  Could you describe him by where he is and what he's

4    wearing?

5    **A.**  (Through the interpreter) He's sitting next to the man

6    with glasses.  He has a blue shirt, sweatshirt.  Just

7    underneath that big screen that is over there.

8          **MR. NARAYAN:**  Your Honor, may the record reflect that

9    the witness has identified the defendant?

10         **THE COURT:**  Yes, it will so reflect.

11   BY MR. NARAYAN:

12   **Q.**  You've told us that you met the defendant briefly the

13   night you arrived but that you spoke with him more extensively

14   the next day.

15   **A.**  (Through the interpreter) That's right.

16   **Q.**  When he spoke with you the next day, was it just you and

17   him, or were there more people there?

18   **A.**  (Through the interpreter) With others who were there.

19   **Q.**  If you remember, approximately how many other people were

20   there?

21   **A.**  (Through the interpreter) There were the people who had

22   been transported that -- the day with me, that day with me,

23   about 10 or 12 people.

24   **Q.**  Let me ask you since you brought it up, how many people

25   were with you in the car when you were transported to Hayward,

1    California?

2    **A.**   (Through the interpreter) There were eight -- we were

3    eight people.  I'm sorry.  I don't know if it was eight or

4    nine people.  We were in a Ford Explorer.

5    **Q.**   I want to get back now to the conversation we're about to

6    discuss.

7        You said that there -- that you had a -- that you had a

8    conversation with Mr. Torres and that there were about 10 to

9    12 people there.

10        Where did the conversation take place?

11    **A.**   (Through the interpreter) There was a short meeting that

12    we had at the place where -- outside the place where we had

13    come to -- where we had slept.

14    **Q.**   And where had you slept that first night?

15    **A.**   (Through the interpreter) We slept on the floor.  I slept

16    on the floor where -- where he has a -- equipment where he

17    cuts foam.  And that night, I slept on the floor.

18    **Q.**   Can you describe now what the defendant said during that

19    conversation with you and the other 10 to 12 people.

20    **A.**   (Through the interpreter) Well, more than anything, it was

21    a motivational meeting.  That you're going to make a lot of

22    money here.  You're going to have no problems.  And words

23    like, you know, make an effort.

24    **Q.**   Did he describe what type of work you would be doing?

25    **A.**   (Through the interpreter) Well, really, he never told us

1    specifically what the work was going to be.  He'd simply send

2    us to work.

3    **Q.**  What, if anything, did he say about how much you would be

4    paid for the work?

5    **A.**  (Through the interpreter) He had promised us $10 an hour.

6    **Q.**  What, if anything, did he say about where you would be

7    staying or sleeping?

8    **A.**  (Through the interpreter) Well, he promised he was going

9    to fix up a space for us, that he would fix up a kitchen, that

10   the bathrooms were going to have water, and that everything

11   was going to be just fine.  So we could all be fine there.

12   **Q.**  I intend this as a -- as a "yes" or "no" question.

13       Did you have a conversation with the defendant about your

14   immigration paperwork?

15   **A.**  (Through the interpreter) Well, yes.  But it wasn't me

16   specifically --

17              **THE COURT:**  Okay.  Just a moment.  Okay.  I'll take

18   care of it.

19       I want to explain to you, sir, that the way we work in

20   this court is even though you have information that you would

21   like to tell us, you should only answer the questions that are

22   asked by the lawyers.  So when the prosecutor just asked you a

23   question and said he wanted a "yes" or "no" answer, you should

24   only answer "yes" or "no."  And then if he wants to get more

25   information from you, he'll ask you to, you know, give more

 1    information, and then you answer that.

 2        So try to listen carefully to what is being asked and

 3    answer only the question that's being asked.

 4        Do you understand, sir?

 5            **THE WITNESS:**  (In English) Okay.

 6        (Through the interpreter) Okay.

 7            **THE COURT:**  And that's different than normal speech

 8    in real life.  This is not real life.  This is court.  It's

 9    different.

10        (Speaking Spanish.)

11            **THE WITNESS:**  (Through the interpreter) I understand.

12    Thank you.

13            **THE COURT:**  (Speaking Spanish.)

14    **BY MR. NARAYAN:**

15    **Q.**  Did you ever have a conversation with the defendant about

16    your immigration paperwork?

17    **A.**  (Through the interpreter) Yes.

18            **THE COURT:**  (Speaking Spanish.)

19        That's exactly the way I told you to do it.  Thank you.

20    **BY MR. NARAYAN:**

21    **Q.**  Approximately when did that conversation take place?

22    **A.**  (Through the interpreter) Well, it was immediately the

23    next day after we arrived.

24    **Q.**  Please describe what the defendant said during that

25    conversation.

1    **A.**  (Through the interpreter) Well, he talked about how here,

2    it was a sanctuary city; that in San Francisco, we weren't

3    going to be chased; weren't going to have any problems with

4    the police.  We -- and for greater security, he said that we

5    should give our visas to his father.  That was something that

6    I didn't really agree with, but I did do it.

7    **Q.**  Does that mean that you -- Just to clarify for the record

8    that you did give your tourist visa to the defendant's father?

9    **A.**  (Through the interpreter) Yes.

10   **Q.**  I want to talk now about the work that you did.

11       How soon after arriving did you start doing work?

12   **A.**  (Through the interpreter) The next day after arriving.

13   Sunday.

14   **Q.**  And you told us that -- I believe you said this was July

15   25th of 2015?

16   **A.**  (Through the interpreter) The 25th of July.  I arrived on

17   a Saturday.  And the next day, Sunday, we left the place where

18   we had slept.  We went directly to Home Depot to get clothes

19   and tools to be able to work.  And by noon, we'd already gone

20   to San Francisco to work.

21   **Q.**  Can you describe the job site in San Francisco?

22   **A.**  (Through the interpreter) Okay.  It was a hotel being

23   remodeled.  Its name is Marriott.  On Post Street.  I don't

24   remember the number, but it was on Post.  And that's where the

25   remodeling was taking place, painting, moving furniture,

1   taking out furniture, and all kinds of finishing things.

2   Q.  What work specifically did you do on that Marriott Hotel?

3   A.  (Through the interpreter) When it all -- in all of the --

4   in all of the places, I was -- I was installing equipment.  I

5   was sanding.  I was painting.  That was mostly what was done

6   there.  Just painting and painting and painting.

7                  (Pause in the proceedings.)

8   BY MR. NARAYAN:

9   Q.  For approximately how many days or weeks did you continue

10  to work on this Marriott Hotel?

11  A.  (Through the interpreter) Sometime between the 9th and the

12  15th of September.  Those were the last days that I worked.

13  Q.  So the time period we're discussing based on your prior

14  testimony is about July 25th of 2015 through about September

15  15th of 2015?

16  A.  (Through the interpreter) That's right.

17  Q.  During that time period, was that the only job site you

18  worked on?

19  A.  (Through the interpreter) No.

20  Q.  What other job sites did you work on?

21  A.  (Through the interpreter) There was another job site on

22  Dolores Street in San Francisco.  And we also worked painting

23  and repairing walls.

24  Q.  How did you get to and from the job sites?

25  A.  (Through the interpreter) We were driven in vehicles to

1    the Post site in the morning.  And for the other job sites, we

2    made arrangements with a person who was in charge of the job.

3    Sometimes we went -- we took BART.  And other times, we were

4    given a ride.

5    **Q.**  Approximately how many hours per day did you work during

6    this time period?

7    **A.**  (Through the interpreter) We started every day at 6:00

8    a.m.  And we were never done before 6:00 p.m.  It was

9    typically until 8:00 or 9:00 p.m.

10   **Q.**  When it got to 8:00 or 9:00 p.m., how would you get back

11   to where you were sleeping?

12   **A.**  (Through the interpreter) There were two shifts.  And the

13   second shift arrived approximately at 6:00 p.m.  And when they

14   dropped off the daytime people, then they would return with

15   the -- with the group, in the evening group.

16   **Q.**  Were there ever occasions were you worked on both shifts?

17   **A.**  (Through the interpreter) Yes.

18   **Q.**  How often did that happen?

19   **A.**  (Through the interpreter) It happened one time that I was

20   sent to the night shift.

21   **Q.**  What's the longest period of time that you worked non-stop

22   during this -- Let's just leave it at that.

23       What's the longest period of time you worked non-stop?

24   **A.**  (Through the interpreter) Since we first came, the idea

25   was to work as many hours as we could and then collect --

1    accumulate as much money as possible so we could return to

2    Mexico.

3        And very often, at least once a week, I had a double

4    shift -- double shift and -- and during the time that I worked

5    with him, I recall two occasions in which I had a double shift

6    and I worked, like, 48 hours.  And when we finished a job,

7    that was the last week, I worked from Thursday p.m. until

8    Monday morning, and that's when we were done with the job.

9    Q.  I want to talk about that last period of time towards the

10   end when you said you worked from Thursday to Monday.

11       During that period of time, were you ever taken back to

12   the shop to sleep?

13   A.  (Through the interpreter) On the last job that I was

14   telling you about in which I worked from Thursday till Monday,

15   I would enter in one of the rooms in the hotel and I would

16   sleep maybe an hour or two hours.

17   Q.  Why did you work that long of a period of time?

18   A.  (Through the interpreter) That's a good question.  I -- by

19   that point -- by that point, I was dis- -- very disappointed,

20   and I didn't believe the words and things that he said and his

21   promises.

22       But even so, I still had hope, and I kept accumulating

23   work hours.

24   Q.  During this entire time you were working on the Marriott

25   job, were you living at that shop on Dunn Road that you

1  mentioned before?

2  **A.**  (Through the interpreter) That's right.

3          **MR. NARAYAN:**  Your Honor, permission to publish page

4  11 of Exhibit 15, which has already been admitted.

5          **THE COURT:**  Granted.

6                  (Exhibit published.)

7  BY MR. NARAYAN:

8  **Q.**  Do you recognize the photo that just came up on the

9  screen, sir?

10  **A.**  (Through the interpreter) Yes.  I do.

11  **Q.**  How do you recognize it?

12  **A.**  (Through the interpreter) Because I'm a professional

13  electrician, and I can see the transformers, and I see the

14  live post and so right there, the machines also -- oh, and

15  here is the -- you can see the machines that -- for the foam.

16  **Q.**  Does this photo depict the building where you slept at

17  night?

18  **A.**  (Through the interpreter) It is depicted, but it's way in

19  the back on the left side.  And it looks very clean.

20  **Q.**  Before we go to photos from -- from inside, I want to ask

21  you some general foundational questions about your living

22  situation.

23      Can you describe from what you remember where inside the

24  warehouse that you slept.

25  **A.**  (Through the interpreter) I slept in the attic.

1          **THE INTERPRETER:**  The interpreter's going to ask for

2     a repetition.

3          (Discussion between the interpreter and the witness in

4     Spanish.)

5          **THE WITNESS:**  (Through the interpreter) I slept

6     above -- just above where his employees worked with the foam

7     material and with concrete.

8     BY MR. NARAYAN:

9     **Q.**  How many other people were sleeping in that area?

10    **A.**  (Through the interpreter) Approximately 25 or 30 people.

11         **MR. NARAYAN:**  Permission to publish page 75, which

12    has already been admitted.

13         **THE COURT:**  Yes.  Granted.

14                    (Exhibit published.)

15    BY MR. NARAYAN:

16    **Q.**  Sir, does this depict a view of the attic where you slept?

17    **A.**  (Through the interpreter) Part of it.

18         **MR. NARAYAN:**  Let's go to page 62, which again has

19    already been admitted.

20                    (Exhibit published.)

21    BY MR. NARAYAN:

22    **Q.**  Does this also depict the attic?

23    **A.**  (Through the interpreter) It's very clean, but it is.

24    **Q.**  How do you remember this attic appearing when you lived in

25    the warehouse?

1   **A.**  (Through the interpreter) It was a garbage dump.  It was

2   filled with supplies, dust.

3   **Q.**  Were there sleeping arrangements or mattresses or anything

4   like that?

5   **A.**  (Through the interpreter) He provided us with a mattress.

6   That's it.

7   **Q.**  How -- you mentioned that there were up to 25 people

8   sleeping up in this area.  Does that mean that there were a

9   number of mattresses up here?

10  **A.**  (Through the interpreter) Yes.

11  **Q.**  Were there also people living in other areas of the

12  warehouse?

13  **A.**  (Through the interpreter) Yes.

14  **Q.**  What other areas of the warehouse do you recall seeing

15  people sleeping?

16  **A.**  (Through the interpreter) In the previous photograph, you

17  can see at the -- in the back of the picture, you can see,

18  like, a trailer, like, a motor home.  There were, like --

19  there were 12 people living in that area -- in that small

20  room.  You can see a small room.

21  **Q.**  I'm going to stop you so we can go to that photograph and

22  just make some record on that.

23       Page 75, please.

24  **A.**  (Through the interpreter) Okay.

25                         (Exhibit published.)

1  BY MR. NARAYAN:

2  Q.  Is this the photograph you were referencing?

3  A.  (Through the interpreter) No, I was talking about the

4  entire property at the very beginning.

5  Q.  I see.  I see.

6      Let's go to page 11.

7                    (Exhibit published.)

8          THE WITNESS:  (Through the interpreter) You can see a

9  room in the back.  In that room, people were sleeping on bunk

10 beds.  And before, in that room in the same building in which

11 I was living, there was a -- a -- something separating, like a

12 division, something parting it.  And then there was also a

13 whole bunch of people there.  And I don't remember how many of

14 them.  Think it was 16 people, I think.  And as a matter of

15 fact, just below my area, there were more -- there were 4

16 people.

17 BY MR. NARAYAN:

18 Q.  Based on what you saw and what you just described,

19 approximately how many people were sleeping in the warehouse

20 at the time you lived there?

21 A.  (Through the interpreter) If you're talking about the

22 entire warehouse, the entire property --

23     (Witness speaking Spanish.)

24         MR. DOVE:  Objection.  That's nonresponsive, I

25 believe.

1          **THE COURT:**  Yes.  Excuse me.

2      Ask another question, please.

3  **BY MR. NARAYAN:**

4  **Q.**  Based on what you remember, how many people total were

5  living on the property we've been looking at?

6  **A.**  (Through the interpreter) Okay.  I am sure there were over

7  50 people.

8  **Q.**  When you were staying at this warehouse, did you have

9  access to bathroom facilities?

10 **A.**  (Through the interpreter) No, he didn't denied (sic)

11 access to the bathroom.

12 **Q.**  How many different bathrooms did you have access to?

13 **A.**  (Through the interpreter) Only one for everybody.

14 **Q.**  When you first arrived, was there a different bathroom

15 that you attempted to use?

16 **A.**  (Through the interpreter) I used another bathroom, but I

17 didn't know it was not allowed.

18          **MR. NARAYAN:**  Permission to approach, Your Honor,

19 with three new exhibits.

20      For the record, this would be Exhibit 15, page 44, 45, 46.

21          **THE COURT:**  All right.  And opposing counsel has seen

22 it?

23          **MR. NARAYAN:**  Yes, Your Honor.  These were premarked,

24 but I can give a courtesy copy right now.

25          **THE COURT:**  Yes.

1          **THE CLERK:**  Counsel, did you say 15 or 50?

2          **MR. NARAYAN:**  One five.

3          **THE CLERK:**  Thank you.

4                  (Off-the-record discussion.)

5          **THE COURT:**  All right.  Proceed.

6    **BY MR. NARAYAN:**

7    **Q.**  (Handing documents.)

8        Sir, I've handed you three photographs.  If you could

9    please silently review those photographs.

10   **A.**  (Reviewing documents).

11   **Q.**  Sir, do those photographs depict the bathroom that you

12   said you attempted to use at first?

13   **A.**  (Through the interpreter) Yes.

14   **Q.**  From your recollection of having lived at the warehouse,

15   do those photos fairly and accurately depict that bathroom?

16   **A.**  (Through the interpreter) Yes.

17          **MR. NARAYAN:**  The government offers pages 44, 45, and

18   46 of Exhibit 15.

19          **THE COURT:**  Any objection?

20          **MR. DOVE:**  No, Your Honor.

21          **THE COURT:**  Admitted.

22       (Trial Exhibit 15, pages 44, 45, 46 received in evidence)

23          **MR. NARAYAN:**  Permission to publish page 45.

24          **THE COURT:**  Granted.

25                  (Exhibit published.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   BY MR. NARAYAN:

2   **Q.**  Sir, is this the bathroom you attempted to use at first?

3   **A.**  (Through the interpreter) Use first?  Yes.

4   **Q.**  Were you able to use the shower, use the toilet facility?

5   **A.**  (Through the interpreter) I just used the -- the toilet

6   because it was clean.

7           **MR. NARAYAN:**  Let's go to page 46.

8                   (Pause in the proceedings.)

9           **MR. NARAYAN:**  Permission to publish page 46.

10          **THE COURT:**  Granted.

11                  (Exhibit published.)

12  BY MR. NARAYAN:

13  **Q.**  Is that the same bathroom, sir?

14  **A.**  (Through the interpreter) Yes.

15          **MR. NARAYAN:**  And permission to publish page 44,

16  which has been admitted.

17          **THE COURT:**  Granted.

18                  (Exhibit published.)

19  BY MR. NARAYAN:

20  **Q.**  Is that the front door of that bathroom?

21  **A.**  (Through the interpreter) Yes.

22  **Q.**  Could you read aloud that sign in Spanish?

23  **A.**  (Through the interpreter) "Please do not use this

24  bathroom."

25  **Q.**  Do you recall that sign appearing at some point while you

1    lived at the warehouse?

2    **A.**  (Through the interpreter) No.  They posted it after I used

3    it.

4              **MR. NARAYAN:**  Permission to publish page 52, which

5    has already been admitted of exhibit.

6              **THE COURT:**  Granted.

7                   (Exhibit published.)

8    BY MR. NARAYAN:

9    **Q.**  Is this the bathroom that you then used from that point

10   forward?

11   **A.**  (Through the interpreter) Yes.

12   **Q.**  Are you aware of any other bathrooms that the workers who

13   lived at the warehouse had access to?

14   **A.**  (Through the interpreter) There were three bathrooms in

15   the property.

16   **Q.**  Was this the only one that you had access to?

17   **A.**  (Through the interpreter) Only this one.

18   **Q.**  Based on your experiences, how many people approximately

19   shared this bathroom?

20   **A.**  (Through the interpreter) The total number of employees

21   except Jorge and the family of Mr. Torres, except for those

22   two people, everybody else had to use this bathroom.

23   **Q.**  From what you recall, was there running water in this

24   bathroom?

25   **A.**  (Through the interpreter) As long as I was there, there

1    was no running water.

2    **Q.**  Did you use buckets to get the toilet and shower to work?

3    **A.**  (Through the interpreter) That's right.

4              **MR. NARAYAN:**  We can take that photo off the screen.

5    **Q.**  Sir, did you have access to laundry facilities?

6    **A.**  (Through the interpreter) No.

7    **Q.**  How did you wash your clothes?

8    **A.**  (Through the interpreter) My -- my friends took it to the

9    laundromat, but I never washed any clothes the whole time I

10   was there.

11   **Q.**  Earlier, you told us, sir, that Mr. Torres told you he

12   would pay ten dollars an hour; is that right?

13   **A.**  (Through the interpreter) That's right.

14   **Q.**  When was the first time after you arrived that you

15   received the money?

16   **A.**  (Through the interpreter) Honestly, I don't remember the

17   first time he paid me because the first time he gave me money,

18   that's when he gave me some money -- he had promised to give

19   me some money as soon as I arrived, which he didn't.

20   **Q.**  Was there a time at which -- the defendant did give you

21   some money?

22   **A.**  (Through the interpreter) The Sunday after the first day I

23   arrived, he gave me a hundred dollars.

24   **Q.**  What did you do with that $100?

25   **A.**  (Through the interpreter) We paid for our work tools,

1    safety equipment, the -- safety glasses, helmets, hard hats,

2    sheets, blanket, pillow.

3    **Q.**  You told us that you worked on the Marriott job from about

4    July 25th of 2015, to September 15th, 2015.

5        How many times during that period did you receive payment

6    from the defendant?

7    **A.**  (Speaking Spanish.)

8           **MR. DOVE:**  Objection, Your Honor.  Non-responsive.

9           **THE WITNESS:**  (Speaking Spanish.)

10          **THE COURT:**  Just a moment.

11       What's your objection?

12          **MR. DOVE:**  Object.  It's non-responsive.  It called

13    for, I believe, a singular number description.

14          **THE COURT:**  Overruled.

15       You may answer.

16          **THE WITNESS:**  (Through the interpreter) I arrived

17    here with the expectation that he was going to give me $800,

18    because that's what he said, so that I could solve some

19    problems at home.  And I received the first hundred dollars

20    the Sunday after I arrived.  And four days later, I got

21    hundred dollars more.  And two weeks later, I think I got

22    400 -- $500.  And that was cash.  And then later on, I

23    received a check.

24    **BY MR. NARAYAN:**

25    **Q.**  From the defendant?

1    **A.**   (Through the interpreter) That's right.

2              **THE COURT:**   Let's take a brief stretch break.

3    Anybody want to stand?

4         You can stand stretch your legs if you if you'd like, sir.

5                    (Pause in the proceedings.)

6              **THE COURT:**   All right.   Please be seated when you get

7    a chance.

8         We'll be taking our first break of the morning, ladies and

9    gentlemen, between 9:30 and 9:45, be taking a 15-minute break.

10        Proceed.

11   **BY MR. NARAYAN:**

12   **Q.**   You had mentioned a check that you received from the

13   defendant.

14        Do you remember approximately what amount that was in?

15   **A.**   (Through the interpreter) About $800, I think.

16   **Q.**   During the period of time you worked for him, how much

17   total money do you recall receiving from the defendant?

18   **A.**   (Through the interpreter) After that check of -- for $800,

19   there was another one for $1,300, and I don't remember any

20   other check.

21   **Q.**   So just so we understand, it's the two initial payments of

22   a hundred dollars cash, and then a check for about $800 and a

23   check for about $1300; is that correct?

24             **MR. DOVE:**   Misstates the testimony, Your Honor.

25             **THE COURT:**   Yeah, please don't repeat the testimony.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

LOPEZ CONTRERAS - DIRECT / NARAYAN

1        Go on the something new, please.

2        **MR. NARAYAN:**  Yes, Your Honor.

3   **Q.**  During this period of time, did you have enough money to

4   buy food for yourself?

5   **A.**  (Through the interpreter) I was always hungry.

6   **Q.**  Did the defendant or anybody else provide you with food?

7   **A.**  (Through the interpreter) Amongst ourselves, we would --

8   we would feed each other.  Sometimes one of us would have

9   money and the others wouldn't.

10  **Q.**  Were there periods of time that you went without food?

11  **A.**  (Through the interpreter) That is true.

12  **Q.**  What's the longest period of time that you recall going

13  without food?

14  **A.**  (Through the interpreter) Saturday, Sunday, Monday, not

15  until Tuesday morning.

16  **Q.**  What happened on Tuesday morning?

17  **A.**  (Through the interpreter) Tuesday in the morning, I

18  couldn't even get up to work.  I was very tired.

19       **THE INTERPRETER:**  May the interpreter clarify, Your

20  Honor?

21       **THE COURT:**  Yes.

22       **THE INTERPRETER:**  If the interpreter could correct

23  for the record, "I was too weak.  I was very weak."

24       **THE WITNESS:**  (Through the interpreter) After that,

25  he arrived.  He kicked my mattress, and he said --

 1              THE INTERPRETER:  May the interpreter clarify a term?

 2              THE COURT:  Yes.

 3              THE WITNESS:  (Through the interpreter) he said, come

 4    on tigers, come on tigers, let's go work.  I said I can't.  I

 5    haven't eaten for three days.

 6         He said, you're going to eat right now.  Come on tiger,

 7    let's go work.  He took me in his car to -- to join up with

 8    other works -- other teams, work teams in a gas station.  And

 9    he bought me some food there.  A coffee.  And a noffie

10    (phonetic) or -- it -- a -- a piece of bread, a bun.  That's

11    all I ate after three days.

12         And that's how I went to work.

13    BY MR. NARAYAN:

14    Q.  When you were recounting that, you said "he."  Who were

15    you talking about?

16    A.  (Through the interpreter) Job Torres.

17    Q.  During that drive to the gas station and then the job

18    site, did the defendant say anything to you?

19    A.  (Through the interpreter) We -- we were talking.  I was

20    asking him, didn't he feel anything to have us there in the

21    conditions in which he had us.  He answered that he'd been

22    through worst problems, that it was going to make us men so we

23    would learn and this and the other.  And I just was quiet.  I

24    just couldn't anymore.

25         But in that period of time --

```
 1        (Speaking Spanish.)
 2            MR. DOVE:  Objection, this is a narrative and
 3   non-responsive at this point.
 4            THE COURT:  Sustained.  Just ask another question,
 5   please.
 6   BY MR. NARAYAN:
 7   Q.  Was there anything else he said in that car ride?
 8   A.  (Through the interpreter) Yes.  He did tell me more.
 9   Q.  Please tell us but limit it to what he said in that car
10   ride.
11   A.  (Through the interpreter) In the car.  Okay.
12        I asked him why he had left on Saturday when he had
13   promised not to leave without leaving me any money for food
14   because I begged him for it on Monday.  Sorry.  On Saturday,
15   said I didn't have any money to eat, to please leave me some
16   money to eat.
17        The man left.  He said he left because he was going to
18   miss a flight.  He went to Las Vegas to spend his birthday
19   with another couple of friends.  He told me that he had gone
20   on a FD16 plane.  And on the road, he talked about his trip to
21   Las Vegas and his friend from the Army, and I just was quiet.
22   I was very angry, very upset.
23   Q.  Before you talked to us about some long shifts that you
24   worked at the -- at the Marriott.  I want to ask a clarifying
25   question about that.
```

1    **A.**   (Through the interpreter) Yes.

2    **Q.**   We talked about how many hours you worked, but how many

3    days per week did you work during that period?

4    **A.**   (Through the interpreter) I worked every day of the week

5    from Monday to Sunday.  From 6:00 in the morning to 8:00 or

6    9:00 at night.

7    **Q.**   Sir, do you recall a time when you were working at the

8    Marriott that the police came?

9    **A.**   (Through the interpreter) Yes.

10   **Q.**   Were you at the job site when the police came?

11   **A.**   (Through the interpreter) Yes.

12   **Q.**   After the police came, were you able to return to the

13   warehouse to keep sleeping at the warehouse?

14   **A.**   (Through the interpreter) No.

15   **Q.**   After the police came to the hotel, where did you go to

16   sleep?

17   **A.**   (Through the interpreter) Under a bridge here in Hayward.

18   **Q.**   Were you eventually taken to a hotel?

19   **A.**   (Through the interpreter) Yes.

20   **Q.**   Do you remember where the hotel was or what it was called?

21   **A.**   (Through the interpreter) Fairmont hotel -- by Foothill --

22   I think in San Leandro.  San Leandro.  I think that's what it

23   was, San Leandro.

24   **Q.**   How many nights did you stay that the hotel?

25   **A.**   (Through the interpreter) Just two or three.  No more.  No

LOPEZ CONTRERAS - DIRECT / NARAYAN

1    more.

2    **Q.**  How many others of your coworkers were there with you at

3    the hotel?

4    **A.**  (Through the interpreter) There were six people in a room

5    with two beds.  And in the room next door, there were eight

6    people in a room with two beds.  And there was another room

7    where there were six people in a room for two people -- two

8    beds.

9              **THE INTERPRETER:**  Sorry.

10             **THE WITNESS:**  (Through the interpreter) That was on

11   the day that I arrived.  Afterwards, some either people came.

12   **BY MR. NARAYAN:**

13   **Q.**  Did the defendant come to visit you at the hotel?

14   **A.**  (Through the interpreter) The day we registered, he was

15   there.

16   **Q.**  Do you remember having a conversation with him?

17        Just "yes" or "no" with response to that question.

18   **A.**  (In English) Yes.  Yes.

19        (Through the interpreter) Yes.  Yes.

20   **Q.**  Was that a conversation just between you and him, or did

21   it involve other people?

22   **A.**  (Through the interpreter) All people in the hotel, we were

23   all meeting with him.

24   **Q.**  Did he address that whole group?

25   **A.**  (Through the interpreter) Yes, that's right.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    Q.  Please tell us what he said.

2    A.  (Through the interpreter) Well, he told us that they were

3    blaming him for -- for some trafficking crime and that he

4    wasn't guilty.

5            THE INTERPRETER:  Could the interpreter clarify, Your

6    Honor?

7            THE COURT:  Please.

8        (Discussion between the interpreter and the witness in

9    Spanish.)

10           THE WITNESS:  (Through the interpreter) Traffic.

11           MR. DOVE:  I'm going to object as calling for a legal

12   conclusion, Your Honor.

13           THE COURT:  Overruled.  This is what he claims

14   somebody said.

15           THE INTERPRETER:  The interpreter stands by her

16   interpretation.

17   BY MR. NARAYAN:

18   Q.  Please continue describing what the defendant said.

19   A.  (Through the interpreter) So at that time, he said that

20   they were trying to implicate him in some human trafficking

21   case, crime, and that somebody talking about us had wanted

22   to -- to have some advantage -- benefit from that situation in

23   order to get papers to stay here in the United States.

24       And he continued saying that he had a lot of money and

25   that he wasn't going to let the government take that away from

1    him, that he'd rather go to jail than pay, to not be in jail

2    and to lose the money that he had.  So that was what the --

3    the talk was turned around.  It was a pretty selfish monologue

4    on his part.

5    **Q.**  Did you have any other actions (sic) with the defendant

6    while you were at the hotel?

7            **THE INTERPRETER:**  May the interpreter ask a --

8    clarify "at"?  Can you ask the question again, Counsel?

9    **BY MR. NARAYAN:**

10   **Q.**  Yes.

11       Did you have any other interactions with the defendant

12   while you were at the hotel?

13   **A.**  (Through the interpreter) Not at that time.

14   **Q.**  Was there another action -- interaction with the defendant

15   while you were at the hotel?

16   **A.**  (Through the interpreter) Not on that day.

17   **Q.**  What about the next day?

18   **A.**  (Through the interpreter) The next day, we saw him at the

19   residence in Hayward.

20   **Q.**  And how many people were there during this interaction?

21   **A.**  (Through the interpreter) I'm not sure if I would be able

22   to tell you an exact number.  But it was those of us who had

23   been sleeping that night in the hotel, some others who have

24   American papers who were able to stay at the property.

25   **Q.**  Is that what the --

1          **MR. DOVE:**  I'm going to object.  Foundation,

2     speculation.  No -- and assumes facts not in evidence.

3          **THE COURT:**  Overruled.

4     **BY MR. NARAYAN:**

5     **Q.**  I just want to be clear about your last answer.  Were you

6     describing what the defendant said?

7     **A.**  (Through the interpreter) Could you repeat the last

8     question for me, please.

9     **Q.**  Let's just do it this way.  Could you please describe what

10    the defendant said during that interaction back at the

11    warehouse.

12    **A.**  (Through the interpreter) Okay.

13         The next day when we were in -- in the residence at the

14    place, he was at that point very upset.  And he knew that one

15    of us was speaking with the police about all the steps that

16    were being taken.  And that he was being betrayed.  And that

17    he wasn't going to permit that.  He began threat -- making

18    threats.

19         And in his anger, he looked at me, and I stood before him,

20    and I asked him, "You think it's me?"

21         "I don't know but I'm going to find out."  So it was a

22    very tense moment and --

23                         (Pause in the proceedings.)

24                         (Off-the-record discussion.)

25         **THE COURT:**  Are you okay?

```
 1                        (Pause in the proceedings.)

 2              THE COURT:  Would you like a drink of water, sir?

 3              THE INTERPRETER:  Tissue or something.

 4              THE COURT:  Could you give him a tissue, Madam Clerk.

 5              THE CLERK:  Right behind you.

 6              THE COURT:  Right behind you.

 7         There's no tissue there.

 8              THE WITNESS:  (Through the interpreter) Thank you.

 9              THE COURT:  Would you like some water, sir?

10              THE WITNESS:  (Through the interpreter) I have some

11    water.

12              THE COURT:  All right.  Take a moment to compose

13    yourself.

14         Just let us know when you're ready to continue.

15              THE WITNESS:  (In English) Okay.

16              THE COURT:  Okay?

17         Proceed.

18              MR. NARAYAN:  I don't have any other questions, Your

19    Honor.

20              THE COURT:  Oh.  All right.

21    BY MR. NARAYAN:

22    Q.  I'm sorry.  Were you finished answering the last question?

23    A.  No, sir.

24    Q.  Okay.  Please -- Please continue describing what the

25    defendant said during that conversation.
```

LOPEZ CONTRERAS - CROSS / DOVE

1    **A.**   (Through the interpreter) At that moment when he was

2    saying that, he was quite upset.  He continued by saying that

3    we owed him loyalty.  And he demanded that we be loyal to him

4    because he was our boss.  He was giving us food.  And he kept

5    saying that if we didn't work for him, that we were not going

6    to eat.

7        It's so -- makes one feel so indignant when he continues

8    asking for loyalty when he is treating one so badly.

9            **MR. NARAYAN:**  No further questions, Your Honor.

10           **THE COURT:**  Thank you.

11       You may cross-examine.

12           **MR. DOVE:**   Thank you, Your Honor.

13                     <u>**CROSS-EXAMINATION**</u>

14   **BY MR. DOVE:**

15   **Q.**  Good morning, sir.

16   **A.**  (Through the interpreter) Good morning, sir.

17   **Q.**  Do you need a moment to sort of gather yourself a bit?

18   **A.**  (Through the interpreter) No.  It's okay.  It's okay.

19   Thank you.

20   **Q.**  Now, you first came in contact with this -- you said with

21   this particular location in response to an advertisement,

22   right?  An ad that you saw?

23           **THE INTERPRETER:**  I'm sorry --

24   **BY MR. DOVE:**

25   **Q.**  An advertisement.

1   **A.**   (Through the interpreter) Which location are you talking

2   about?

3   **Q.**   Well, the -- the events that you been describing started

4   with you responding to an ad that you saw in the *Frontera*

5   newspaper.  Agreed?

6   **A.**   (Through the interpreter) Okay.  Okay.

7   **Q.**   Is that "yes" or "no"?

8   **A.**   (In English) "Yes."

9        (Through the interpreter) "Yes."

10  **Q.**   All right.  Now -- and I believe you probably should best

11  answer in Spanish, if you would, for the record.

12       **THE COURT:**   Yes.  Even if you -- even if you

13  understand the question, a little bit of English, wait for the

14  Spanish translation and then respond in Spanish, please.

15  Okay?

16       **THE WITNESS:**   (In English) Okay.

17       **THE COURT:**   Thank you very much.

18       **THE WITNESS:**   (In English) Okay.

19       (Through the interpreter) Okay.  Okay.

20  **BY MR. DOVE:**

21  **Q.**   And you described when you first met -- when you came up,

22  you described the ad as promising -- now, you just -- you saw

23  the ad -- excuse me -- earlier -- which was the Exhibit 14?

24       Remember seeing that ad when you first -- early on in your

25  testimony?

 1          (Discussion between the interpreter and the witness in

 2     Spanish.)

 3          **THE WITNESS:**  (Through the interpreter) It was in the

 4     newspaper.

 5     **BY MR. DOVE:**

 6     **Q.**  Yes.

 7          For the record, I'm -- Counsel's put up Exhibit 14.

 8                         (Exhibit published.)

 9          **THE COURT:**  Exhibit 14, page what?

10          **MR. DOVE:**  It's a singular page.

11          **THE COURT:**  Oh, great.  Thank you.  Thank you.

12          **MR. DOVE:**  Yes.

13     **Q.**  Now, this was the only ad that you saw, correct?

14     **A.**  (Through the interpreter) That's right.

15     **Q.**  Right.

16          Yet -- and the -- the content of the ad essentially says

17     that there's a -- a request or invitation for people to work

18     in the U.S. in the construction area; is that right?

19     **A.**  (Through the interpreter) Yes.

20     **Q.**  Yes.

21          And that further, it says, "with or without experience."

22     But requires that you have visa and a desire to work.

23     **A.**  (Through the interpreter) That's right.

24     **Q.**  Now, that is the only ad that you saw that caused you to

25     respond and call the telephone number that's at the bottom of

LOPEZ CONTRERAS - CROSS / DOVE

1    the ad.  Agreed?

2    **A.**  (Through the interpreter) That's right.  Yes.

3    **Q.**  Yes.

4        But when you -- you do recall, sir -- would you agree or

5    disagree that when you met with an agent in this case from the

6    San Francisco police department, you said that the ad had more

7    than just what we see in front of us, an invitation to work

8    and an opportunity in the construction area?

9        You understand my question?

10   **A.**  (Through the interpreter) I understand your question.

11   **Q.**  All right.  So now when you -- because I want to establish

12   and be clear about something.

13       The only ad that you responded to -- the only ad that

14   you -- caused you to take action was the ad in Exhibit 14 in

15   front of us now.  Agreed?

16   **A.**  (Through the interpreter) That's right.

17   **Q.**  Right.

18       Would you agree or disagree that when you spoke with --

19   that you did at some point in late October of 2015 speak with

20   someone from the San Francisco Police Department?

21   **A.**  (Through the interpreter) Yes.

22   **Q.**  Right.

23       And you were -- one of the first things the person from

24   the police department asked you was what was the content of

25   the ad that you responded to.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    **A.**    Uh-huh.

2         (Through the interpreter) Uh-huh.

3              **THE COURT:**  You should answer "yes" or "no."

4              **THE WITNESS:**  (In English) Yes.  Yes.

5         (Through the interpreter) Yes.  Yes.

6    BY MR. DOVE:

7    **Q.**  Yes.  And your description to the member of the

8    San Francisco Police Department that you spoke to was more

9    detailed and elaborate than what we see in Exhibit 14; is that

10   right?

11   **A.**  (Through the interpreter) Possibly, yes.

12   **Q.**  Yes.

13        Would you agree that you -- you told the police officer

14   that the ad promised a United States work visa.

15             **MR. NARAYAN:**  Objection to improper impeachment.

16             **THE COURT:**  Sustained.

17   BY MR. DOVE:

18   **Q.**  Did you, in addition to the contents of the ad here, tell

19   the San Francisco police officer additional information that

20   wasn't in the ad?

21             **MR. NARAYAN:**  Objection to improper impeachment.

22             **THE COURT:**  Sustained.

23   BY MR. DOVE:

24   **Q.**  When you spoke to the person from the San Francisco

25   police -- Let's go back again.

LOPEZ CONTRERAS - CROSS / DOVE

1        You spoke to someone from San Francisco Police Department

2    in October of 2015; is that right?

3    **A.**   (Through the interpreter) That's right.

4    **Q.**   Right.  And that was after you had gone and spoke to

5    someone from the Office of Labor Standards Enforcement,

6    correct?

7    **A.**   (Through the interpreter) That office, yes.

8    **Q.**   Yes.  And it was someone from the Office of -- "yes" or

9    "no," did someone -- did you get information at your visit to

10   the Office of Labor Standards Enforcement that if you had been

11   threatened, you could get a certain level of authority or

12   permission to remain in the United States?

13   **A.**   (Through the interpreter) Never.

14   **Q.**   Never.  They never said that to you.

15   **A.**   (In English) No.

16        (Through the interpreter) No.

17   **Q.**   All right.  But you did have a conversation with someone

18   from the Office of Labor Standards Enforcement while you were

19   still employed by Mr. Hernandez, agreed?

20   **A.**   (Through the interpreter) That's true.

21   **Q.**   All right.  But that conversation didn't have anything to

22   do with a threat, did it?

23   **A.**   (Through the interpreter) With a threat?

24   **Q.**   Yes.  The conversation that you had with Office of Labor

25   Standard Enforcement sometime during your time working for

1    Mr. Torres Hernandez did not -- did not concern a threat made

2    to you of any kind, agreed?

3    **A.**   (Through the interpreter) I don't remember having said

4    that.

5    **Q.**   Right.

6        You don't -- so just to be clear, going back to the

7    interview that you had while working for Mr. Hernandez with

8    someone from the Office of Labor Standard Enforcement, you

9    don't recall telling that person that you had been threatened

10   by Mr. Hernandez?

11       Is that your testimony?

12   **A.**   (Through the interpreter) The time that I was threatened

13   by Mr. Torres, I had already spoken to the person at the

14   bureau -- of the labor bureau.

15   **Q.**   Yes.

16       So you're saying that you had gone to speak to someone at

17   the labor bureau while employed by Mr. Hernandez -- yes?

18            **MR. NARAYAN:**   Objection, asked and answered.

19            **THE COURT:**   Overruled.

20            **THE WITNESS:**   (Through the interpreter) Yes.

21   **BY MR. DOVE:**

22   **Q.**   All right.  And you had been working for Mr. Hernandez at

23   that point for approximately four and a half weeks, correct?

24   **A.**   (Through the interpreter) Possibly, yes.

25   **Q.**   Yes.  The entire amount of time that you worked for

1    Mr. Hernandez was five and a half weeks, correct?

2    **A.**  (Through the interpreter) Yeah.

3    **Q.**  All right.  And your conversation -- "yes" or "no" -- when

4    you went to Office of Labor Standard -- Office of Labor

5    Standards Enforcement -- we'll call it's OLSE for short.

6            **THE INTERPRETER:**  I'm sorry.  What is the acronym?

7            **MR. DOVE:**  Yes.  OLSE.  Excuse me.

8    **Q.**  Your conversation with OLSE, you agree it's four or four

9    and a half weeks after starting work for Mr. Hernandez?

10            (Translation by the interpreter.)

11            **THE WITNESS:**  (Speaking Spanish.)

12   **BY MR. DOVE:**

13   **Q.**  Yes.  That conversation did not concern any threats made

14   by you -- made to you by Mr. Hernandez; you agree with that?

15   **A.**  (Through the interpreter) No.

16   **Q.**  So you did tell someone about a threat made to you by

17   Mr. Hernandez?

18   **A.**  (Through the interpreter) Afterwards.

19   **Q.**  After.  That's what I'm clarifying, sir.

20       So after you made -- you had an interview with someone

21   from OLSE -- Yes?

22   **A.**  (Through the interpreter) No.

23   **Q.**  So you never had an interview with someone from O --

24   Office of Labor Standard Enforcement.

25   **A.**  (Through the interpreter) If you refer to my being

1    interviewed on my own, then no.  Many of the -- many of us

2    went.

3    **Q.**  Okay, sir.

4        You were among the people who went, correct?

5    **A.**  (Through the interpreter) That's right.

6    **Q.**  Right.

7        And there was an exchange between you and someone at OLSE,

8    correct?

9    **A.**  (Through the interpreter) We exchanged words?

10   **Q.**  Conversation.  Discussion.  Interview.

11   **A.**  (Through the interpreter) Yes.  We went to make a report.

12   **Q.**  Yes.  Right.

13   **A.**  (Through the interpreter) That's what we went for.

14   **Q.**  Yes.

15       Now, we're not talking about what anyone else did now.

16   We're talking about what you did, your interactions with

17   someone at OLSE.

18       You agree or disagree that you -- during this time going

19   with other people to OLSE, you too had a conversation with

20   someone from OLSE?

21   **A.**  (Through the interpreter) Did I speak with them?  Yes.

22   **Q.**  Yes.

23       All right.  In that conversation, your own -- about --

24   agreed about four weeks into your employment with Mr. Torres,

25   correct?

1          (Translation by the interpreter.)

2   **BY MR. DOVE:**

3   **Q.**  You agree with -- We still agree with the time line,

4   right?

5   **A.**  (Through the interpreter) It wasn't at that time.  I went

6   towards the end.  It was in the -- during the last weeks that

7   I went to that -- to that office.

8   **Q.**  But during the last weeks of your employment with

9   Mr. Torres, correct?

10  **A.**  (Through the interpreter) That's right.

11  **Q.**  All right.

12      When you spoke to someone from OLSE, the topic that you

13  spoke about with them was only concerning pay that you felt

14  you hadn't received.

15  **A.**  (Through the interpreter) That's right.

16  **Q.**  Yes.

17      Approximately four, four and a half weeks into your

18  five-and-a-half-week employment, you did not make mention to

19  anyone at OLSE that you had been threatened by Mr. Hernandez.

20  **A.**  (Through the interpreter) No.

21  **Q.**  Yeah.  So you agree with that statement, yes?

22  **A.**  (Through the interpreter) That I didn't say it to anyone

23  from the bureau, that he had -- that I had been threatened?

24  Right.  I didn't speak to anybody.  Because I hadn't received

25  any threat.

1    **Q.**  Right.  All right.

2         So now you basically are about a week before you're

3    leaving your term there that you're speaking to OLSE, correct?

4    **A.**  (Through the interpreter) When we were in the hotel

5    already, the last weeks that I was working, I had already been

6    threatened by Mr. Torres.  And when I --

7              **THE INTERPRETER:**  May the interpreter clarify, Your

8    Honor?

9              **THE COURT:**  Yes.

10        (Discussion between the interpreter and the witness in

11   Spanish.)

12             **THE WITNESS:**  (Through the interpreter) When I spoke

13   about that, it wasn't to those from the -- the labor bureau.

14   When I talked about it, it wasn't with the people at the labor

15   bureau.

16   **BY MR. DOVE:**

17   **Q.**  Right.

18        And you would agree that the labor bureau interview --

19   were you restricted in terms of what you could say?  You were

20   not, agreed?

21   **A.**  (Through the interpreter) Well, I don't know the law.  I

22   don't know what one can say or not.  I simply went to complain

23   about the conditions of our work.

24   **Q.**  Yes, sir.  All right.

25        All right.  And the conditions would include how you were

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    treated by Mr. Torres, right?

2    **A.**   (Through the interpreter) I don't know.  You tell me.  You

3    know the law.

4    **Q.**   You -- you said you were advanced money within two days of

5    starting to work for Mr. Torres, correct?

6    **A.**   (Through the interpreter) That's right.

7    **Q.**   Yes.

8        And the first sum you got was about a hundred dollars just

9    in cash, right?

10   **A.**   (Through the interpreter) That's right.

11   **Q.**   Right.

12       Your understanding about your work rate was going to be

13   about -- about ten bucks an hour, right?

14   **A.**   (Through the interpreter) That's right.

15   **Q.**   Right.

16       And then you said a few -- about four days later --

17   correct me if I'm wrong -- or sometime later, within a few

18   days of that, you received another hundred dollars in cash,

19   yes?

20   **A.**   (Through the interpreter) That's right.

21   **Q.**   Yes.

22       And then within a few days of that, "yes" or "no," you

23   received approximately $500 in cash.  Yes?

24   **A.**   (Through the interpreter) 15 days later.  Not a couple

25   days.

1    **Q.**  All right.

2         And then you also, though, received in that time frame,

3    another payment, another check.  Yes.

4    **A.**  (Through the interpreter) A check.

5    **Q.**  And you said you don't remember the amount of the check,

6    right?

7    **A.**  (Through the interpreter) That's right.

8    **Q.**  Right.  But the check came about -- would you -- if you

9    recall, was it about 30 days or -- it'd be about four weeks

10   into your employment?

11   **A.**  (Through the interpreter) Approximately.

12   **Q.**  Right.

13        And the check that you received was a check that you took

14   to the bank and -- and cashed, yes?

15   **A.**  (Through the interpreter) Yes.

16   **Q.**  Yes.  And that check to was for $1300.  Yes?

17   **A.**  (Through the interpreter) Um-hmm.

18             **THE COURT:**  Is that "yes"?

19   **BY MR. DOVE:**

20   **Q.**  Is that "yes"?

21   **A.**  (In English) Yes.  Yes.

22        (Through the interpreter) Yes.  Yes.

23             **THE COURT:**  Excuse me.  I'm sorry.  Is this an

24   appropriate time we can take our --

25             **MR. DOVE:**  Yes, Your Honor.

1          **THE COURT:**   -- morning break?

2       Thank you very much.

3       Ladies and gentlemen, we're going to take a 15-minute

4    break.  Before we get up, I'm not going to restate the usual

5    admonition about your proper conduct.  Just remember to

6    remember it -- remind you of the usual admonitions about

7    keeping an open mind and not discussing the case or receiving

8    outside information.

9       And we'll see in you 15 minutes.  Thank you for your

10   attention.

11      (Recess taken at 9:39 A.M.; proceedings resumed at 9:56

12   A.M.)

13      (The following proceedings were heard out of the presence

14   of the jury:).

15          **THE CLERK:**  Remain seated, come to order.  Court is

16   again in session.

17          **THE COURT:**  Please bring in the jury.  Have the

18   witness resume the stand.

19      (The following proceedings were heard in the presence of

20   the jury:)

21          **THE COURT:**  Please be seated.

22      You may continue with your examination, Counsel.

23          **MR. DOVE:**  Thank you, Your Honor.

24      May we have Exhibit 14 up, please?

25                       (Exhibit published.)

1               (Pause in the proceedings.)

2    BY MR. DOVE:

3    Q.  Mr. Contreras, good morning again, sir.

4         Now, it was after -- sometime after you had gone to Office

5    of Labor -- Office of Labor Standard Enforcement to talk about

6    not receiving your pay, correct?

7    A.  (Through the interpreter) That's right.

8    Q.  Yeah.  And your testimony, just to remind the jury -- not

9    to be too redundant -- hopefully not -- is that that was about

10   four weeks into your testimony -- into your work time with

11   Mr. Hernandez.  Yes?

12   A.  (Through the interpreter) I think more.

13   Q.  Is it your testimony that you started working at the -- I

14   believe you said around the 25th or 26th of July, 2015?

15   A.  (Through the interpreter) That's right.

16   Q.  Yeah.  So it was you said more than four weeks after

17   July -- July 26th, 2015, that you went to the Office of Labor

18   Standards Enforcement?

19   A.  (Through the interpreter) I don't recall the exact date

20   when I went to -- to the labor office.  I don't have a exact

21   recollection.

22   Q.  I understand, sir.  I'm not asking you for an exact date.

23        I'm asking you for your best approximation, not a guess.

24   A.  (Through the interpreter) Approximately, yes.

25   Q.  Yes.

1     And by that time, to be clear, you had already received --

2  $2,800 in payments from Mr. Torres, including cash and checks?

3  **A.**  (Through the interpreter) No.

4  **Q.**  All right.

5     You agree, though, that you had received -- I won't go one

6  by one, but you'd received 1400 within the first two weeks of

7  your employment, correct?

8  **A.**  No, sir.

9  **Q.**  By the time you -- you started on the 25th, right?  You

10  agree with that, right?

11  **A.**  (Through the interpreter) I arrived on the 25th.

12  **Q.**  Right.  Started working, you said, the next day around the

13  26th.  Yes?

14  **A.**  (Through the interpreter) Yes.

15  **Q.**  All right.

16     Don't want to do this too many times, but I want to just

17  be clear.  You got cash -- you had -- you received cash of

18  about $700 within the first ten days of working.  Correct?

19  **A.**  (Through the interpreter) My first 10 days of work was a

20  hundred -- hundred dollars the next day.  And 4 days later, it

21  was a hundred dollars more.  And about 8 to 10 days later, it

22  was --

23     (Discussion between the interpreter and the witness in

24  Spanish.)

25          **THE WITNESS:**  (Through the interpreter) Excuse me.

1  No.  About 15 days, 2 weeks, it was approximately the $700.

2  **BY MR. DOVE:**

3  **Q.**  Yes.

4     Would it refresh your recollection as to the date that you

5  received the -- the $500 to look at a document?

6  **A.**  (Through the interpreter) Yes, I would remember it because

7  he had us sign, yes.

8  **Q.**  Yes.  All right.

9     May I approach, Your Honor?

10        **THE COURT:**  Yes, you are.  Has the government seen

11  this?

12        **MR. DOVE:**  Yes.

13        **THE COURT:**  All right.  Very well.

14  **BY MR. DOVE:**

15  **Q.**  (Handing document.)

16     Just review the document without commenting.  Don't say

17  anything.  And let us know whether that refreshes your

18  recollection about my question.

19  **A.**  (Reviewing document.)

20     (Through the interpreter) This talks about this $500 that

21  I received.

22  **Q.**  Does this refresh your recollection as to the date that

23  you received the $500?

24  **A.**  (Through the interpreter) If it's written there, yes.

25  **Q.**  Not so much -- I'm not asking you what's written there.

1    I'm asking you whether you recall -- whether this refreshes

2    your recollection as to when you received the $500 in addition

3    to the other 200 you'd already received in cash?

4    **A.**  (Through the interpreter) I want to be very honest with

5    you.  I don't remember, but -- but that's my handwriting.  I

6    wrote that down.  I don't have a photographic memory, but that

7    is my handwriting, and I know my handwriting.

8    **Q.**  Is it your recollection that you received $500 on August

9    6th, 2015?

10   **A.**  (Through the interpreter) I can't remember the exact date

11   at this time.  But if I -- if it's -- my handwriting is on it

12   and you have the date and my signature, it's because it's

13   real.

14       Why do you ask me that question?

15   **Q.**  I'm trying to clarify -- it has to be your testimony, sir.

16   It can't be mine.

17          **THE COURT:**  I think you should move on, Counsel.  I

18   think you've made your point.  He doesn't remember independent

19   of the document.

20          **MR. DOVE:**  All right.

21   **Q.**  As of August 6th, 2015, you continued to work for

22   Mr. Torres, right?

23   **A.**  (Through the interpreter) Yes.

24   **Q.**  Yes.

25       And, sir, you received another payment from Mr. Torres on

1    August 20th, 2015, in a -- in the form of a check on August

2    20 -- August 20th -- I'm sorry -- August 26th, 2015?

3    **A.**  (Through the interpreter) Possibly, yes.  And it would

4    have been the first check I got from him.

5    **Q.**  Yes.  And does that date sound about right, that you got a

6    check and then also cashed a check on August 26th, 2015 in the

7    amount of $1,300?

8    **A.**  (Through the interpreter) How much?

9    **Q.**  $1,300.

10   **A.**  (Through the interpreter) That was the amount for the

11   second check.

12       I -- I recall that check, but in that amount, for the

13   second check, not the first one.

14   **Q.**  Right.

15       What was the amount of the first check you received?

16   **A.**  (Through the interpreter) I have to be honest with you, I

17   don't remember.

18   **Q.**  All right.

19       Do you recall that upon receiving the check on August

20   26th, 2015, that you wrote essentially a confirmation --

21   something regarding that payment in that -- regarding how you

22   had been paid in full?

23   **A.**  (Through the interpreter) What do you mean "confirmation"?

24   **Q.**  I mean, did you -- was it your -- was it something that

25   you did while working for Mr. Torres that you wrote a -- in

1  your own hand, a statement --

2  **A.**  (Through the interpreter) Yes.

3  **Q.**  -- saying that -- that you'd received $1300 from

4  Mr. Torres and that he doesn't owe you anything else to that

5  point?

6  **A.**  (Through the interpreter) I signed a -- a piece of paper

7  with my handwriting.  And I said I received -- Mr. Torres the

8  amount of $1300 -- and I'm trying to be as honest I can.  I

9  don't remember him writing "I don't owe you anything."

10  **Q.**  Do you recall you writing that?

11  **A.**  (Through the interpreter) If I -- if you show me the

12  document, I will recognize my handwriting and I will accept

13  that I signed it.

14      **MR. DOVE:**  May I approach the witness --

15      **THE COURT:**  Of course.  Yes.

16      **MR. DOVE:**  -- for purposes of -- Yes.

17  **Q.**  Showing you a document, sir, that -- tell me if that helps

18  fresh your recollection (handing document).

19      **THE WITNESS:**  (Through the interpreter) it's my

20  handwriting, indeed.  That's right.

21  **BY MR. DOVE:**

22  **Q.**  All right.

23      Does that refresh your recollection about whether you

24  confirmed to Mr. Torres -- confirmed that you had been paid in

25  full up to August 26th, 2015?

1   **A.**   (Through the interpreter) Well, yes.

2   **Q.**   Yes.

3        You continued to work for Mr. Torres after --

4   **A.**   (Through the interpreter) Yes.

5   **Q.**   -- that date.  Yes?

6   **A.**   (Through the interpreter) Yes.

7   **Q.**   Until around September 5th, 2015, when you left employment

8   there altogether.  Yes?

9   **A.**   (Through the interpreter) That's right.  Yes.

10  **Q.**   Yes.  All right.

11       And did you receive a check on September 3rd, 2015, in the

12  amount of $632.59?

13  **A.**   (Through the interpreter) I don't remember the amount, but

14  I believe I did.  Yes, I did.

15  **Q.**   All right.  So you don't remember the amount, or you

16  just --

17  **A.**   (Through the interpreter) I received a check, but I don't

18  remember the amount.  That's all.  And I will say this again

19  to you, if you show me the document that I signed, I will

20  recognize it immediately.

21  **Q.**   This is not a document that you signed.  I'm simply wanted

22  to ask you whether this would refresh your recollection about

23  whether you had received a check on or about September 3rd,

24  2015, in the amount of $632.59?

25  **A.**   (Through the interpreter) The only thing I don't remember

LOPEZ CONTRERAS - CROSS / DOVE

1    is the amount.

2    **Q.**  Would looking at a document possibly refresh -- would

3    looking at a document refresh your recollection as to whether

4    you received that particular amount?

5    **A.**  (Through the interpreter) Yes.

6    **Q.**  All right.

7         May I approach again, Your Honor?

8              **THE COURT:**  Yes.

9    **BY MR. DOVE:**

10   **Q.**  (Handing document.)

11   **A.**  (Reviewing document.)

12        (Through the interpreter) Yes.

13   **Q.**  All right.

14        Sir, does that refresh your recollection?

15   **A.**  (Through the interpreter) That he gave me that check?  And

16   that I signed for it?  Yes.

17   **Q.**  Yes.  And did you, in fact, cash that check or --

18   **A.**  (Through the interpreter) Yes, he took me.  He took me to

19   the bank, and I cashed it.

20   **Q.**  And once more, sir, I want you to wait for the

21   interpreter, if you will.

22   **A.**  (Through the interpreter) I'm sorry.

23              (Pause in the proceedings.)

24              **MR. DOVE:**  All right.

25   **Q.**  Now, when you first came on, there were -- you were never

1    made any promises about -- Well, let me withdraw that.

2        You were -- you arrived at the warehouse and you'd never

3    been there before, right?  In Hayward on Dunn Road?

4    **A.**  (Through the interpreter) I've never been there.

5    **Q.**  Right.  Right.

6        And there were a number -- actually when you first

7    arrived, there were very few people on the day you arrived at

8    the warehouse, correct?

9    **A.**  No, there were very few people.

10   **Q.**  Yes.  I think you mentioned -- is it correct to say about

11   two or three people were there when you first arrived?

12   **A.**  (Through the interpreter) Two or three people?  No.  There

13   were more.

14   **Q.**  Less than ten people, right?

15   **A.**  (Through the interpreter) No.

16   **Q.**  More than ten?

17   **A.**  (In English) Yes.

18       (Through the interpreter) yes.

19            **THE COURT:**  Again, would you wait for the -- just a

20   moment.

21       Would you wait for the interpreter to finish before you

22   answer, please.  Thank you very much.

23            **THE WITNESS:**  (Through the interpreter) Yes.  Excuse

24   me.  Pardon me.

25

LOPEZ CONTRERAS - CROSS / DOVE

1    BY MR. DOVE:

2    Q.  All right.  So fair estimate, 10 to 12 people when the

3    day -- the day that you arrived at the warehouse?

4    A.  (Through the interpreter) I don't agree with that number.

5    Q.  All right.  You're saying more.

6    A.  (Through the interpreter) That's right.

7    Q.  All right.  Fair enough.

8        But one of the first things that you did after the long

9    drive is you decided to get some rest, right?

10   A.  (Through the interpreter) Yes.

11   Q.  Yes.  And you agree that things in the warehouse weren't

12   so set up yet for people to sleep, right?

13   A.  (Through the interpreter) Exactly.

14   Q.  Yes.

15       The next day, though, Mr. Torres gave you about a hundred

16   dollars, right?

17   A.  (Through the interpreter) That's right.

18   Q.  Yes.

19       In addition, Mr. Torres went out and purchased several

20   mattresses.

21   A.  (Through the interpreter) He -- he had already purchased

22   mattresses for the people who were already there.  And then he

23   went out to get some more mattresses.

24   Q.  Yes.

25       And he bought a mattress and you ended up sleeping on one

LOPEZ CONTRERAS - CROSS / DOVE

1    of the mattresses that he brought in, yes?  The second night.

2    **A.**  (Through the interpreter) That's right.

3    **Q.**  Yes.

4         And as for the condition of the bathroom, you were shown

5    pictures earlier today reflecting, you know, a bathroom.

6         Do you recall whether the pictures that you were shown

7    reflect the condition of the bathroom when you were there?

8    **A.**  (Through the interpreter) I was shown two pictures of two

9    bathrooms.

10   **Q.**  Right.

11   **A.**  (Through the interpreter) The first photograph was the --

12   a picture of bathroom to which I was restricted access after

13   using it.  And -- and the second one is the one I was

14   authorized to use.

15        Which one are you talking about?

16   **Q.**  The bathroom that -- Well, let's talk about something in a

17   way that may help clarify this.

18        The bathroom that you did use was used by other workers

19   who were staying at the -- at the warehouse as well, correct?

20   **A.**  (Through the interpreter) That's right.

21   **Q.**  Right.

22        And you pretty much were, is it fair to say, kind of a

23   group of men or just an ad hoc community of people?

24   **A.**  (Through the interpreter) That's right.

25   **Q.**  Yes.  And that within the group, did you guys kind of work

LOPEZ CONTRERAS - CROSS / DOVE

1    out your own timing and rules about who would use the bathroom

2    and when?

3    **A.**   (Through the interpreter) Amongst us, we established some

4    rules.  Some were respected, others were not.  But we ended up

5    not paying attention to the rules.

6    **Q.**   Yes, that you had made among each other.

7    **A.**   (Through the interpreter) Yes, amongst ourselves.

8    **Q.**   Right.

9    **A.**   (Through the interpreter) Yes.

10   **Q.**   Right.

11        And as far as -- did you guys -- the group -- among the

12   group, did anyone assign responsibilities for, let's say,

13   cleaning the bathroom?

14   **A.**   (Through the interpreter) We -- we attempted to establish

15   some order and to get some kind of arrangement -- control, but

16   we ended up doing whatever people wanted.

17   **Q.**   Right.

18        So within the group, there was kind of a little bit of

19   dissension where people just kind of wouldn't stick to the

20   agreement they made with one another?

21   **A.**   (Through the interpreter) That's -- that's right.

22   **Q.**   And there were some individuals that you worked with who

23   did not -- if you recall -- Let me put this another way.

24        There were individuals that you worked with when you went

25   out to work sites who did not sleep at the warehouse, right?

LOPEZ CONTRERAS - CROSS / DOVE

1    **A.**  (Through the interpreter) Yes.

2    **Q.**  Right.

3         And when you arrived from -- you said it was from

4    Los Angeles or San Diego when you -- that you came from to

5    start your journey up north?

6    **A.**  (Through the interpreter) I came from San Ysidro,

7    San Diego.

8    **Q.**  Right.

9         It's true that you had worked in L.A., Los Angeles,

10   several times before coming up to work in Hayward, right?

11   **A.**  (Through the interpreter) Never.  Never.

12   **Q.**  Never worked in Los Angeles?

13   **A.**  (Through the interpreter) Never in the United States.

14   Never.

15   **Q.**  Your first time?

16   **A.**  (Through the interpreter) That's right.

17   **Q.**  Okay.  And then when you came, though -- when you came up

18   this time, you didn't have another alternative place to stay,

19   correct?

20   **A.**  (Through the interpreter) That's right.

21   **Q.**  Right.

22        And the instructions to you or the information you got was

23   if you didn't have an alternative place to stay while these

24   construction -- while the construction jobs were happening,

25   that you could stay at the warehouse.

LOPEZ CONTRERAS - CROSS / DOVE

1   **A.**   (Through the interpreter) No.  No.  Excuse me.  Let me --

2   **Q.**   Well, if the answer is "no," that's fine.  I'll move on to

3   another question.

4   **A.**   (Through the interpreter) I don't want to give you a "no"

5   answer.  But I want to answer first.

6        First of all, I want to understand what you're asking me.

7   **Q.**   Okay.  So I'm --

8                      (Simultaneous colloquy.)

9            **THE COURT:**  No.  Just -- whoa, whoa.  Just a minute.

10       Finish your answer.

11           **THE WITNESS:**  (Through the interpreter) When you're

12   talking about instructions, whose instructions are you talking

13   about?

14           **MR. DOVE:**  May I clarify the question, Your Honor?

15           **THE COURT:**  Yes, please.

16           **MR. DOVE:**  Excuse me.  Last time, Your Honor.

17           **THE COURT:**  All right.

18   **BY MR. DOVE:**

19   **Q.**   My question, sir, is if you'd had an alternative place to

20   stay, would you have stayed there?

21   **A.**   (Through the interpreter) Probably, yes.

22   **Q.**   Yes.

23       All right.  But you didn't have an alternative place to

24   stay when you arrived, correct?

25   **A.**   (Through the interpreter) No, I didn't have another

LOPEZ CONTRERAS - CROSS / DOVE

1    alternative --

2    Q.  And your goal was to work as many hours and get as much

3    pay you could in this short period of time.  Agreed?

4    A.  (Through the interpreter) I want to remind you that I came

5    with a contract from Mexico.  I had been made work promises

6    when I arrived here.  And a commitment from them and --

7    regarding the amount of money I was going to get here for my

8    work.  I was brought here.  I didn't arrive here by myself.

9    Q.  I understand that, sir.

10        But you -- you agree that you -- you originated in

11   Tijuana, correct?

12   A.  (Through the interpreter) I lived in Tijuana.

13   Q.  Yes.

14        The ad that you responded to was -- first seen in Tijuana,

15   correct?

16   A.  (Through the interpreter) That's right.

17   Q.  All right.

18        In response to that ad, you came across the U.S. Mexico

19   border and arrived in to San Ysidro, correct?

20   A.  (Through the interpreter) That was the request, and that's

21   what I did.

22   Q.  Yes.

23        The -- upon arriving in San Ysidro -- first of all, in

24   order to get across the U.S./Mexico border, you provided a

25   visa, correct?

1    **A.**   (Through the interpreter) That's right.

2    **Q.**   Right.

3         And it's a visa you had obtained before this date,

4    correct?

5    **A.**   (Through the interpreter) Ten years prior, yes.

6    **Q.**   Yes.  Yes.

7         You had been to the United States before July of 2015?

8    **A.**   (Through the interpreter) Many -- on many occasions.

9    **Q.**   All right.

10        And the manner that which you would come into the United

11   States was to cross the border, correct, through the point of

12   entry, the lawful point of entry, correct?

13                (Translation by the interpreter.)

14   **BY MR. DOVE:**

15   **Q.**   Yeah.

16   **A.**   Every time.

17   **Q.**   All right.

18        And that the first person that you spoke to when you came

19   into the United States in response to the ad was someone who

20   was not Mr. Torres, correct?

21   **A.**   (Through the interpreter) No, it wasn't Mr. Torres.

22   **Q.**   Right.

23        It was a man named Jorge Tellez, if you recall.

24   **A.**   (Through the interpreter) No.

25   **Q.**   Another person.

1    **A.**  (Through the interpreter) Another person.

2    **Q.**  Do you recall that person's name?

3    **A.**  (Through the interpreter) His last name is Ruiz.

4    **Q.**  Yes.

5       All right.  And that's the first person when you -- when

6    you called that number at the bottom of the ad which was

7    Exhibit 14, that's the person you spoke to.

8    **A.**  (Through the interpreter) The person who answered the

9    phone call from the ad was Mr. Jorge Tellez in the city of

10   Tijuana.  And when I went across to San Ysidro, I met the

11   driver and the vehicle that was going to bring me here, I met

12   Mr. -- Mr. Torres's driver, and his name is Ruiz.

13   **Q.**  Yes.

14      All right.  And so -- the warehouse were you stayed for

15   the period of time that you worked from -- the larger part of

16   the time that you worked, that's not a -- you've never seen

17   Mr. Torres spend the night there, correct?

18   **A.**  (Through the interpreter) Not to my knowledge.

19   **Q.**  Right.

20      In fact, you hadn't even really seen Mr. Torres go into

21   the warehouse where you were staying while you were there,

22   correct?

23   **A.**  (Through the interpreter) Of course, I did.

24   **Q.**  The location where you slept, you didn't see Mr. Torres in

25   that location, agreed or disagreed?

1    **A.**   (Through the interpreter) Of course, I did.

2    **Q.**   All right.  You saw him there from time to time, right?

3    **A.**   But it was a garbage dump.  It was a -- a place full of

4    trash.  I only saw him one time.  It was one time he came up.

5    **Q.**   All right.  And the trash was the trash that was

6    accumulated by the men who were staying there, right?

7    **A.**   (Through the interpreter) No.

8    **Q.**   Trash from other sources.

9    **A.**   (Through the interpreter) It was from all the materials of

10   all the work product from his factory.

11   **Q.**   Right.

12        Was anybody responsible among the group for sort of taking

13   out the trash from time to time, or was that something that

14   was not assigned?

15   **A.**   (Through the interpreter) No.

16   **Q.**   All right.

17        While you were there, you -- for a period of time, you --

18   you went to sleep at a hotel, correct?

19   **A.**   (Through the interpreter) Yes, towards the end.

20   **Q.**   Yes.  And that was -- was that a hotel near the -- the

21   Marriott Hotel that you were working on?

22   **A.**   (Through the interpreter) Near where I was working at the

23   Marriott?  No.

24   **Q.**   All right.  You state -- you mentioned that you stayed at

25   the Fairmont Inn.  Yes?

1    **A.**   (Through the interpreter) Yes.  I said -- that's what I

2    said, Fairmont.

3    **Q.**   Right.

4        And that was -- do you remember when -- about what length

5    of time into your five and a half weeks that that was -- where

6    you stayed at the Fairmont Inn?

7    **A.**   (Through the interpreter) I remember three nights.

8    **Q.**   Do you remember when those three nights were in terms of

9    the five weeks you were there?

10   **A.**   (Through the interpreter) It was afterward -- after the

11   Hayward sheriff -- where he -- the sheriff went to see

12   Mr. Torres's place.

13            **MR. DOVE:**  Well, I'm going to object to that 'cause I

14   believe that's no foundation --

15                    (Simultaneous colloquy.)

16            **THE WITNESS:**  (Through the interpreter) I just don't

17   remember the date.

18            **THE COURT:**  All right.  Move on, please.

19            **MR. DOVE:**  All right.

20   **Q.**   Now, you gave a -- a lengthy -- a pretty long interview

21   with a -- a member of the --

22        Pause for a second.

23            **THE INTERPRETER:**  Thank you.

24                    (Translation by the interpreter.)

25            **THE COURT:**  Would you repeat the question.

1          **MR. DOVE:**  Yes.

2          **THE COURT:**  Thank you.

3   **BY MR. DOVE:**

4   **Q.**  You had a long interview in October, late October of 2015,

5   with a -- a member of the San Francisco Police Department?

6   **A.**  (Speaking Spanish.)

7          **THE INTERPRETER:**  The interpreter did not have a

8   chance the interpret the question, Your Honor.

9          **THE COURT:**  All right.  Well, interpret it now,

10  please.

11              (Translation by the interpreter.)

12          **THE WITNESS:**  (Through the interpreter) That's right.

13  **BY MR. DOVE:**

14  **Q.**  Yes.  And in that interview, that detective asked you

15  specifically about a conversation that you described earlier

16  regarding Mr. Torres showing up at a hotel, correct?  And

17  where he talked to a group of workers?

18  **A.**  (Through the interpreter) That's right.

19  **Q.**  Yes.

20      And this is while you were staying at the Fairmont Inn

21  hotel, correct?

22  **A.**  (Through the interpreter) That's right.

23  **Q.**  Right.

24      And during that interview, you told Mr. -- was it --

25  Officer Ly, L-y, that you spoke to?  Do you recall?

1   **A.**   (Through the interpreter) Yes.

2   **Q.**   Yes.  Along with another police officer as well?

3   **A.**   (Through the interpreter) No, there wasn't another police

4   officer.

5   **Q.**   It was just Officer Ly and yourself?

6   **A.**   (Through the interpreter) It was Agent Randy Ly and a

7   translator.

8   **Q.**   Yes.  So that was the other person I was talking about.

9   There was someone else there, right?

10  **A.**   (Through the interpreter) That's right.

11  **Q.**   Right.  And Officer Ly, L-y, asked you quite a few

12  questions about this particular event that happened over the

13  five weeks that you worked with Mr. Torres?

14  **A.**   (Through the interpreter) That's right.

15  **Q.**   All right.  And earlier when you testified, you said --

16  you mentioned that Mr. Torres was -- said -- used the words

17  (sic) "trafficking"?

18  **A.**   (Through the interpreter) That's right.

19  **Q.**   Right?

20       And that someone was blaming him for trafficking?

21  **A.**   (Through the interpreter) That's right.

22  **Q.**   Yes.

23       And that -- And that there would be some day that -- well,

24  anyway, you mentioned that Mr. Torres said that he had a lot

25  of money?

1    **A.**  (Through the interpreter) Yes.  He'd repeat that to us all

2    the time.

3    **Q.**  All right.  And that -- that he would -- he was not going

4    to go jail, right?

5    **A.**  (Through the interpreter) Right.  That he wasn't going to

6    go to jail.  No.

7    **Q.**  And you said that that -- you felt that was --

8            **THE COURT:**  Just a moment.

9            **THE WITNESS:**  (Through the interpreter) I haven't

10   finished.

11   **BY MR. DOVE:**

12   **Q.**  I didn't know, sir.

13   **A.**  (Through the interpreter) He'd say he wasn't going to

14   waste his money in a long trial.  That he'd rather go to jail

15   and not give his money away.

16   **Q.**  Right.

17       And all of these statements, sir, you agree that you told

18   those statements to Officer Ly, correct?

19   **A.**  (Through the interpreter) Yes.

20   **Q.**  Yes.

21       You're as certain of that as you are of the rest of your

22   testimony, correct?

23   **A.**  (Through the interpreter) Yes.

24           **THE INTERPRETER:**  May the interpreter clarify?

25           **THE COURT:**  Yes.

1          (Discussion between the interpreter and the witness in

2     Spanish.)

3          **THE WITNESS:**  (Through the interpreter) And other

4     things that you're omitting as well.

5     **BY MR. DOVE:**

6     **Q.**  Yes.  I understand that.  There's a process here, sir.

7     **A.**  (In English) Okay.

8          (Through the interpreter) Okay.

9          **THE COURT:**  Mr. Dove, can I ask you to kind of move

10    it along.  I'm not going to cut you off, but I appreciate --

11    you're doing very well --

12                    (Simultaneous colloquy.)

13         **THE COURT:**  Thank you.

14    **BY MR. DOVE:**

15    **Q.**  Now, it's after you -- after you met with Officer Ly, you

16    also then met with some people from Homeland Security,

17    correct?

18    **A.**  (Through the interpreter) Yes.

19    **Q.**  All right.  And then you -- you gave them a further

20    interview, correct?

21    **A.**  (Through the interpreter) I don't remember a formal

22    interview as I had with Agent Ly.  But if you're saying so,

23    then I imagine you have documents that reflect that.

24    **Q.**  I'm not suggesting anything, sir.  I'm simply asking

25    whether you recall an interview with someone from Homeland

LOPEZ CONTRERAS - CROSS / DOVE

1    Security.

2    **A.**  (Through the interpreter) Not an interview.

3    **Q.**  All right.

4        Do you recall a meeting with a person -- a special

5    agent -- a lady from Homeland Security at all, who identified

6    herself as a special agent?

7    **A.**  (Through the interpreter) I remember I was introduced to

8    her, and I introduced myself to her.

9    **Q.**  So you did have an interview with someone from Homeland

10   Security, right?

11   **A.**  (Through the interpreter) Well, it's that I don't -- it's

12   just that I don't know what you mean by "interview."

13   **Q.**  A meeting.  A conversation of some kind in either formal

14   or maybe even informal setting.

15   **A.**  (Through the interpreter) The -- it was all about general

16   aspects of it.  Things that I didn't like, things that I

17   liked, and that was it.

18   **Q.**  All right.  So -- in that interview, you were -- were you

19   permitted to describe any and all things about your five and a

20   half weeks with Mr. Torres?

21   **A.**  (Through the interpreter) So -- well, that would have been

22   a formal interview.

23   **Q.**  All right.

24   **A.**  (Through the interpreter) You would like me to say that I

25   had a formal interview, but I can't because that didn't

1  happen.

2  **Q.**  Sir, I'm not asking to you say anything.  I'm simply

3  asking you questions about --

4  **A.**  (Speaking Spanish.)

5        **THE COURT:**  Whoa, whoa, whoa.  Just a minute.  Stop,

6  please.

7     You interpret what he said.

8        **THE WITNESS:**  (Through the interpreter) You didn't

9  ask me, but you're insinuating that.

10        **THE COURT:**  Okay.  Just -- Sir, don't try to figure

11  out what -- why the lawyer's asking a question.  Just answer

12  the questions that he's asking, and you'll have an opportunity

13  to explain.  Understand?  (Speaking Spanish.)

14        **THE WITNESS:**  (Through the interpreter) But it's just

15  that I don't understand what he means by "interview," and

16  he's -- he's talking about interviews and interviews.

17        **THE COURT:**  Thank you.  If you don't -- so one of the

18  other rules we follow here, if you don't understand a question

19  that if attorney is asking, just say "I don't understand the

20  question."  And that's perfectly okay if that's what you

21  believe.  Okay?

22        **THE WITNESS:**  (In English) Okay.

23     (Through the interpreter) Okay.

24        **THE COURT:**  All right.

25              (Off-the-record discussion.)

1    BY MR. DOVE:

2    Q.  Now, one of the -- something that changed -- did something

3    change about your residency status after you provided

4    information to Homeland Security?

5              (Translation by the interpreter.)

6    BY MR. DOVE:

7    Q.  "Yes" or "no."

8    A.  (Through the interpreter) A short while after speaking

9    with her, yes.

10   Q.  Yes.

11       You were given a status called a continued presence

12   status.  Does that sound familiar?

13   A.  (Through the interpreter) That's right.

14   Q.  Yes.

15       And along with that status, there were several conditions

16   that came with it?

17              (Translation by the interpreter.)

18   BY MR. DOVE:

19   Q.  I'll clarify.

20       You received housing subsequent to your speaking to folks

21   from Homeland Security, correct?  "Yes" or "no," sir?

22   A.  (Through the interpreter) Yes.

23   Q.  All right.

24   A.  (Through the interpreter) But I didn't accept it.  I

25   didn't accept anything from them with no conditions.  They

1   didn't ask -- there was no condition for my doing something on

2   their behalf.

3   **Q.**  All right.  I didn't ask that question, sir.

4   **A.**  (Through the interpreter) I know you didn't ask me, but

5   you're leaving it in the air.

6          **THE COURT:**  All right.  Ask another question, please.

7   **BY MR. DOVE:**

8   **Q.**  Okay.  Sir --

9          May I say this, Your Honor?

10         -- you will have a chance to talk to the U.S. attorney

11  after I speak, sir, so they're --

12         **THE COURT:**  Please don't comment.

13         **MR. DOVE:**  Oh, all right.

14         **THE COURT:**  Just ask the next question.

15         **MR. DOVE:**  All right.

16         **THE COURT:**  I'll manage the courtroom, and you manage

17  your questions, please.

18         **MR. DOVE:**  I apologize, Your Honor.

19         **THE COURT:**  Thank you.

20  **BY MR. DOVE:**

21  **Q.**  Now, also you were permitted to -- to work lawfully in the

22  United States after meeting Homeland Security, correct?

23  **A.**  (Through the interpreter) That's right.  Yes.

24  **Q.**  Right.  And, in fact, a short term (sic) after meeting

25  with Homeland Security, you found a position where you were

1    able to lawfully work at another construction location,

2    correct?

3    **A.**   (Through the interpreter) Yes.

4    **Q.**   Yes.  And then for a period of time, you also worked at a

5    restaurant, right?  Or something to do with the restaurant

6    industry.

7    **A.**   (Through the interpreter) That's right.

8    **Q.**   Yes.

9    **A.**   (Through the interpreter) Yes.

10   **Q.**   And the visa that you -- the tourist visa that you had was

11   elevated to a more fixed type of residency.  Agreed?

12   **A.**   (Through the interpreter) That's right.

13   **Q.**   Yes.

14       Any compensation that you can describe that you received

15   with respect to your -- by that, I mean money benefits with

16   respect to your continued presence status?

17   **A.**   (Through the interpreter) For what reason?

18   **Q.**   Like, so --

19   **A.**   (Through the interpreter) They didn't give me anything.

20   **Q.**   Right.  Right.

21       But you did -- I'm talking about the -- the work that you

22   performed subsequent to meeting with Homeland Security was

23   with permission to do so, correct?

24   **A.**   (Through the interpreter) Okay.  I don't understand from

25   whom that compensation would have come.

1  **Q.**  Were you employed, sir, after meeting with Homeland

2  Security?

3  **A.**  (Through the interpreter) But do you mean did I continue

4  working with Mr. Torres, or did I work for some -- some other

5  place?

6          **MR. DOVE:**  You know, I'll withdraw the question.

7          **THE COURT:**  All right.  Very well.

8          **MR. DOVE:**  I don't think it's going into somewhere

9  else.

10          **THE COURT:**  All right.  Thank you.

11  **BY MR. DOVE:**

12  **Q.**  All right.

13      Now, you indicated that you started working for Mr. Torres

14  on -- you said about July 25th, 2015?

15  **A.**  (Through the interpreter) Yes, so I arrived the 25th.  On

16  the 26th, Sunday, I began to work.

17  **Q.**  All right.  Now, did you fill out an application in your

18  own hand when you arrived at the -- to work for Mr. Torres?

19  You personally?

20  **A.**  (Through the interpreter) No.

21  **Q.**  All right.  So do you remember seeing a form that's titled

22  "New Employee Information"?

23  **A.**  (Through the interpreter) I don't remember that when I

24  arrived.

25  **Q.**  All right.

1        Do you recall signing a form that had you -- that was

2   attached to a -- a two-page document called a "New Employee

3   Information Form"?

4   **A.**  (Through the interpreter) Yes.

5   **Q.**  All right.  Do you recall when you signed that New

6   Employee Information Form?

7   **A.**  (Through the interpreter) That's right.

8   **Q.**  Do you recall when you'd signed that form?

9   **A.**  (Through the interpreter) I don't remember the date --

10  exact date.  I remember when it was that I did so, the

11  circumstances when I did that.

12  **Q.**  Do you remember the date?

13  **A.**  (Through the interpreter) That's what I don't remember.

14  I'm sorry.  But if you have it there, then that's right.

15  **Q.**  Right.

16  **A.**  (Through the interpreter) It depends on the document that

17  you could show me.

18  **Q.**  All right.

19      May I approach the -- if --

20      Do you not recall the date that you signed -- first of

21  all, do you recall whether you signed a new employee

22  information form?

23          **MR. NARAYAN:**  Objection, asked and answered.

24          **THE COURT:**  Sustained.  We're getting into the same

25  thing.  Please move on.

1    **MR. DOVE:**  All right.  May I approach the witness,

2    Your Honor?

3         **THE COURT:**  Yes.  You may try refresh his memory.

4    **BY MR. DOVE:**

5    **Q.**  I'm going to show you a document, and let me know if it

6    refreshes your recollection about -- (Handing document) --

7    **A.**  (Reviewing document.)

8    **Q.**  -- something.

9    **A.**  (Through the interpreter) These are definitely forms that

10   I filled out in my hand.  And all the information that's

11   written here is false.  And it was dictated to me by

12   Mr. Tellez for all of those who were there filling out this

13   document.

14        **MR. DOVE:**  I'm going to object to speculation.

15        **THE COURT:**  All right.  Finish the interpretation.

16        **THE INTERPRETER:**  She did, Your Honor.

17        **THE COURT:**  All right.

18        **MR. DOVE:**  I'm asking what happened with this

19   witness.

20        **THE COURT:**  Well, he's answering what he noticed or

21   what he saw, I imagine.  But whatever, the jury will determine

22   that.

23   **BY MR. DOVE:**

24   **Q.**  Was this form signed on July 30th, 2015?

25   **A.**  (Through the interpreter) Not the 30th of July of 2015.

1   **Q.**  Do you recall when?

2   **A.**  (Through the interpreter) Well, as I said, I don't

3   remember the date, but I remember the circumstances of my

4   signing those documents.

5   **Q.**  I said --

6   **A.**  (Speaking Spanish.)

7            **THE COURT:**  Just a moment.

8            **MR. DOVE:**  There's no question pending.

9            **THE COURT:**  Sir, just a moment.  Wait for the next

10   question, please.

11           **THE WITNESS:**  (In English) Okay.

12           **THE COURT:**  And we need to move this along, Mr. Dove,

13   please.

14           **MR. DOVE:**  I have no further questions, Your Honor.

15           **THE COURT:**  All right.  Thanks.  Let's -- before --

16       You have any further examination?

17           **MR. NARAYAN:**  No, Your Honor.

18           **THE COURT:**  Great.

19       Not great that you don't have any -- I'm just

20   acknowledging.  Said that during jury selection.  I don't mean

21   great that I'm commenting.

22       All right.  So you are excused.  Thank you very much.  You

23   may step down.

24       Let's take a stretch break for a while.  We're going to

25   break formally at about -- about 11:15.

```
 1                      (Witness left the courtroom.)

 2          THE COURT:  And in the meantime, will you get your

 3   next witness, Mr. Narayan.

 4          MR. NARAYAN:  Yes, Your Honor.

 5          THE COURT:  Thank you very much.

 6                      (Pause in the proceedings.)

 7          THE COURT:  All right.  Please be seated while we

 8   await the next witness.

 9                      (Pause in the proceedings.)

10          THE COURT:  Mr. Lee, please, let's reduce this delay

11   in the future.  I've told both sides I don't want this delay.

12          MR. LEE:  Yes, Your Honor.

13          THE COURT:  'Cause it adds up.

14                      (Pause in the proceedings.)

15          THE COURT:  Let's do this.  There's a delay here, and

16   I'm not going to hold you up.

17      Let's recess for 15 minutes.  Remember the court's usual

18   admonitions.  Thank you.

19      (Recess taken at 10:50 A.M.; proceedings resumed at 11:05

20   A.M.)

21      (The following proceedings were heard out of the presence

22   of the jury:)

23          THE CLERK:  Remain seated.  Come to order.  Court is

24   again in session.

25          THE COURT:  All right.  Please -- please get the
```

1    jury.

2         And do you have your witness ready?

3              **MR. LEE:**  Yes, Your Honor.

4              **THE COURT:**  Oh, great.  Thank you.

5         (The following proceedings were heard in the presence of

6    the jury:)

7              **THE COURT:**  All right.  Please be seated.

8         As I mentioned, ladies and gentlemen, we're going to go

9    till 12:15 'cause the court has a calendar schedule of cases

10   this afternoon.  And then tomorrow and Thursday, we'll go our

11   regular 8:00 to 1:30 with two 15-minute breaks.

12        Please call your next witness.

13             **MR. NARAYAN:**  Your Honor, the government calls Robert

14   Bodine.

15             **THE COURT:**  Please come forward, sir.

16                  (Pause in the proceedings.)

17             **THE CLERK:**  Up there, please, sir.

18        Raise your right hand, please.

19                        **ROBERT BODINE**,

20   called as a witness for the PLAINTIFF, having been duly sworn,

21   testified as follows:

22             **THE CLERK:**  Thank you.  Please be seated.

23        State and spell your full name for the record.

24             **THE WITNESS:**  Robert C. Bodine, R-o-b-e-r-t, C,

25   Christopher, Bodine, B-o-d-i-n-e.

| | |
|---|---|
| 1 | THE CLERK:  Thank you. |
| 2 | **DIRECT EXAMINATION** |
| 3 | BY MR. NARAYAN: |
| 4 | Q.  Sir, I want to start by giving the jury an opportunity to |
| 5 | get to know who you are. |
| 6 | Where were you born? |
| 7 | A.  Fremont, California. |
| 8 | Q.  Did you grow up in the Bay Area? |
| 9 | (Off-the-record discussion.) |
| 10 | THE COURT:  Pull the microphone in.  Thank you, sir. |
| 11 | THE WITNESS:  Excuse me? |
| 12 | THE COURT:  Speak into microphone, please. |
| 13 | THE WITNESS:  Oh. |
| 14 | THE COURT:  Thank you. |
| 15 | BY MR. NARAYAN: |
| 16 | Q.  You had said that you were born in Fremont.  And I asked |
| 17 | you if you grew up in the Bay Area. |
| 18 | Could you repeat your answer. |
| 19 | A.  Yeah, my whole entire life. |
| 20 | Q.  Do you currently live on the East Coast? |
| 21 | A.  Yes, sir. |
| 22 | Q.  And approximately how long ago did you move to the |
| 23 | East Coast? |
| 24 | A.  About a year ago. |
| 25 | Q.  What do you do for a living? |

Bodine - DIRECT / Narayan

1    **A.**   I restore old cars.

2    **Q.**   Do you, in fact, own a restoration shop?

3    **A.**   Yes, I do.

4    **Q.**   And is that your livelihood?

5    **A.**   Yes.

6    **Q.**   Sir, throughout your adult life, have you worked in

7    various forms of auto repair and construction work?

8    **A.**   Yes.

9    **Q.**   Are you -- Do you have experience in the area of

10   construction and auto repair?

11   **A.**   Yes.

12   **Q.**   What skills do you have that have led to these jobs?

13   **A.**   Heavy machine operation, driving forklifts, tow truck,

14   machinery, transportation, paint, dry wall.

15   **Q.**   Sir, are you -- are you married?

16   **A.**   Yes.

17   **Q.**   Do you have children?

18   **A.**   Yes.

19   **Q.**   Now, while you were living in the Bay Area and working in

20   the general area you -- you discussed, did you meet someone

21   named Job Torres Hernandez?

22   **A.**   Joe Torres, but yeah.  He went by "Joe," not "Job," but

23   yes.

24   **Q.**   How did you know him?

25   **A.**   Joe.

Bodine - DIRECT / Narayan

1    Q.   Joe Torres?

2    A.   Yes.

3    Q.   Do you see the person that you know as Joe Torres here in

4    the courtroom today?

5    A.   Yeah.  Yes.

6    Q.   Could you describe where he is and what he's wearing?

7    A.   He's wearing a purple sweater with a gray shirt, sitting

8    to my left with a -- at -- I don't know -- the table over

9    there.

10            MR. NARAYAN:  May the record reflect that the witness

11   has identified the defendant?

12            THE COURT:  Yes.

13   BY MR. NARAYAN:

14   Q.   About when did you first meet the defendant?

15   A.   I met Joe in the early '90's.  We worked at NB Industries

16   restoring -- or not restoring, but painting buses and

17   fixing -- painting tractors at the Alameda Naval Base.

18   Q.   After working together in the early '90's, did you stay in

19   touch with the defendant?

20   A.   Off and on, periodically, yeah.

21   Q.   Was that in a friendship or social capacity or more of a

22   work capacity?

23   A.   In the beginning, it was social, and then it turned

24   into -- or social friendship, and then it turned into trying

25   to do business together as far as working on cars together and

Bodine - DIRECT / Narayan

1    stuff like that.

2    Q.   And did that continue through the 2000's and past 2010?

3    A.   Yes.

4    Q.   Is it fair to say that you got to know the defendant

5    fairly well during that time?

6    A.   We were friends, consider each other brothers, I guess

7    you'd say.  I mean, we said it to each other a lot, that we

8    were like brothers.

9    Q.   Is that still true today?

10   A.   Yeah.

11   Q.   Sir, at some point in 2015, did you have a conversation

12   with the defendant about work he was doing on a Marriott

13   property?

14   A.   Yes.

15   Q.   Did he reach out to you to discuss that?

16   A.   Yes.

17   Q.   And was this conversation in person or over the phone?

18   A.   Originally, it was over the phone.  Then we met in person,

19   had lunch, and went and talked about the job that he was going

20   to be doing.

21   Q.   Okay.  Let's talk about the phone conversation first.

22       What do you recall the defendant saying during that phone

23   conversation?

24   A.   I need your help.  You can make a lot more money helping

25   me with this construction job than you will doing the cars.

Bodine - DIRECT / Narayan

1   And when do you want to meet up so we can talk about it?

2   **Q.** Did he tell you what the construction job was?

3   **A.** On the phone, no.  In person, yes.

4   **Q.** Okay.  Let's move forward to the meeting you had in person

5   where you said you had lunch.

6       What did the defendant tell you during that conversation

7   about this job?

8   **A.** That he had gotten a job through -- doing the Marriott

9   Hotel in San Francisco, and that he was going to be doing

10  painting, carpeting, revamping retired or dilapidated hotel.

11  **Q.** During that conversation, did the subject of how much

12  money he expected come up?

13  **A.** Yeah.  Yes.

14  **Q.** And what, if anything, did the defendant say about that?

15  **A.** He'd be making close to about $500,000 if all went well.

16  **Q.** Did he ask you to -- to help him with this job?

17  **A.** Yeah.  He wanted me to be a foreman to kind of help run

18  the crews and do the painting and stuff.

19  **Q.** Did you agree to work with him?

20  **A.** Yes.

21  **Q.** And what exact -- what work did you exactly agree to do?

22  **A.** That I was going to help him with the company and run --

23  run the different jobs with him to get stuff done, picking up

24  material, going to different job sites, stuff like that.

25  **Q.** Did the defendant discuss with you what he was going to

Bodine - DIRECT / Narayan

1  pay you for -- for that work?

2  **A.**  We talked about a salary.  We talked about hourly wages.

3  It was just random talking of different things.

4  **Q.**  And what were the salary, hourly wages you discussed?

5  **A.**  We talked about doing minimum of $50,000 a year.  Then we

6  talked about hourly, like, 20-something bucks an hour.

7  **Q.**  At the time that you had this conversation over lunch with

8  the defendant, what was the status of the -- the Marriott job?

9  Had it begun yet?

10  **A.**  It had already been started, yes.

11  **Q.**  And what work did you agree to do specifically with

12  respect to the Marriott job, if -- if any?

13  **A.**  To just delivering materials and stuff, and then he had to

14  finish a job that was in San Rafael doing some excavation, and

15  there was another job he was doing where there was some

16  flooring and painting and stuff.

17  **Q.**  So we been talking about the Marriott job.  You mentioned

18  a job site in San Rafael.

19      What was the third one that you mentioned?

20  **A.**  It was in, like -- I want to say it was, like, Martinez,

21  Albany area, something like that.

22  **Q.**  And did you help in some capacity with all of those jobs?

23  **A.**  Yes.

24  **Q.**  The thing you mentioned was that you delivered materials.

25      Is that the main capacity in which you helped with these

Bodine - DIRECT / Narayan

1  jobs?

2  **A.**  For the Marriott or -- for the Marriott, I delivered -- we

3  went to Home Depot, picked up paint and supplies for the guys,

4  and stuff like that.

5       As far as like on the Martinez job, I ran the excavators

6  and brought the guys to and from the job sites.

7  **Q.**  When you say "the guys," are you talking about the people

8  that --

9  **A.**  Workers.

10  **Q.**  -- job sites?

11  **A.**  Workers, different guys that worked for Joe.

12  **Q.**  In the course of taking people to and from -- the workers

13  to and from the job site, did you gain some familiarity with

14  the workers?

15  **A.**  Yes.

16  **Q.**  Approximately how many workers would you say that you

17  either interacted with or -- or transported for the defendant?

18  **A.**  Interacted with on the job --

19       **MR. DOVE:**  Objection, Your Honor.  Compound.

20       **THE COURT:**  Sustained.

21  BY MR. NARAYAN:

22  **Q.**  Let's start with approximately how many workers you -- you

23  transported, if you could describe that for us.

24  **A.**  Usually when we went to San Rafael, it would be myself and

25  three other guys.

Bodine - DIRECT / Narayan

1    Q.   And what about with respect to the Marriott job?

2    A.   The Marriott job, it was mostly just me and Joe in his

3    personal vehicle, and we'd drive to the place and deliver

4    materials and go check on different other prospective jobs and

5    stuff like that in the San Francisco area.

6    Q.   In your -- did you ever assist in taking the workers home

7    at night?

8    A.   No.  Oh, from the jobs that I was working on away from

9    Joe?  Yes.  Like, if we went to San Rafael and worked on a

10   job, we'd all get in the same car, go home.

11   Q.   Did you become familiar in doing this work for the

12   defendant with a property at 2140 Dunn Road?

13   A.   Yes.

14   Q.   And what was the property at 2140 Dunn Road?

15   A.   Originally the property at 2140 Dunn Road was when he was

16   getting -- he was in the beginnings of the Marriott.  I had

17   found that building.  We were talk- -- and I'd showed it to

18   him, that it was for sale by owner, and we talked about buying

19   it.  Or he talked -- I talked about going to one of my friends

20   and having them lend me the money to buy it.  And then he said

21   he was interested in buying it and he was thinking about

22   getting it.

23   Q.   Do you know if he ultimately bought it?

24   A.   I believe so, yes.

25   Q.   During this period of time that you were assisting with

Bodine - DIRECT / Narayan

1   these three jobs, did you have occasion to be at that property

2   on 2140 Dunn Road?

3   **A.**   When he got 2141 -- 2140 Dunn Road, we emptied the place

4   from the people that were there before.  They got evicted or

5   whatever you want to call it.  And we moved all the stuff and

6   did dump runs and took everything out of there.  And then we

7   started fixing the place up.

8   **Q.**   Did you see any of the workers that you'd mentioned living

9   at the property on Dunn Road?

10  **A.**   When he first purchased the property, no.  But in the --

11  cleaning up the place and everything and once he started

12  running the business out of there, yes, people stayed there.

13  **Q.**   Was there another commercial property that the defendant

14  had, if you know, on Foley Road?

15  **A.**   That wasn't his property, but yes, there was -- we did

16  work at Foley --

17  **Q.**   Could you describe the property at Foley?

18  **A.**   I'd say it's a 30- to 40,000-square-foot commercial

19  building.  And it was -- originally, he was using it for

20  producing foam and doing the foam work for different places.

21  And then somewhere along the lines, he took a business partner

22  and started converting it into some kind of office.

23  **Q.**   During this period of time that you were working with the

24  defendant, did you have occasion to visit the property at

25  Foley Road?

Bodine - DIRECT / Narayan

1    **A.**    Yes.

2    **Q.**    Did you go inside of it?

3    **A.**    Yes.

4    **Q.**    Did you see whether workers were living at the property on

5    Foley Road?

6    **A.**    Yes.

7    **Q.**    And were they?

8    **A.**    Yes.

9    **Q.**    Were there times that you were asked to transport water in

10   between any of these sites that we've discussed?

11   **A.**    Yes.

12   **Q.**    Could you describe that, please?

13   **A.**    Well, on Dunn Road, the -- the water had been turned off

14   because the bill hadn't been paid and so we were taking waters

15   (sic) from Foley -- from Foley and from another job site,

16   was -- I want to believe Alpine and taking it there.

17          Then there was also -- for Foley, the water bill hadn't

18   been paid or -- or the water main getting put in -- some kind

19   of big water thing, but there was people staying there, and we

20   had to take water 'cause there was no running water, so if you

21   went to the bathroom, you had to use a bucket to flush the

22   toilet.

23   **Q.**    That point about no running water at Foley, how do you

24   know that?

25   **A.**    At Foley?

Bodine - DIRECT / Narayan

1    **Q.**  Yes.

2    **A.**  Because we excavated the sewer line or some kind of water

3    line, 'cause there -- they cut up the whole floor inside the

4    whole building to put new lines in.

5    **Q.**  During this period of time that you were assisting in some

6    capacity at least with the Marriott job, how often were you

7    with the defendant?

8    **A.**  On the Marriott job?  On a weekly basis, I'd say we were

9    together two days out of the week.

10   **Q.**  And on a day that you would be together, take us through

11   an example of that of -- of how long you would be together and

12   how much time you would be spending together?

13   **A.**  I would show up to Dunn Road or to Foley, and then we'd

14   get in his truck.  We'd drive -- he either stop and get

15   Starbucks, whatever.  Then we'd drive to San Francisco, and

16   then we'd stop by the Marriott.  Then spend, hmm, maybe an

17   hour and a half, two hours there.  I'd sit in the car because

18   he didn't -- for the parking reasons.  And then he'd come out.

19   And then we'd go to different other prospective job sites

20   around that area for -- and we'd get home, hmm, 6:00, 7:00

21   o'clock at night.

22   **Q.**  During those days together, did you have occasions to talk

23   about the status of the -- the job sites?

24   **A.**  Yes.

25   **Q.**  Did you have opportunities to observe what Mr. Torres was

1   doing during those hours you were spending together?

2   **A.**  What do you mean by "observe what he was doing," like who

3   he was talking to or what --

4   **Q.**  Let me ask you a -- a better question, or a more specific

5   question at least.

6       Did you ever observe Mr. Torres pick up checks during this

7   period of time?

8   **A.**  On occasions, yes.  By they weren't at the actual Marriott

9   site.  They were at some other building down in San Francisco.

10  **Q.**  Could you describe an occasion on which you saw the

11  defendant pick up a check?

12  **A.**  We went to the Marriott, and then he said we had to go to

13  this other spot that was I'd say six, seven streets away.  It

14  was a big building.  He went in there and came without a check

15  in a white envelope.  And then he's, like, okay, okay, we need

16  to go to the bank.  We need to go deposit this.  And that was

17  it.

18      I mean, as far as dollar amounts, it's kind of random, but

19  I want to say --

20          **MR. DOVE:**  There's no question pending on that --

21          **THE COURT:**  Sustained.  Just ask another question.

22  BY MR. NARAYAN:

23  **Q.**  Let's go with a "yes" or "no" question here.

24      Do you know -- without telling us the conclusion, do you

25  know the dollar amount of any of these checks that the

Bodine - DIRECT / Narayan

1    defendant picked up?

2    **A.**   Yes.

3    **Q.**   And, again, without telling us the amount, how do you know

4    the amount?

5    **A.**   Two occasions -- two or three occasions he showed me the

6    check.   And on other occasions, he showed me the bank account

7    statements because we were asking about our money.

8    **Q.**   Let's talk about the occasions that he showed you the

9    check.

10       What would the amount -- what were those amounts?

11   **A.**   One check that I've seen was over $50,000.   You want exact

12   amount?   It was like 50,000 -- 50,400 and $900 (sic).

13   **Q.**   Something in the $50,000 range?

14   **A.**   Correct.

15   **Q.**   You've said that there were multiple examples that you saw

16   the check.

17       Can you give us another example that you remember?

18   **A.**   When we were going for -- are you talking about for the

19   Marriott, or are you just talking about random checks in

20   general?

21   **Q.**   Let's for now, just so we're clear on the record about

22   time period, let's talk about the general time period during

23   the Marriott job.

24   **A.**   As far as the Marriott job, I maybe saw one check.   And

25   that check was the 54,900-and-something dollars.

Bodine - DIRECT / Narayan

1    **Q.**  During that time period, was that the -- the only check

2    that you recall seeing?

3    **A.**  From the Marriott, correct.  Yes.

4    **Q.**  We'll -- Just so we do this in order, we'll circle back

5    and talk about the other checks later.  But I have some other

6    questions about the Marriott job.

7        Did you observe the defendant spending money during the

8    time of the Marriott job?

9              **MR. DOVE:**  Objection, relevance, Your Honor.

10             **THE COURT:**  Just a moment.

11                    (Pause in the proceedings.)

12             **THE COURT:**  Overruled.  You may answer.

13             **THE WITNESS:**  Yes.  So when he'd get checks, he'd go

14   buy, like -- when they were doing San Francisco job, Marriott,

15   he went and bought four Chevy Colorado's for different guys.

16   **BY MR. NARAYAN:**

17   **Q.**  Let me stop you there and ask you how you know that he

18   bought those four Chevy Colorado's?

19   **A.**  Because he told us.

20   **Q.**  Are there other examples during this period of time of the

21   defendant making purchases?

22   **A.**  He went to -- there was a company that was going out of

23   business, and he went and bought almost all of the tools and

24   everything that the place had.

25             **MR. DOVE:**  Objection, Your Honor, foundation.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

Bodine - DIRECT / Narayan

1    Speculation.

2              THE COURT:  What are you basing your knowledge about

3    the defendant supposedly making these payments -- or these

4    purchases?  How do you know that?

5              THE WITNESS:  Because I was there with him.

6              THE COURT:  There at the place where the --

7              THE WITNESS:  Where he bought the stuff, correct.

8              THE COURT:  Excuse me.  Where the tools -- you were

9    there at the place where the tools were purchased by the

10   defendant?

11             THE WITNESS:  Correct.

12             THE COURT:  Overruled.

13   BY MR. NARAYAN:

14   Q.  Could you please finish your answer with respect to the

15   purchase of tools.

16   A.  What he bought?  He bought a 50-gallon -- just random.

17   It's just a 50-gallon drum full of brooms, a 50-gallon drum

18   full of shovels.  Saws.  There was some scaffolding.  There

19   was a black enclosed trailer.  He gave the guy -- he gave the

20   guy a check and said he'd be back to finish collecting the

21   rest of tools, which some of the stuff we left were ladders,

22   construction tools, and then we went back two days later and

23   picked up the rest of the stuff.

24   Q.  Was there an occasion, Mr. Bodine, where you assisted in

25   removing items from a warehouse in -- from the warehouse in

1    Hayward?

2         MR. DOVE:  Your Honor, I'm going to object.  May we

3    approach briefly with sidebar on this issue?

4         THE COURT:  All right.  We're going to -- I told you

5    occasionally we have to talk about legal matters.  We're not

6    talking about what's on Netflix tonight.  We're talking about

7    the case, so you can stand while we're talking.  We're going

8    to be piping static into the jury box so you can't hear what

9    we're saying.  But you can stand, but please be silent when

10   you're standing -- if you wish.

11      Do you need the court reporter for this?

12        MR. DOVE:  Yes, please.

13        THE COURT:  All right.  Please bring -- Let's wait

14   until the court reporter gets over there so we don't have a

15   tendency to talk before she's there.

16             (Sidebar on the record as follows:)

17        THE COURT:  All right.  Since this is the first

18   sidebar, I actually motioned for the defendant to come over,

19   and I heard Mr. Dove say that we'll waive it.  Have you

20   discussed the defendant -- with the defendant his right to be

21   present at this as well as any other sidebar?

22        MR. DOVE:  Yes, Your Honor.  Pursuant to Rule 47,

23   I've done so, and on this particular sidebar as well, as well

24   as the scope of trial for any sidebar.

25        THE COURT:  And has he waived his right to be here?

1          MR. DOVE:  Yes, he has.

2          THE COURT:  All right.  Very well.

3      So what's your --

4          MR. DOVE:  Well, I only -- my objection is to the

5   report.  I don't want to -- I hate to make a discovery -- but

6   I -- discussion, but the only report I have is the one that

7   discusses Robert Bodine, nothing about materials, the

8   transactions, going to the border to pick up individuals on

9   several occasions but nothing about these transactions that

10  are being discussed now.

11      Is there another report that I missed somehow or --

12          THE COURT:  All right.  But wait.  So the point is

13  you're alleging that you're claiming that the government

14  failed to make disclosure of these transactions and that

15  somehow that's a violation of the government's discovery

16  obligations?

17          MR. DOVE:  Yes.

18          THE COURT:  What's your offer of proof?

19          MR. NARAYAN:  Your Honor, the -- I see the report

20  that Mr. Dove is referring to.  And that's a report

21  identifying Jonathan Bodine, which is the brother of this

22  defendant.  There are many reports that at the time they were

23  written refer to a source of information and identifier.  We

24  previously produced the identities of the sources of

25  information.

1    Consistent with my Jencks disclosure, I sent an email to

2    Mr. Dove and Mr. Getz saying -- essentially memorializing, you

3    know, I want to be clear and confirm the government's Jencks

4    disclosures.  And I said, "source of information A", "source

5    of information A" referred for the reports is Robert Bodine.

6    And I have that email, which I said, please confirm that, you

7    know, you have these items and confirm your understanding.  I

8    also have further disclosure about how he -- being a source of

9    information, and we'll cover that later.

10         THE COURT:  All right.  So just to get my Bodines

11   straight.  Is Robert this gentlemen?

12         MR. NARAYAN:  Robert is this witness.

13         THE COURT:  Okay.  And you're saying that in a report

14   concerning individual A, it -- it disuses transactions about

15   which this witnessed is testifying.

16         MR. NARAYAN:  There are several interview reports of

17   this witness that don't refer to him by name but refer to him

18   by "a source of information" and that talk about many of the

19   matters that we are going to cover today.

20      And I have disclosed that he -- for the purposes of

21   understanding discovery, that he was that source of

22   information.

23         THE COURT:  All right.  So the point is here, to just

24   sort of focusing on a legal aspect of it, the government is

25   obliged to turn over all Jencks and all *Brady* and Giglio and

Bodine - DIRECT / Narayan

```
 1    any Rule 16 discovery.  But they're not -- unless there's a
 2    bill of particulars which is ordered, they're not required to
 3    tell the defendant every transaction about which there'll be
 4    testimony from a witness -- if a report omitted what the
 5    witness is saying, then that's the stuff that impeachment is
 6    for by omission or inconsistent statement is made of.  There's
 7    no really no -- there's no other obligation.  The government
 8    is not required to disclose information to you except in
 9    certain forums, and they've represented that they have turned
10    over everything that they're required to do.
11        So if it ever -- if it comes up that they didn't, then
12    I'll consider whatever appropriate remedial action, if any,
13    may be necessary.
14            MR. DOVE:  May I ask for clarification from counsel?
15            THE COURT:  Yes.
16            MR. DOVE:  Was that the CD that you gave me on --
17    last week and you said that that -- when you say there's
18    additional information about sources of information, is that
19    the CD that you gave me last week at -- when we had our final
20    meet-and-confer?
21            MR. NARAYAN:  No, it's not the CD that I gave you
22    last week.  This was a -- well, a prior disclosure that prior
23    counsel made to Mr. Garcia originally, and then it was me
24    following up.  I believe I sent you an email on -- over the
25    weekend to confirm several Jencks matters.  I believe I sent
```

1    you on Sunday around noon with a list of things I wanted to

2    confirm --

3            **MR. LEE:**  The universe.

4            **MR. NARAYAN:**  -- Jencks disclosures.

5            **THE COURT:**  All right.  Well, look, I'm going to cut

6    this off right now because you all can meet and confer -- you

7    know, we're going to be breaking in about 45 minutes -- about

8    the status of this.

9        To the extent that you believe, Mr. Dove, that there is a

10   Jencks violation, remember, the remedy -- technically Jencks

11   is not producible until after the witness testifies under

12   direct, so there's no violation.  If it's *Brady* material, that

13   may or may not be -- may be a different situation.  But for

14   now, I haven't heard anything as to conclude the court is

15   required to take any action.

16       But I would suggest that there may be just some confusion

17   about who is whom and what's been turned over.  And I think

18   you can deal with that on a break or after we're done so we

19   don't hold up the jury.

20           **MR. DOVE:**  May I request, then, given the hour,

21   we're -- I think court said you would break at 12:15 --

22           **THE COURT:**  Correct.

23           **MR. DOVE:**  I'm at -- I don't know -- other than what

24   he's said, I'm not sure how deep I can go into

25   cross-examination.  I'd ask for leave -- for this witness to

 1   be brought back tomorrow as a witness 'cause I don't think I

 2   can properly cross-examine him.

 3          THE COURT:  How much more time do you have on direct?

 4   Are you finished -- will you finish with him on direct for the

 5   rest of the time?

 6          MR. NARAYAN:  I believe so.  I believe I at least

 7   have another half hour, possibly closer to an hour left of the

 8   witness.

 9          THE COURT:  There must be something you can -- even

10   without what you're asking for, I'm sure you have plenty of

11   hours in your quibble with this guy.

12          MR. DOVE:  Just what I gather the -- from this right

13   here.

14                  (Simultaneous colloquy.)

15          THE COURT:  Why don't you at this point -- and if as

16   and when we're done with time -- you say, hey, I can't do any

17   more, I'll understand, and then we'll break early.

18      But I want you to use that advisedly 'cause I'm sure you

19   have plenty of other stuff with this guy.

20          MR. DOVE:  Yes, Your Honor.

21          MR. NARAYAN:  May I just -- one thing, Your Honor,

22   and that's even though we're not required to do the bill of

23   particulars, I'm happy -- and we are happy to point out to

24   Mr. Dove exactly which reports were --

25          THE COURT:  I think --

1      **MR. NARAYAN:**  -- cross-examination.  We have no

2   objection to --

3            **THE COURT:**  Okay.  As a courtesy, I think that's --

4            **MR. NARAYAN:**  Happy to do that.

5            **MR. DOVE:**  -- I ask -- this might even speed things

6   up a little bit more.  If you have the reports that -- if you

7   have a duplicate copy of reports that you're basing your

8   examination on now, I can look at them at counsel's table.

9   I'll multi-task and prepare for cross while the record's

10  happening.

11           **MR. NARAYAN:**  Yeah, I can.  I can right now give

12  Mr. Dove some copies --

13           **THE COURT:**  Can you give that sort of sub rosa?  I

14  don't want to take a break now.  Let's just go on and see

15  where we are.

16           **MR. DOVE:**  Okay.

17           **MR. LEE:**  Thank you.

18           **THE COURT:**  Thanks.

19                  (End sidebar on the record.)

20      (The following proceedings were heard in the presence of

21  the jury:)

22           **THE COURT:**  All right.  Proceed.  Thank you for your

23  patience, ladies and gentlemen.

24  **BY MR. NARAYAN:**

25  **Q.**  Earlier, you spoke about a property at Dunn Road.  Is that

Bodine - DIRECT / Narayan

1    right?

2    **A.**   Yeah.

3    **Q.**   Was there an occasion were you assisted with the removal

4    of several items from Dunn Road to move them to a different

5    location?

6    **A.**   Yes.  Yes.

7    **Q.**   Was that during the time the Marriott job was going on?

8    **A.**   Yes.

9    **Q.**   All right.  I want to -- before I ask you to describe

10   that, I want to talk about how that came to be.

11        Do you recall receiving a text message from the defendant?

12   **A.**   Yes.  Yes.

13   **Q.**   Could you move just a little bit closer --

14             **THE COURT:**  Yeah, just so you know, sir, the court

15   reporter gets your -- she doesn't actually hear your voice

16   except through the microphone.

17             **THE WITNESS:**  Okay.

18             **THE COURT:**  And so she can't hear what you're

19   saying -- she has headphones on or an ear plug -- unless you

20   speak right into the microphone.

21             **THE WITNESS:**  Okay.

22             **THE COURT:**  We can hear you fine, but she may not be

23   able to.

24             **THE WITNESS:**  Okay.

25             **THE COURT:**  Thank you, sir.

Bodine - DIRECT / Narayan

BY MR. NARAYAN:

Q.  I think your last answer was that you did indeed receive a text message from Mr. Torres; is that right?

A.  Correct.

Q.  Now can you tell us what the text message said?

A.  Call me now.

Q.  Did you call Mr. Torres in response to the text message?

A.  Yes.

Q.  Could you please describe the conversation you had with him.

A.  I got a text message that says call now.  That's kind of just the way Joe is.  If something's going wrong, he'll text now, call me now and that's it.  So I called him, what's going on.  He said get to Dunn Road.  You need to help Bonbon and couple of guys move some stuff.

   And then we ended up moving -- I had to go back and pick up my car trailer, and then we moved mattresses and whole bunch of stuff out of Dunn Road.

Q.  Where did you take the mattresses to?

A.  Some of the mattresses we took back to the mattress store that's just around the corner, put them in front of their dumpster.  And then other stuff we took to Foley.

Q.  That was the same property at Foley that you mentioned a little while ago?

A.  Yes.

1    **Q.** In addition to mattresses, were there any other items that

2    you assisted in removing from that Dunn Road warehouse?

3    **A.** There was black trash bags, but that was about it.  I

4    mean, there was just black trash bags, mattresses, and random

5    stuff, like people's stuff.

6    **Q.** Do you know what was in the trash bags?

7    **A.** I can make an assumption.  It was their clothes --

8    **Q.** If you don't know, that's fine.  If you don't know, that's

9    fine.

10            **THE COURT:** Just tell what you say saw and what you

11   heard.  Don't tell us what you assume.

12            **THE WITNESS:** Okay.

13            **THE COURT:** Next question, please.

14   **BY MR. NARAYAN:**

15   **Q.** When you went to the Dunn Road warehouse after this phone

16   conversation with the defendant, who was there that was

17   assisting with this?

18   **A.** It was Bonbon.  His name's Jorge -- I don't know his real

19   last name, so we -- we all used nicknames.  It's just our

20   thing.

21       It was Bonbon, Eric, me, Julio, and two other guys.

22   **Q.** And from what you saw, who was doing what?

23   **A.** Bonbon and Julio and Eric were moving stuff out of the

24   center shop location where everybody stayed, where the bunk

25   beds and everything were.

Bodine - DIRECT / Narayan

1  **Q.**  Did you take one of your vehicles to assist with this?

2  **A.**  I said that.  I took my truck and trailer.

3  **Q.**  And how many truckloads of items did you end up

4  transporting?

5  **A.**  I took -- as far as the mattresses and stuff to the

6  mattresses place, we took one load.  It was the bed of my

7  truck and the trailer.  And then to Dunn Road, it was in the

8  bed of my truck, probably seven or eight big black trash bags.

9  On the trailer was seven or eight mattresses.  And then after

10  that, it was just plywood and stuff to -- like that.

11  **Q.**  Now, after this took place, did you ever have a

12  conversation with the defendant about it?

13  **A.**  As far as -- yeah, he said -- I asked him, well, what's

14  that all about.  He said, oh, a bunch of stuff went wrong down

15  in San Francisco, and the City's coming down on me.

16  **Q.**  How soon after this incident did that conversation take

17  place?

18  **A.**  That night.

19  **Q.**  Where were you and the defendant when you had that

20  conversation?

21  **A.**  We were in front of the Dunn Road shop closer to the --

22  the street by where the stop sign is in Napa (sic).

23  **Q.**  Now, after the work on the Marriott job was over, did you

24  assist the defendant with any other work?

25  **A.**  Yeah, I had -- still helped him with some construction

Bodine - DIRECT / Narayan

```
1    jobs.  And then he started -- I went back to work at my shop,

2    and then he was still doing his jobs.  And then he got the

3    contract for Silver Towers.

4            THE COURT:  Sustained.

5        Ask another question, please.  Thank you.

6    BY MR. NARAYAN:

7    Q.  I want to be clear about -- about timing.  When --

8    approximately when do you recall that the work on the Marriott

9    ended?  If you do.

10   A.  I -- I don't have the exact date on the top of my head,

11   no.

12   Q.  Let's do it this way:  How long after the work on the

13   Marriott shop ended did you go back to your shop to do your

14   work?

15   A.  Probably a month and a half, two months.

16   Q.  During the time that you were back at your shop, were you

17   continuing to work with Mr. Torres in any way?

18   A.  Yeah, we'd -- he'd come by my shop, talk, and I got this

19   job going on.  I need your help moving this, and so I would go

20   move a bobcat on my -- with my truck and trailer to a

21   different job, stuff like that.

22   Q.  Earlier, you said that the defendant had made some

23   statements to you about what he was going to pay you.

24       Up to this point that we're at in the time line, was he

25   paying you?
```

1    **A.**  Not all of what we agreed upon and stuff like that.  It

2    was periodic -- it was sporadic.  We'd have to sit there and

3    either go to his house on A Street or -- no, D street -- on D

4    Street, or we'd line up on Fridays at the shop on Dunn Road or

5    Foley --

6    **Q.**  You said --

7    **A.**  -- and then --

8    **Q.**  I'll interrupt you for a second.

9        You said "we would line up outside," outside the house.

10   Who is we?

11   **A.**  All the workers.  All the employees.

12   **Q.**  And on -- in saying, "we would line up," how often did

13   that happen?

14           **MR. DOVE:**  Objection, vague as to time.

15           **THE COURT:**  Sustained.  Try to pin down the time as

16   much as the witness can possibly do.  Thank you.

17   **BY MR. NARAYAN:**

18   **Q.**  All right.  Do I understand correctly that the time you

19   went back to your shop, you said was about two months after

20   the work on the Marriott job ended?

21           **MR. DOVE:**  That misstates the testimony, Your Honor.

22           **THE COURT:**  Overruled.

23       Is that correct?

24           **THE WITNESS:**  Yes.

25           **THE COURT:**  All right.  Overruled.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

Bodine - DIRECT / Narayan

1    BY MR. NARAYAN:

2    Q.   These instances where you said that you would line up, you

3    and others would line up outside of the defendant's house, can

4    you give us a sense of just when this took place relative to

5    the work of the Marriott job before we go any further?

6    A.   Wasn't just relative to the Marriott job.  It's forever.

7    We'd line up either at Foley or Dunn or at his house, and we'd

8    be -- basically on Friday's, he'd disappear from noon to 7:00,

9    8:00 o'clock at night, so we knew we had to be there early in

10   the morning to where he would show up and -- and then we'd all

11   get -- I don't know.  I guess single file lined up, you could

12   say.  And then he'd call us individually, hey, okay.  Here

13   turn in your hours from -- you know, your hours from last

14   week.  And then, okay, look, I only have this much.  I'm going

15   to give you this, but I'll get you next -- and --

16   Q.   How often would this happen?

17   A.   I just explained to you.  Every week, every Friday, we

18   would go and line up either at his house or at Dunn, at Foley.

19   Every week.  Or D Street.

20   Q.   Did you -- in the course of doing that, did you have

21   occasion to observe the way that defendant would respond to

22   other workers requesting payment?

23           MR. DOVE:  Objection, that's vague, Your Honor,

24   "other workers."

25           THE COURT:  Why don't you be more -- in this case, in

 1    light of the objection, a little bit more direct in the

 2    question.

 3        Sustained.

 4    **BY MR. NARAYAN:**

 5    **Q.**  Do you recall witnessing a conversation between the

 6    defendant and a worker from Guatemala?

 7    **A.**  Yes.

 8            **THE COURT:**  We didn't hear you.  Speak into the

 9    microphone.

10            **THE WITNESS:**  Yes.

11            **THE COURT:**  Thank you.

12    **BY MR. NARAYAN:**

13    **Q.**  Before we get into the contents of that conversation, I'll

14    ask you a few foundational questions.

15        Approximately when did this conversation take place?

16    **A.**  Where he got in a argument about money?  I mean, he'd get

17    in arguments about money all the time.  But the particular one

18    you're asking about, that was right after the -- the police

19    had come or -- I don't know what you'd call them -- the people

20    came down from the City of San Francisco.

21    **Q.**  Okay.

22        Where did this conversation take place?

23    **A.**  At the Dunn Road shop.

24    **Q.**  Where within the Dunn Road shop?

25    **A.**  On the -- in front of the second roll-up door.  The first

Bodine - DIRECT / Narayan

1   roll-up door would be his office area.  And then the second

2   roll-up door was a smaller -- where they did metal working and

3   stuff.  There's a shower and stuff in there.  And then the

4   back -- then next to that was another shop.  And next to that

5   was another shop.  So the silver metal fabrication shop with

6   the shower.

7   **Q.**  One more foundational question.  Who was present during

8   this conversation?

9   **A.**  On the property would be 15 to 20 guys.  In close

10  proximity of where it happened, it was myself, Joe, the guy --

11  I don't remember the guy's name.  We just had a nickname for

12  him.  But Guatemalan guy, and then there was one other

13  person -- probably Bonbon was there.

14  **Q.**  Could you describe what the defendant said during that

15  conversation?

16  **A.**  It was basically the four of us in kind of like a almost a

17  circle situation.  And the guy was complaining that he still

18  hadn't gotten his money and he's done working for Joe, and

19  he's -- he's going back home.  He just needs his money and

20  he's tired of waiting.

21  **Q.**  What did the defendant say in response to that?

22  **A.**  You know the problems I'm having.  Why -- why are you

23  doing this?  You know who I know.  Just give me more time.

24  And, you know, don't make a scene.

25  **Q.**  Do you recall anything else from that conversation?

Bodine - DIRECT / Narayan

```
 1   A.   It's kind of comical, but he said he was going to call the
 2   immigration on the guy.  He goes, you know, you're not legal,
 3   so why are you going to -- what are you going to do?  Who are
 4   you going to go see?  Who's going to help you?
 5   Q.   I want to make sure that with that last point, we
 6   understand exactly what you heard the defendant say.
 7        So what did you hear the defendant say?
 8   A.   "The defendant"?  You mean Joe?
 9   Q.   What did you hear Mr. -- Mr. Torres say?
10   A.   Joe said, you know, what -- who are you going to go --
11   who's going to help you?  Nobody's going to help you.  If
12   you -- you want me to call immigration on you?  I'll help you
13   that way.  You'll get a free ticket home.  You know who I
14   know.  You know what I know.
15   Q.   That last part, the "you know who I know."
16   A.   Um-hmm.
17   Q.   Were there other occasions that you heard the defendant
18   make similar statements?
19   A.   Yeah.  All the time.
20   Q.   How often?
21   A.   The -- it's kind of asking how often do you get paid from
22   Joe.  It's -- on a weekly basis almost, I'd say.
23   Q.   And is this something you heard on a weekly basis him say
24   to workers?
25   A.   Yeah.
```

Bodine - DIRECT / Narayan

1    **Q.**   Okay.  Before you started talking about some checks that

2    you witnessed the defendant pick up.  And I stopped you before

3    we got into all of them.  I want to go into that now.

4         What other checks did you see the defendant pick up?

5    **A.**   He picked up checks from a guy named Steve in Burlingame.

6    He picked up checks from -- place in San Francisco.  He picked

7    up checks from a company that this lady Robin worked for that

8    he was doing construction work on their -- I don't know if --

9    I guess it'd be like condos or commercial buildings.

10   **Q.**   Let me stop you there and -- and break that down.  The

11   first one you mentioned, picking up a check from a person

12   named Steve in Burlingame.

13        How do you know that he picked up that check?

14   **A.**   Because he told me he was picking up the check.  And then

15   he was going to go to the bank and cash it and we were all

16   going to get paid.

17   **Q.**   When -- when did that happen?

18   **A.**   Like, a day of the week?  It was on --

19   **Q.**   Give us the best sense that you have of when that happened

20   even if it's in reference to another event.

21   **A.**   So at the Burlingame job, we were moving stuff and needed

22   dumpsters and stuff.  And we were getting gravel delivered and

23   doing concrete work.  And I proceeded to call Joe and say,

24   hey, you know, we need to get these dumpsters out.  We need

25   more money.  We need to get the dumpsters and the gravel.

Bodine - DIRECT / Narayan

1    He said okay.  I'm on my way.  I'm going to -- Felipe's

2    going to take me, and then I'm going to get a check from Steve

3    'cause Steve's going to China.  And it was -- that was on a

4    Wednesday afternoon.

5    **Q.**  Is that a check that you saw?

6    **A.**  Yes.

7    **Q.**  And how much was the check for?

8    **A.**  26,000.

9    **Q.**  Was there an occasion -- were there any occasions in which

10   you saw him pick up larger checks than that?

11   **A.**  I think there was one time he picked up a check from -- it

12   was at the Greyhound station.  It was, like, a hundred and --

13   like, a $150,000.  That was for, like, Silver Towers.

14   **Q.**  Okay.

15       At some point, did you learn about a -- you just

16   mentioned -- at some point, did you learn about a job in

17   San Jose that the defendant was going to work on?

18   **A.**  Yes.

19   **Q.**  And what job was that?

20   **A.**  Silver Towers.

21   **Q.**  And how did you learn about that job?

22   **A.**  There was a guy named Jack that was from the Marriott job

23   that was at Joe's shop, and they were talking about he had

24   left the Marriott company and Joe --

25       **MR. DOVE:**  Objection.  It's hearsay as to this other

Bodine - DIRECT / Narayan

1   person Jack.

2          **THE COURT:**  Let's establish who was present during

3   this conversation to address the objection.

4          **MR. NARAYAN:**  Yes, Your Honor.

5   **Q.**  You were beginning to describe a conversation.  Before we

6   get into the contents of the conversation, can you tell us who

7   was there.

8   **A.**  We were at the -- so you want me to tell you, like, where

9   we're at the Dunn -- okay.  We're at the Dunn shop --

10         **THE COURT:**  No, no.  We're asking -- he's asking

11  you -- so you're about to talk about a conversation.  We just

12  want to know -- if anybody who saw *Hamilton* -- who was in the

13  room --

14         **THE WITNESS:**  Okay.

15         **THE COURT:**   -- for the conversation.

16         **THE WITNESS:**  Yeah, we were at the Dunn shop on the

17  back side.  And it was myself, Big Jack, Joe, Little Jack,

18  Felipe, Bonbon, and another person.

19  **BY MR. NARAYAN:**

20  **Q.**  Let me ask follow-up questions about Big Jack and Little

21  Jack.

22     Do you know their full names?

23  **A.**  No.  Like I said before, we all have nicknames for

24  everybody.

25  **Q.**  Do you know if there's a relation between Big Jack and

1   Little Jack?

2   **A.**   Yeah, they're -- they're father/son.

3   **Q.**   What did Big Jack and Little Jack look like?

4   **A.**   Big burly guy with a beard, like a logger.

5   **Q.**   That's Big Jack?

6   **A.**   That's Big Jack.  Little jack's a smaller version with a

7   beard and red hair.

8   **Q.**   This came up in -- you brought this up in response to a

9   question about the job in San Jose.

10      Can you tell us what, if anything, the defendant said

11   during that conversation about the job in San Jose.

12   **A.**   They were talking about how Jack had started for the --

13   the construction company.  Joe was in the process of doing the

14   bidding to get the water removal.  And he was trying to get a

15   brick laying -- or stone mason job.

16   **Q.**   And what did the defendant say about -- about that job?

17   **A.**   That the -- to get a contract, all you needed was one

18   union mason, but he had to be, like, higher up on the -- the

19   masonry scale.  And then as long as that, he could train the

20   guys and they wouldn't have to be union.

21   **Q.**   Were Big Jack and Little Jack there for this conversation?

22   **A.**   I believe Big Jack was.  I think Little Jack had gone to

23   go get something to eat.

24   **Q.**   This San Jose job --

25   **A.**   Silver Tower.

1   **Q.**   You said -- can you say that into the microphone?

2   **A.**   Silver Towers.

3   **Q.**   The Silver Towers job, do you know when in time that job

4   took place?

5   **A.**   As far as which part?  As far as them doing --

6                    (Simultaneous colloquy.)

7           **THE WITNESS:**  -- the grinding of the concrete, or as

8   far as the brick-laying job?

9   **BY MR. NARAYAN:**

10  **Q.**   To the extent that you can, walk us through month, year,

11  or even season when those things took place.

12  **A.**   Worse guy about --

13            **MR. DOVE:**  Narrative --

14                    (Simultaneous colloquy.)

15          **THE COURT:**  All right.  Then you need lead him a

16  little bit then so we don't have a narrative.

17      Ask leading questions as long as they're reasonable.

18          **MR. NARAYAN:**  Yes, Your Honor.

19          **THE COURT:**  Just --

20          **THE WITNESS:**  I'm not good with months and years

21  so --

22          **THE COURT:**  Okay.  Well, we'll try to --

23      Go ahead.

24  **BY MR. NARAYAN:**

25  **Q.**   Did that job take place in -- in early 2017?

Bodine - DIRECT / Narayan

1    **A.**   Yes.

2    **Q.**   So would this conversation that you just described for

3    us -- would that have taken place in about early 2017?

4    **A.**   I'd say about the summertime if I -- the season, yeah.

5    **Q.**   Now, sir, at some point in 2017 around the time of this

6    conversation, did you learn that the federal government was

7    investigating Mr. Torres?

8    **A.**   Hmm, no.

9    **Q.**   Did -- did you end up having meetings with agents from

10   Homeland Security?

11   **A.**   Yes.

12   **Q.**   And was that at about this time?  In 2017?

13   **A.**   Of when they were doing the contract and all that stuff

14   for the Silver towers?  No.

15   **Q.**   I'll ask -- I'll ask a better question.

16       I'm asking about the -- the timing of when you started to

17   have meetings with agents with Homeland Security.

18       Did that take place in 2017?

19   **A.**   Yes.

20   **Q.**   Do you recall about when in 2017 those meetings took

21   place -- these meetings took place?  And it's okay if you

22   don't.

23   **A.**   It was after my brother got arrested for -- in front of

24   Joe's shop.

25   **Q.**   And when would that have been?

Bodine - DIRECT / Narayan

1   **A.**   It was right around his son's birthday, so it would be the

2   first -- like, July.

3   **Q.**   Around that time, did you have multiple meetings with

4   agents with Homeland Security?

5   **A.**   Yes.

6   **Q.**   When those meetings took place, was work ongoing on this

7   Silvery (sic) Towers job that you mentioned?

8   **A.**   Yes.

9   **Q.**   And did you agree to become a source of information for

10   Homeland Security and provide information?

11   **A.**   Yes.

12   **Q.**   And over the course of those meetings, were you asked

13   questions about what you knew about what -- Mr. Torres?

14   **A.**   Yes.  Yes.

15   **Q.**   Did you ultimately receive payment from Homeland Security

16   for being a source of information at that time?

17   **A.**   Yeah.  To cover my brother's lawyer.

18   **Q.**   How much did you receive from Homeland Security?

19   **A.**   Thousand dollars.

20   **Q.**   Do you remember about when that was?

21   **A.**   It was -- think it was a little bit before Christmastime.

22   **Q.**   I want to follow up on an aspect of the conversation you

23   recounted for us with Big Jack, Little Jack, and the Silvery

24   Towers incident.  You said that the defendant made reference

25   to a -- a union worker.

1    Did you have other conversations with the defendant about

2    the need to hire union workers?

3         **MR. DOVE:**  Objection, relevance.

4         **THE WITNESS:**  Yes.

5         **MR. DOVE:**  -- Your Honor.

6         **THE COURT:**  Overruled.

7         **THE WITNESS:**  Yes.

8    **BY MR. NARAYAN:**

9    **Q.**  Did you have conversations with the defendant about what

10   types of workers he would hire?

11   **A.**  Well, you only needed one union worker to get the

12   contract, so then basically any random person could be trained

13   to do the --

14         **MR. DOVE:**  Speculation, Your Honor.

15         **THE COURT:**  Overruled.

16    Let's just confine your answer to what Mr. -- the person

17   you know as Joe told you.

18    Did he tell you these things?

19         **THE WITNESS:**  He told me that as long as you have one

20   union worker, then you can have any random person be a laborer

21   and assist the union guy and you can still get the contract.

22         **THE COURT:**  Overruled.

23   **BY MR. NARAYAN:**

24   **Q.**  Around that time, did you have a conversation with the

25   defendant about where he intended to get his other workers?

1    "Yes" or "no."

2    **A.**   Yes.

3    **Q.**   When -- when did that conversation take place?

4    **A.**   It was during the water removal but before the stone mason

5    started.  It was -- It was a overcast season, so it was

6    probably like wintertime-ish.

7    **Q.**   And where did that conversation take place?

8    **A.**   At the Dunn Road shop.

9    **Q.**   Who was there for that conversation that you remember?

10   **A.**   Yes, Bonbon, Joe, Moses, Felipe, couple other guys.

11   **Q.**   Moses, do you know if he has any relation to the

12   defendant?

13   **A.**   That's his brother.

14   **Q.**   What did the defendant say during this conversation?

15   **A.**   It was -- we were talking about placing the ads on the

16   newspaper to get a -- a union stone mason.

17   **Q.**   If anything, what else did he say?

18   **A.**   That we needed to place ads on Craig's List and stuff like

19   that to get workers, because he's going to need at least 20 to

20   30 guys to do brick laying, cutting the bricks, stacking the

21   bricks, and making mortar, and doing rebar.

22   **Q.**   Did you assist with drafting the advertisement?

23   **A.**   I assisted in the second draft 'cause the first one looked

24   like a two-year-old wrote it.

25   **Q.**   What --

Bodine - DIRECT / Narayan

1    **A.**  Basically it was an ad that --

2         Can I talk or no?  'Cause you're getting all panicky.

3              **THE COURT:**  Wait for the next question.

4    BY MR. NARAYAN:

5    **Q.**  In the course of you providing assistance with this

6    newspaper advertisement, what did the defendant say to you

7    about the newspaper advertisement?

8    **A.**  Showed me something that he had written up.  Like I said

9    before, it looked like a two-year-old wrote it, so I rewrote

10   the ad for him that sounded professional and that could

11   actually have people apply for a job instead of thinking it

12   was a Craig's List scam.

13   **Q.**  Did he say where he wanted to recruit workers from?

14   **A.**  From Mexico.  I mean -- but that's an ongoing thing since

15   I first met Joe when I had my --

16   **Q.**  Let me stop you there.

17              **THE COURT:**  Yeah, wait for the next question, please.

18   BY MR. NARAYAN:

19   **Q.**  Let's focus on -- on this conversation.  What did he say

20   that you recall about workers from Mexico?

21   **A.**  That you could get three workers for the price of one guy

22   from the U.S.

23   **Q.**  Was there a -- another occasion in which he -- the

24   defendant asked for your assistance in transporting workers?

25   **A.**  Yes.  He asked me if I'd have my brother and mother --

Bodine - DIRECT / Narayan

1    **Q.**  Let's -- Let me ask you a few more foundational questions.

2    All right?

3        The conversation you were about to tell us about, when did

4    that take place?

5    **A.**  It was in the beginning -- beginning of Silver Towers

6    water removal, and when it actually transpired of being

7    actually done was when he got the contract for the stone mason

8    job.

9    **Q.**  Was that the stone mason job at --

10   **A.**  Silver Towers.

11   **Q.**  -- Silver Towers.

12       And who was there during this conversation?

13   **A.**  It was myself, Joe, Moses, my brother, Felipe, and Bonbon.

14   **Q.**  Where did that conversation take place?

15   **A.**  Dunn Road, the far back building that Joe was making his,

16   like, little office thing for a while.

17   **Q.**  For the record, what's your brother's name?

18   **A.**  Jonathan Bodine.

19   **Q.**  What did the -- what did defendant say during this

20   conversation?

21   **A.**  That I need to go pick people up from Mexico and bring

22   them here, San Diego.  So basically, you'd run up there, pick

23   them up, and bring them back.  But I need you to rent a car

24   to -- that way your -- it's a different car every time.

25   **Q.**  Did you agree to do that?

Bodine - DIRECT / Narayan

1    **A.**  My brother did, yes.

2                    (Pause in the proceedings.)

3            **MR. NARAYAN:**  No further questions, Your Honor.

4            **THE COURT:**  All right.  If it's okay with you,

5    Mr. Dove, we're a few minutes before adjourning, and I want to

6    instruct the jury, so it would be -- is it acceptable to begin

7    your cross-examination tomorrow?

8            **MR. DOVE:**  Yes, Your Honor.

9            **THE COURT:**  Very well.  Thank you.

10       You may step down and you're required to be back here

11   tomorrow before 8:00 o'clock.  All right?

12       Thank you, sir.

13                   (Witness leaves the witness stand.)

14                   (Pause in the proceedings.)

15           **THE COURT:**  Ladies and gentlemen, we're about to

16   adjourn, and I'm going to give you your conduct -- proper

17   conduct instruction again.  This is what the law requires, and

18   it's also what fairness requires.  And even though you might

19   know it by heart, which is great, I'm required to recite and

20   just to make sure 'cause it's really important and as each day

21   goes by, you are more invested as in your role as judges of

22   the facts in your time, and it becomes, you know, more at

23   stake in terms of anybody possibly violating these rules

24   because we have to start all over again and kind of waste

25   everybody -- the time that you've put in, so that's why this

1    is important.

2        So here we go.  Keep an open mind throughout the trial and

3    do not decide what the verdict should be until you and your

4    fellow jurors have completed your deliberations at the end of

5    the case.

6        Because you must decide this case based only on the

7    evidence received in the case and on the court's instructions

8    as to the law that applies, you must not be exposed to any

9    other information about the case or to the issues it involves

10   during the course of your jury duty.

11       Thus, until the end of the case, or unless I -- unless the

12   court tells you otherwise, do not communicate with anyone in

13   any way and do not let anyone else communicate with you in any

14   way about the merits of the case or anything to do with it.

15       This includes discussing the case in person, in writing,

16   by phone or electronic means, via email, via text messaging,

17   or any Internet chatroom, blog, website, or application,

18   including but not limited to Facebook, YouTube Twitter,

19   Instagram, LinkedIn, Snapchat, or any other forms of social

20   media.

21       This applies to communicating with your fellow jurors

22   until the court gives the case for deliberation, and it

23   applies to communicating with everyone else, including your

24   family members, your employer, the media or press, and the

25   people involved in the trial; although, you may notify your

1  family and your employer that you are continuing to be seated

2  as a juror in the case and how long you expect the trial to

3  last.

4      But if you are asked or approached in any way about your

5  jury service or anything about this case, you must respond

6  that you've been ordered by the court, by me, not to discuss

7  the matter and to report the contact to the court.

8      Because you'll receive all the evidence and legal

9  instruction you properly may consider to return a verdict, do

10  not read, watch, or listen to any news or media accounts or

11  commentary about the case or anything to do with it.  Do not

12  do any research, and/or consulting dictionaries, searching the

13  Internet, or using other reference materials, and do not make

14  any investigation or in any way try to learn about the case on

15  your own.

16      Do not visit or view any place discussed in this case.

17  And do not use any -- use any Internet programs or other

18  devices to search for or view any place discussed during the

19  trial.

20      Also do not do any research about this case, the law, or

21  the people involved, including the parties, the witnesses, or

22  the lawyers until you have been excused as jurors.

23      If you happen to read or hear anything touching on this

24  case or in the media, turn away and report it to me as soon as

25  possible.

1          These rules protect each party's right to have this case

2     decided only on the evidence that has been presented here in

3     court.

4          Witnesses here in court take an oath to tell the truth and

5     the accuracy of their testimony is tested through the trial

6     process.

7          If you do any research or investigation outside the

8     courtroom or gain any information through improper

9     communications, then your verdict may be influenced by

10    inaccurate, incomplete, or misleading information that has not

11    been tested by the trial process.

12         Each of the parties is entitled to a fair trial by an

13    impartial jury, and if you decide the case based on

14    information not presented in court, you will have denied the

15    parties a fair trial.

16         Remember, you've taken an oath to follow the rules, and it

17    is very important that you follow these rules.

18         A juror who violates these restrictions jeopardizes the

19    fairness of these proceedings, and a mistrial could result

20    that would require the entire trial process to start over.

21         If any juror is exposed to any outside information, please

22    notify the court immediately.

23         So the schedule tomorrow is going to be our regular 8:00

24    to 1:30 with two 15-minute break sessions, tomorrow and

25    Thursday.  And then we're dark or no court on Friday.

1          Of course, none on the weekend.  And what I do every --

2     most afternoons is -- is query the parties after you've left

3     about how the case is going according to their schedule to

4     make sure we're still on the schedule that we gave to you.

5     And if there are any changes, hopefully in terms of making it

6     shorter rather than longer, we'll report that to you so you

7     can figure out your lives after this trial.

8          But we do our best to move things along with due deference

9     to the fairness of the proceedings and the ability of each

10    side to have a fair trial.

11         So we'll see you tomorrow morning.  Thank you for your

12    punctuality.  Leave your books.  And have a wonderful

13    afternoon and evening.

14         Thank you.

15         (The following proceedings were heard out of the presence

16    of the jury:)

17              **THE COURT:**  Please be seated.  The jury has left.

18         I have just a couple of brief, quick matters.  I will

19    exhort the government to follow through with its offer to

20    Mr. Dove that it made at sidebar and just so the defendant can

21    hear, in which he -- Mr. Narayan agreed to provide Mr. Dove

22    after court before tomorrow with new copies of the Jencks

23    material clearly identifying which Jencks material is

24    attributable to the witness that we just heard.

25         Is that correct, Mr. Narayan?

1          **MR. NARAYAN:**  Yes, Your Honor.

2          **THE COURT:**  Is that acceptable to you?

3          **MR. DOVE:**  Yes, Your Honor.

4          **THE COURT:**  All right.  There's one other thing I

5     wanted to mention as a housekeeping matter.  And I think

6     lawyers do this inadvertently.  They engage when they're

7     questioning in something that I call "para language."  Either

8     they say "and" or "um" or "okay."

9          You have a habit, Mr. Dove, of saying "yes," which may

10    sound to a jury that you're affirming or agreeing or in some

11    way commenting on the evidence.  I know it's not substantive.

12    It's probably a habit that -- I had a habit like that,

13    although I didn't use word "yes."

14         When you look at the transcript, you'll see that.  And I'd

15    ask you to please kind of think about it and not say "yes"

16    after the witness's answer, 'cause it sounds something that I

17    know you don't intend it to be.

18         Were you aware that you do that?

19         **MR. DOVE:**  Yeah.  Now that you mention it, yeah.

20    I -- yes.

21         **THE COURT:**  Yeah.  Thank you.  It's not -- you can

22    say it now, but -- it's like Simple Simon says.  But it's not

23    appropriate only because to the extent it feels like some kind

24    of comment by counsel about agreeing or disagreeing.  It's

25    confusing to jury, and I -- I just want to let you know that.

1    So let me ask the government -- Mr. Lee, I see you

2 standing, I know it's still early.  We've only had a couple or

3 three witnesses.

4    How are we doing vis-a-vis the government's schedule, at

5 least so far?

6         **MR. LEE:**  Yes, Your Honor.  I was going to simply

7 address the question that was raised when we had the gap in

8 time.  We had a system in place for getting the witnesses in

9 the room quickly.  Clearly there was a breakdown.  It was a

10 technological breakdown.  We got a better system in place now.

11 It won't happen again.

12         **THE COURT:**  Yeah, thank you.  We had -- Ms. Ottolini

13 suggested the break, and I always listen to her, so that was a

14 good idea.

15    All right.

16         **MR. NARAYAN:**  Yes, Your Honor.  Yes, Your Honor.

17    With respect to the schedule, we are about one witness

18 behind kind of what we had -- what we had projected in terms

19 of how quickly we're moving.

20    I still think we are on track for the six days in terms of

21 the government's case.  Part of that depends on the length of

22 the cross-examinations.

23    At present, the government intends to call six more of the

24 victims.  The court's now heard from two.  And the court, I

25 think, and the parties have a sense now of what those direct

1    examinations will entail in terms of the amount of time.

2              THE COURT:  All right.  It's hard for me to ask you

3    to comment.  I think your cross-examinations have been

4    reasonable, Mr. Dove, in terms of length compared to the

5    direct and -- and I -- so if you want to comment on what

6    Mr. Narayan just said about estimates, that's fine.

7         But my -- my goal is obviously move the case along as

8    efficiently as possible with due regard to everybody's rights,

9    with the idea of shortening it rather than lengthening it.

10        And to the extent that we're always within the three weeks

11   that we predicted, then I'm a happy camper.  When we start

12   getting close to that -- I'm not going to say anything to the

13   jury unless -- you know, probably ever because I -- things can

14   happen in a trial and I hate to say, hey, guess what, we're a

15   week shorter and then we go longer and then we change their

16   expectations in a bad way.

17        Fair enough?

18             MR. NARAYAN:  Yes, Your Honor.

19        And I did want to add that if at any point that we believe

20   our projection is moving into, you know, day seven or day

21   eight, we'll alert the court at the -- as soon as we can.

22             THE COURT:  Very well.

23        Anything you want to say about that, Mr. Dove?

24             MR. DOVE:  No, Your Honor.

25             THE COURT:  All right.  Thank you.  Thanks for your

1     courtesy.

2          And, again, we will just keep moving the case along.  And

3     I think counsel's doing a good job in being solicitous of the

4     court and the jury's time.

5          So thank you, counsel.  See you tomorrow morning.

6               (Proceedings were concluded at 12:18 P.M.)

7                              --o0o--

8

9

10                   **CERTIFICATE OF REPORTER**

11

12          I certify that the foregoing is a correct transcript

13     from the record of proceedings in the above-entitled matter.

14     I further certify that I am neither counsel for, related to,

15     nor employed by any of the parties to the action in which this

16     hearing was taken, and further that I am not financially nor

17     otherwise interested in the outcome of the action.

18

19     _____

20          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

21               Sunday, March 10, 2019

22

23

24

25