UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA   *ORIGINAL*

Before The Honorable JEFFREY S. WHITE, Judge

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 9** |
| | ) | |
| vs. | ) | NO. CR 17-00462 JSW |
| | ) | |
| JOB TORRES HERNANDEZ, | ) | **Pages 1548 - 1655** |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Thursday, March 14, 2019 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES:**</u>

For Plaintiff:          David L. Anderson, Esq.
                        United States Attorney
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:   JONATHAN U. LEE,
                        RAVI T. NARAYAN,
                        Assistant United States Attorneys

For Defendant:          Law Offices of Austin R. Dove
                        555 W. 5th Street, 35th Floor
                        Los Angeles, California  90017
                  BY:   AUSTIN R. DOVE, ATTORNEY AT LAW

                        Law Offices of Brian H. Getz
                        888 Kearny Street, Suite 850
                        San Francisco, California  94108
                  BY:   BRIAN H. GETZ, ATTORNEY AT LAW

Reported By:            Raynee H. Mercado
                        CSR. No. 8258

     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

## I N D E X

|  | PAGE | VOL. |
|---|---|---|
| Jury Instructions | 1565 | 9 |
| Closing Argument by Mr. Narayan | 1577 | 9 |
| Closing Argument by Mr. Dove | 1597 | 9 |
| Rebuttal Closing Argument by Mr. Narayan | 1642 | 9 |

--o0o--

```
 1  Thursday, March 14, 2019                         7:41 a.m.
 2                    P R O C E E D I N G S
 3       (The following proceedings were heard out of the presence
 4  of the jury:)
 5            THE CLERK:  Calling case CR-17-462, United States
 6  versus Job Torres Hernandez.
 7       Counsel, please step forward to the podiums and state your
 8  appearances.
 9            MR. NARAYAN:  Good morning, Your Honor.  Ravi Narayan
10  and Jonathan Lee for the United States.
11            THE COURT:  Good morning.
12            MR. LEE:  Good morning.
13            MR. GETZ:  Your Honor, good morning.  Austin Dove and
14  Brian Getz on behalf of Mr. Torres Hernandez who's present and
15  ready for these proceedings.
16            THE COURT:  Good morning.
17       Hello, Mr. Torres Hernandez.  You may be seated.  Thank
18  you.
19       All right.  So let me -- I want to go through some of my
20  items, and then we can talk about today's proceedings.
21       The first thing that I omitted to do yesterday is ask
22  defense counsel -- or confirm because we ended sort of
23  abruptly yesterday with the obvious decision for the
24  Mr. Torres Hernandez not to testify.
25       And I just wanted to confirm that Mr. Torres Hernandez was
```

1   advised by his attorneys of his right to testify?

2          **MR. GETZ:**  Your Honor, we discussed that subject

3   comprehensively and at length before the trial, during the

4   course of the trial, and even as recent as last night.  And I

5   can advise the court that Mr. Torres Hernandez is comfortable

6   in his decision not to testify and makes that knowing full

7   well what his rights and -- and possibilities are.

8          **THE COURT:**  Great.  Thank you very much.

9       And, again, the court wants to thank the parties, counsel,

10  for meeting and conferring and reaching an agreement on the --

11  on the jury instructions.

12      You have a copy of the instructions.  And the -- one thing

13  the parties did and maybe I wasn't a hundred percent clear and

14  I'm not in any way faulting the parties, but you didn't submit

15  a complete copy -- a complete set 'cause there were certain

16  boiler-plate instructions that were not in the packet.  So the

17  court took the liberty of adding from the original

18  instructions largely submitted by the parties adding those

19  back in, the ones that are necessary, so pay particular

20  attention.  We have flyspecked and proofread, but that's

21  your -- you know, your job is to look at it substantively as

22  well as for any -- any typos.

23      Now, the court has reviewed the instructions and the

24  special verdict form but will ask the parties again to take a

25  few minutes right after we adjourn briefly this morning to

1   review them and make sure there are no errors.

2        With respect to the jury instructions, the court has not

3   reiterated instructions that were more appropriately given in

4   the preliminary jury instructions or during the trial.

5        And the only one that the court gave during the trial in

6   the court's recollection is the one on cautioning the jury

7   about their proper conduct during the first recess.  That was

8   the only one that the court gave.

9        And the court has deleted the stipulations of fact

10  instruction and the judicial notice instructions since neither

11  applies.

12       And the court's -- the court also notes that the parties

13  noted that they had deleted the, quote, on or about, unquote,

14  instruction but included it anyway so the court has included

15  that information -- that instruction because the indictment

16  charges that the counts -- the conduct -- the alleged conduct

17  occurred on or about certain dates, so I added that back in

18  there.

19       The other thing I did, just for your notification, is

20  there's an instruction in there which I don't really

21  particularly like anyway but in its there, and it's in -- it

22  will still be in there.  And it's about -- the one having to

23  do with impeachment of witnesses.  And that one in the form

24  instruction and the one that you all submitted preliminarily

25  and also last night requires the court or the parties to make

1    judgments about who got impeached, who didn't and what kind of

2    impeachment.  So I left it generic that certain witnesses were

3    impeached and, you know, they are to -- and then I left the

4    rest of the instruction in.

5        My thinking is the court's going to give an instruction

6    that you all agreed on on credibility of witnesses.  You can

7    argue to the jury whatever you want about whether a particular

8    witness was impeached or how they were impeached -- rather

9    than the court making or the parties deciding who they think

10   was -- were impeached and whose recollection was refreshed, I

11   just leave it more generic and let you all argue who you think

12   was impeached and how they were impeached.

13       So is -- is there any problem from the government with

14   respect to that?  You'll to have read it, but generally that's

15   what I did.  I didn't put any names in there.

16           **MR. LEE:**  No, Your Honor.  Generally, there's no

17   problem with that.

18           **THE COURT:**  Okay.

19       Mr. Getz?

20           **MR. GETZ:**  We're fine with that.

21           **THE COURT:**  Okay.  Great.

22       Now, the court also asked the parties follow the local

23   rules and file a redacted version of the jury instructions.

24   And so at this point, this is the point where I would allow

25   you to review the instructions, give you a few minutes just

```
 1    for any oversights.
 2         Again, they all are agreed upon by you.  It's really just
 3    a function of making sure that there's no last-minute issues,
 4    no last-minute objections, and then we'll finalize those.
 5         And the -- one question I have is -- and this -- I was
 6    going to say this after you looked at it, but I'll say it now.
 7    Rather than post a version of the jury instruction -- jury
 8    instructions -- let me strike that.
 9         I'm going to -- what I do is I actually have the
10    instructions up on the -- on the monitor as I'm giving it just
11    like I did for the preliminary instructions.  And rather than
12    put up a version of the jury instructions with the alleged
13    victims' initials, for the ones that I read, it will have the
14    full names of the -- of the -- the alleged victims.  But for
15    the posted ones, the court will redact the names of the
16    alleged victims for the final posting of these instructions.
17         Is that okay with the government?
18              MR. LEE:  Yes, Your Honor.  And we -- just to make
19    sure we understand, we can -- we can efile the jury
20    instructions document that we submitted jointly last night
21    under seal -- we could efile that between the time that we end
22    here and before closing arguments with the initials inserted
23    so that's on the -- on the docket.
24         Is that the court's preference?
25              THE COURT:  Yes.  It is.
```

1           **MR. LEE:**  Okay.

2           **THE COURT:**  Do you have any problem with that?

3      So basically what will happen is -- just 'cause there's a

4   lot of drafts going on -- final instructions will have the

5   full names of the alleged victims and similarly when I read to

6   the jury and what they see will have those.

7      So one question I have -- kind of preliminary question is,

8   does the government have any objection, which it didn't at the

9   beginning of the trial, to being -- to broadcasting those

10  names to the gallery and the gallery cameras, 'cause we did

11  that with the voir dire.

12          **MR. LEE:**  No, we don't -- the government has no

13  objection to that, Your Honor.

14          **THE COURT:**  All right.

15     Do you have any problem with that?

16          **MR. GETZ:**  No, Your Honor.

17          **THE COURT:**  All right.

18     Okay.  So we talked about that.

19     All right.  Let me -- before I come back and hear any

20  further -- put on the record any further requests for

21  instructions or objections, what -- I had asked you to come

22  prepared to give me time estimates so I can inform the jury

23  about closing argument.

24          **MR. NARAYAN:**  Thirty to forty-five minutes for the

25  government's closing argument.

1          **THE COURT:**  Is that the whole or just -- the direct

2    and the -- and the rebuttal or just the --

3          **MR. NARAYAN:**  The whole.

4          **THE COURT:**  Okay.  And from the defense?

5          **MR. DOVE:**  Forty-five minutes, Your Honor.

6          **THE COURT:**  Okay.  I'm glad you said that.  I was

7    going to make a little homily here that, you know, when I was

8    in practice, especially when I was a government attorney, I

9    tried over 150 cases, and I never gave a closing argument

10   longer an hour, ever.  And usually it averages half hour.  And

11   I tried some four-month cases and I thought anything beyond 45

12   minutes is a waste of time.  It's a filibuster, and the jury

13   hates all of us for talking at them, so -- if they don't

14   understand the case now, they're never going to understand it,

15   so I really appreciate that.  I think it will get the case to

16   the jury.

17        And then I'm going to give them this -- remind them that

18   if they want to deliberate as late as they want, within

19   reason, they can, and if they want the deliberate tomorrow,

20   they can.

21        So what I'm planning on doing is after the -- after your

22   closing arguments, I will then provisionally excuse the

23   alternates, but I will tell them that they're still under the

24   strictures of the conduct -- proper conduct of the jury

25   instruction and that they'll be released by telephone or email

1    or text, however we communicate, to let them know if the

2    verdict -- when the verdict comes in so they know they're free

3    to go about their lives without any restrictions from the

4    court.

5        All right.  So any other matters other than going through

6    the instructions?

7            **MR. NARAYAN:**  No, Your Honor.

8            **THE COURT:**  From you?  Any other matters?

9            **MR. GETZ:**  I -- At some point I should make the Rule

10   29.

11           **THE COURT:**  Yes.  How about we do this?  Why don't

12   you go through the instructions.  I'll give you, like, 15

13   minutes, should be enough, and then I'll come back out.  And

14   then if they're fine, you know, they'll be in the can, ready

15   to go.  And then I'll hear your brief motion for -- you know,

16   for the record for your Rule 29 motion.

17           **MR. GETZ:**  Thank you.

18           **THE COURT:**  Then we'll -- I'll let you folks, you

19   know, get organized and give you couple hours -- extra hours

20   to prepare.  Great.

21           **MR. DOVE:**  If I may, Mr. Torres Hernandez has

22   indicated that he would be willing to waive my appearance for

23   purposes of tomorrow if the jury decides to deliberate

24   tomorrow.

25       Mr. Getz would be available for all purposes.  And I

```
 1      wanted to advise the court.
 2                  THE COURT:  And I will --
 3                      (Simultaneous colloquy.)
 4                  THE COURT:  Okay.  I guess it doesn't matter.  I was
 5      going to ask if I should say anything to the jury, but since
 6      they'll be back there deliberating, they won't know it anyway
 7      until they -- 'cause, as I said, they just come and go on
 8      their own.  We don't --
 9                  MR. DOVE:  Right.
10                  THE COURT:  We don't do further instructions.  This
11      way they go about their business.  They don't waste time
12      coming in here.  They just --
13          So fine.  So I agree with that and thank you for telling
14      me that.
15          All right.  See you in 15 minutes.
16          (Recess taken at 7:52 A.M.; proceedings resumed at 9:54
17      A.M.)
18          (The following proceedings were heard out of the presence
19      of the jury:)
20                  THE CLERK:  Remain seated and come to order.  Court
21      is again in session.
22                  THE COURT:  Counsel, would you come forward and let
23      me know whether you have any objections or found any errors or
24      requests.
25          From the government first.
```

```
 1            MR. LEE:  Your Honor, no objections.

 2        There were a few minor items that we noticed that we

 3    wanted to bring to the court's attention.

 4            THE COURT:  Okay.  I don't know if I have a set of --

 5                    (Off-the-record discussion.)

 6            THE COURT:  Okay.  Go ahead.

 7            MR. LEE:  The first item would be on page 10 where

 8    the instructions discuss the election of the defendant to

 9    testify or not to testify, so I'm sure the court would have

10    delete --

11            THE COURT:  Yeah, of course.  That's an error on our

12    part.  Go ahead.  That's why we have more eyes on this, 'cause

13    we're all blurry-eyed at this point.

14        Go ahead.

15            MR. LEE:  Everything else is errors that we made in

16    submitting this, Your Honor.

17        Page 13, the "on or about" instruction, to include that,

18    it should really refer to both counts in the indictment 'cause

19    they -- the counts use the same language that beginning

20    sometime in 2015 and through sometime in 2017, the following

21    conduct is alleged.

22            THE COURT:  So we should say in count one and count

23    two.

24            MR. LEE:  Counts one and two, and that should be

25    repeated twice because of the two references to count one.
```

```
1          THE COURT:  Okay.

2          MR. LEE:  And then on the next page, page 14, we

3    noticed two items.  In the paragraph that starts on line 19,

4    that starts with the word "fourth," there's no period at the

5    end, and that I -- should be -- just to make sure no one's

6    wondering if there's omitted language after that.

7          THE COURT:  Okay.

8          MR. LEE:  And then we wanted to bring to the court's

9    attention, Dave Noel Alvarez Nolazco, we noticed that the last

10   name, the "S" is a "Z" in his I94 form and as he testified.

11   So that would be a global change throughout on that name.

12         THE COURT:  Okay.

13         MR. LEE:  And I believe those are the only items that

14   we noted from the government, Your Honor.

15         THE COURT:  All right.

16      Mr. Getz?

17         MR. GETZ:  We had a question about the verdict form.

18   Is that something I can address now?

19         THE COURT:  Please.

20         MR. GETZ:  With regard to the choice that the jury

21   has between guilty and not guilty, it seemed like instead of

22   word "not," the version we saw was "non," n-o-n.

23         THE COURT:  "Non-guilty"?

24         MR. GETZ:  And I think that while that might be

25   correct, we -- we would prefer the "not," n-o-t, guilty as the
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
 1   choice that the jury has on the verdict form.

 2            THE COURT:  What's in the current form?

 3            MR. GETZ:  I believe it's "non," n-o-n.

 4            THE COURT:  That's an error then.  I don't even know

 5   where that came from.

 6            THE CLERK:  Here's my copy.

 7            THE COURT:  Unless it came from you guys.

 8            MR. LEE:  It came from us, Your Honor.  It's an

 9   error.

10            THE COURT:  Okay.  Thank you.

11      Anything else?

12            MR. DOVE:  I just noticed a typo page 14 on line 25

13   where, the alien --

14                  (Off-the-record discussion.)

15            MR. DOVE:  It's page 14, line 25.

16            THE COURT:  Yeah, that is an error.  It says "it"

17   should be "is" not lawfully in this country, correct.

18      Okay.  Anything else, Mr. Dove?

19            MR. DOVE:  No, Your Honor.

20            THE COURT:  All right.  You may be make your motion

21   now, Mr. Getz.

22            MR. GETZ:  Thanks for letting me reserve that, Your

23   Honor.  Rule 29's for the benefit of the defendant.  And while

24   I like to be helpful to the court, at the same time I don't

25   think I'm going to be very helpful to the court.
```

1    But I would like to perfect my rule 29 now, which the

2    court allowed me to reserve after the government rested and

3    again allowing me to reserve after the defense rested.

4    And with regard to the charge in count one, our Rule 29

5    motion rests on the premise that there was no harboring within

6    the meaning of the term.  Although circuit courts have held

7    that it is not necessary for a defendant to actively take

8    steps to hide an alien from immigration authority, to amount

9    to harboring under the statute, it is necessary that the

10   defendant provide the alien with shelter for financial gain.

11   Our argument rests on the -- the idea that the shelter, in

12   this case, the warehouse, that was available for use by the

13   workers was collateral to anything that the defendant intended

14   and was not sufficient to allow that issue to go to the jury

15   within the meaning of the statute.

16   Second, count two, the forced labor charge, in order for

17   the defendant to be guilty on this charge, the jury would have

18   to find that the defendant obtained the services or labor of

19   one of the workers by means of a scheme, which he did not

20   because there was no scheme; a plan, which he did not because

21   there was to plan not to pay them; a pattern intended to cause

22   that person to believe that if that person did not perform

23   such labor or services, that person would suffer serious harm.

24   I argue to the court that there was no such conduct

25   presented by the defendant and, therefore, there was no forced

1    labor within the meaning of the statute.

2        And I would ask the court to grant judgment of acquittal

3    on both counts.

4            THE COURT:  All right.  So as I -- you don't need to

5    respond, Mr. Narayan and Mr. Lee.  That's not a commentary on

6    the merits.  I would prefer to let -- let the case go to the

7    jury and then have this briefed so I can do this in a very

8    dispassionate and considered way, which is my practice in

9    almost every case, and you've preserved the motion.

10       I would ask for further -- obviously, if there's an

11   acquittal, then it's all moot.

12       If there's a conviction, I am going to ask as part of the

13   post-trial motions to actually brief the points that you made

14   because, you know, they may be well taken.

15       So anything further you want to say on that at this point?

16           MR. GETZ:  The only thing further I would say is that

17   in the event that there are convictions, the Rule 29 motion

18   that would follow would be a different motion.  I believe it

19   would be Rule 29(c).  And I would ask leave of court to be

20   able to file one Rule 29 motion that encompasses all three

21   stages of the procedure without having to enunciated which one

22   I'm referring to.

23           THE COURT:  Granted.

24           MR. GETZ:  Thank you.

25           THE COURT:  Thank you very much.  We'll see you

1    promptly at 10:00 o'clock and ready to go.

2        Thank you.

3            **MR. NARAYAN:**  Thank you.

4        (Recess taken at 8:17 A.M.; proceedings resumed at 10:07

5    A.M.)

6        (The following proceedings were heard out of the presence

7    of the jury:)

8            **THE CLERK:**  Remain seated and come to order.  Court

9    is again in session.

10           **THE COURT:**  Let's bring in the jury.

11       (The following proceedings were heard in the presence of

12   the jury:)

13           **THE COURT:**  Please be seated.

14       Good morning, ladies and gentlemen.

15           **JURORS:**  Morning.

16           **THE COURT:**  And thank you very much again for your

17   punctuality.  It allows us to start on time.

18       So as promised, what's going to happen this morning is I'm

19   going to give you your jury instructions on what the law is

20   that you're bound to follow.  That will be followed by closing

21   argument by counsel, and then I'll give you one last

22   housekeeping instruction to aid you in your -- procedurally in

23   your deliberations.

24       So I'm going to, like I did for the opening preliminary

25   instructions, put up the instructions on -- on the board as --

1    on the screen.  And you can either read along with that or

2    listen to me or -- one of those two will be fine.  And you'll

3    have a copy of the instructions, a hard copy, in the jury

4    room.

5        So these are your instructions.  I'm not going to read the

6    heading.  That's just to help you as you go back to the jury

7    room if you want to find a particular instruction.

8                          **JURY INSTRUCTIONS**

9        **THE COURT:**  Members of the jury, now that you have

10   heard all the evidence, it is my duty to instruct you on the

11   law that applies in this case.  A copy of these instructions

12   will be available in the jury room for you to consult.

13       It is your duty to weigh and to evaluate all the evidence

14   received in the case and, in that process, to decide the

15   facts.  It is also your duty to apply the law as I give it to

16   you to the facts as you find them, whether you agreed with the

17   law or not.

18       You must decide the case solely on the evidence and the

19   law.  Do not allow personal likes or dislikes, sympathy,

20   prejudice, fear, or public opinion to influence you.  You

21   should also not be influenced by any person's race, color,

22   religion, national ancestry or gender, sexual orientation,

23   profession, occupation, celebrity, economic circumstances, or

24   position in life or in the community.  You'll recall that you

25   took an oath promising to do so at the end of the -- at the

1   beginning of the case.

2       You must follow all of these instructions and not single

3   out some and ignore others.  They are all important.  Please

4   do not read into these instructions or into anything I may

5   have said or done any suggestion as to what verdict you should

6   return.  That is a matter entirely up to you.

7       This is a criminal case brought by the United States

8   government.  The government charges the defendant with

9   harboring illegal aliens for commercial advantage or private

10  financial gain in violation of 8 U.S.C., which stands for

11  United States Code, Section 1324A18 3 little I's and B 1

12  little I, and forced labor in violation of 18 United States

13  Code Section 1589A.

14      The charges against the defendant are contained in the

15  indictment.  The indictment simply describes the charges the

16  government brings against the defendant.  The indictment is

17  not evidence and does not prove anything.

18      The defendant has pleaded not guilty to the charges and is

19  presumed innocent unless and until the government proves the

20  defendant guilty beyond a reasonable doubt.  In addition, the

21  defendant has the right to remain silent and never has to

22  prove innocence or to present any evidence.

23      Proof beyond a reasonable doubt is proof that leaves you

24  firmly convinced the defendant is guilty.  It is not required

25  that the government prove guilt beyond all possible doubt.  A

1   reasonable doubt is a doubt based upon reason and common sense

2   and is not based purely on speculation.  It may arise from a

3   careful and impartial consideration of all the evidence or

4   from lack of evidence.

5       If, after a careful and impartial consideration of all the

6   evidence, you are not convinced beyond a reasonable doubt that

7   the defendant is guilty, it is your duty to find the defendant

8   not guilty.

9       On the other hand, if, after a careful and impartial

10  consideration of all the evidence, you are convinced beyond a

11  reasonable doubt the defendant is guilty, it is your duty to

12  find the defendant guilty.

13      You are not -- you are here only to determine whether the

14  defendant is guilty or not guilty of the charges in the

15  indictment.  The defendant is not on trial for any conduct or

16  offense not charged in the indictment.

17      Evidence you are to consider -- the evidence you are to

18  consider in deciding what the facts are consists of, one, the

19  sworn testimony of any witness; and, two, the exhibits

20  received in evidence; and, three, any facts to which the

21  parties have agreed.

22      In reaching your verdict, you may consider only the

23  testimony and exhibits received in evidence.  The following

24  things are not evidence and may not -- and you may not

25  consider them in deciding what the facts are:

1    One, questions, statements, objections, and arguments by

2    the lawyers are not evidence.  The lawyers are not witnesses.

3    Although you must consider a lawyer's questions to understand

4    the answers of a witness, the lawyer's questions are not

5    evidence.

6    Similarly, what the lawyers have said in their opening

7    statements, will say in their closing arguments and at other

8    times is intended to help you interpret the evidence but is

9    not evidence.

10   If the facts as you remember them differ from the way the

11   lawyers state them, your memory of them controls.

12   Two, any testimony that I have excluded, stricken or

13   instructed to you disregard is not evidence.  In addition,

14   some evidence was received only for a limited purpose.  When I

15   have instructed you to consider certain evidence in a limited

16   way, you must do so.

17   Three, anything you may have seen or heard when the court

18   was not in session is not evidence.  You are to decide the

19   case solely on the evidence received at the trial.

20   Evidence may be direct or circumstantial.  Direct evidence

21   is proof of a fact, such as testimony by a witness about what

22   that witness personally saw, or heard, or did.  Circumstantial

23   evidence is indirect evidence; that is, it is proof of one or

24   more facts from which you can find another fact.  You are to

25   consider both direct and circumstantial evidence.  Either can

1   be used to prove any fact.  The law makes no distinction

2   between the weight to be given to either circumstantial --

3   direct or circumstantial evidence.  It is for you to decide

4   how much weight to give any evidence.

5       A defendant in a criminal case has a constitutional right

6   not to testify.  In arriving at your verdict, the law

7   prohibits you from considering in any manner that the

8   defendant did not testify.

9       In deciding the facts of this case, you may have to decide

10  which testimony to believe and which testimony not to believe.

11  You may believe everything a witness says or part of it or

12  none of it.

13      In considering the testimony of any witness, you may take

14  into account, one, the witness's opportunity and ability to

15  see or hear or know the things testified to; two, the

16  witness's memory; three, the witness's manner while

17  testifying; four, the witness's interest in the outcome of the

18  case, if any; five, the witness's bias or prejudice, if any;

19  six, whether other evidence contradicted the witness's

20  testimony; seven, the reasonableness of the witness's

21  testimony in light of all the evidence; and, eight, any other

22  factors that bear on believability.

23      Sometimes a witness may say something that is not

24  consistent with something else he or she said.  Sometimes

25  different witnesses give different versions of what happened.

 1   People often forget things or make mistakes in what they also

 2   remember.  Also two people may see the same event but remember

 3   it differently.  You may consider these differences, but do

 4   not decide that testimony is untrue just because it differs

 5   from other testimony.

 6       However, if you decide that a witness has deliberately

 7   testified untruthfully about something important, you may

 8   choose not to believe anything that witness said.

 9       On the other hand, if you think the witness testified

10   untruthfully about some things but told the truth about

11   others, you may accept the part you think is true and ignore

12   the rest.

13       The weight of the evidence as to a fact does not

14   necessarily depend on the number of witnesses who testify.

15   What is important is how believable the witnesses were and how

16   much weight you think their testimony observed -- deserves.

17       Now, you have heard testimony that the defendant made a

18   statement.  It is for you to decide, one, whether the

19   defendant made the statement; and, two, if so, how much weight

20   to give to it.

21       In making those decisions, you should consider all the

22   evidence about the statement, including the circumstances

23   under which the defendant may have made it.

24       You have heard evidence that -- that may impeach the

25   testimony of certain witnesses.  You may consider this

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  evidence in deciding whether or not to believe certain

2  witnesses and how much weight to give the testimony of certain

3  witnesses.

4       You have heard testimony of eyewitness identification.  In

5  deciding how much weight to give this testimony, you may

6  consider the various factors mentioned in these instructions

7  concerning credibility of witnesses.  In addition to those

8  factors in evaluating eyewitness identification testimony, you

9  may also consider the capacity and opportunity of the

10  eyewitness to observe the offender based upon the length of

11  time for observation and the conditions at the time of

12  observation, including lighting and distance, whether the

13  identification was the product of the eyewitness's own

14  recollection or was the result of subsequent influence or

15  suggestiveness, any inconsistent identifications made by the

16  eyewitness -- eyewitness, the witness's familiarity with the

17  subject identified, the strength of earlier and later

18  identification, lapses of time between the event and the

19  identification, and the totality of circumstances surrounding

20  the eyewitness's identification.

21       An act is done knowingly if the defendant is aware of the

22  act and does not act through ignorance, mistake, or accident.

23       The government is not required to prove that the defendant

24  knew that his acts or omissions were unlawful.  You may

25  consider evidence of the defendant's words, acts, or

1   omissions, along with all the other evidence in deciding

2   whether the defendant acted knowingly.

3       The indictment charges that the offenses alleged in counts

4   one and two occurred, quote, unquote, on or about a certain

5   date.  Although it is necessary for the government to prove

6   beyond a reasonable doubt that the offenses were committed on

7   a date reasonably near the dates alleged in counts one and two

8   of the indictment, it is not necessary for the government to

9   prove that the offenses were committed precisely on the date

10  charged.

11      The defendant is charged in count one of the indictment

12  with harboring illegal aliens in violation of 8 United States

13  Code Section 1324(a)(1)(A)(iii) and B(i).  In order for you to

14  find the defendant guilty of this charge, the government must

15  prove each of following elements beyond a reasonable doubt:

16      First, at least one of the following persons was an alien.

17  Arnoldo Lopez Contreras, Jordan Rene Ledesma Alvarez, Juan

18  Manuel Nevares Tavera, Alejandro Lopez Alcantar, Jose Leonardo

19  Avila Cortes, Sabas Morales Alvarado, Jose Francisco Morales

20  Alvarado, and Dave Noel Alvarez Nolazco.

21      Second, at least one of the following persons was not

22  lawfully in the United States:  Arnoldo Lopez Contreras,

23  Jordan Rene Ledesma Alvarez, Juan Manuel Nevares Tavera,

24  Alejandro Lopez Alcantar, Jose Leonardo Avila Cortes, Sabas

25  Morales Alvarado, Jose Francisco Morales Alvarado, and Dave

1  Noel Alvarez Nolazco.

2      Third, the defendant knew or was in reckless disregard of

3  the fact that at least one of following persons were not

4  lawfully in the United States:  Arnoldo Lopez Contreras,

5  Jordan Rene Ledesma Alvarez, Juan Manuel Nevares Tavera,

6  Alejandro Lopez Alcantar, Jose Leonardo Avila Cortes, Sabas

7  Morales Alvarado, Jose Francisco Morales Alvarado, and Dave

8  Noel Alvarez Nolazco.

9      And fourth, the defendant harbored, concealed, or shielded

10  from detection at least one of the following persons for the

11  purposes of avoiding detection by immigration authorities:

12  Arnoldo Lopez Contreras, Jordan Rene Ledesma Alvarez, Juan

13  Manuel Nevares Tavera, Alejandro Lopez Alcantar, Jose Leonardo

14  Avila Cortes, Sabas Morales Alvarado, Jose Francisco Morales

15  Alvarado, and Dave Noel Alvarez Nolazco.

16      An alien is a person who is not a natural born or

17  naturalized citizen of the United States.  An alien is not

18  lawfully in this country if the person was not duly admitted

19  by an immigration officer.

20      Harboring includes conduct tending substantially to

21  facilitate an alien's remaining in the United States illegally

22  and to prevent government authorities from detecting his or

23  her unlawful presence.

24      Such facilitation may be attempted through a wide range of

25  conduct, including providing aliens with housing,

1    transportation, and assisting them in obtaining employment.

2    Harboring does not require that the defendant actively take

3    steps to hide the alien from immigration authorities.  It is

4    sufficient that the defendant provided the alien with shelter

5    for financial gain.

6        With respect to count one, all of you must be unanimous as

7    to at least one of the persons listed above.  If you find that

8    the government has proven all the elements set forth in the

9    previous instruction with respect to at least one of the

10   individuals named therein, you must also decide whether the

11   defendant committed the charged offense for the purpose of

12   commercial advantage or financial gain.

13       A person acts with reckless disregard when he knows of a

14   substantial and unjustifiable risk that his conduct is

15   criminal.  A person acts recklessly with respect to a fact

16   when he consciously disregards a substantial and unjustifiable

17   risk that the fact exists.

18       The risk must be of such a nature and degree that

19   considering the nature and purpose of the person's conduct and

20   the circumstances known to him, its disregard involves a gross

21   deviation from the standard of conduct that the law-abiding

22   person would observe in the person's situation.

23       The defendant is charged in count two of the indictment

24   with forced labor in violation of 18 United States Code

25   Section 1589.  In order for you to find the defendant guilty

1    of this charge, the government must prove each of the

2    following elements beyond a reasonable doubt.

3        First, defendant obtained the labor or services of at

4    least one of the following persons:  Arnoldo Lopez Contreras,

5    Jordan Rene Ledesma Alvarez, Juan Manuel Nevares Tavera,

6    Alejandro Lopez Alcantar, Jose Leonardo Avila Cortes, Sabas

7    Morales Alvarado, Jose Francisco Morales Alvarado, and Dave

8    Noel Alvarez Nolazco.

9        The word "obtained" means to acquire or procure or to

10   succeed in gaining the possession of something as a result of

11   the some plan, endeavor, or general course.

12       The word "labor" means work or the performance of any

13   particular task or set of tasks, and it includes any form of

14   physical or mental effort or exertion to perform such work or

15   tasks.

16       The word "services" means any conduct, work or duty

17   performed for the benefit of another person or thing.

18       Second, if you find that the defendant obtained the labor

19   or services of at least one of the persons listed above, then

20   you must determine whether he did so by means of a scheme,

21   plan, or pattern intended to cause that person to believe that

22   if that person did not perform such labor or services, that

23   person would suffer serious harm.

24       The word "serious harm" means any harm, whether physical

25   or non-physical harm, including psychological, financial, or

1  reputational harm that is sufficiently serious under the all

2  the surrounding circumstances to compel a reasonable person of

3  the same background and in the same circumstances to perform

4  or to continue to perform labor or services in order to avoid

5  incurring that harm.

6      In determining whether a particular type or certain degree

7  of harm or coercion was sufficient to obtain labor or services

8  of the persons listed above, you should consider their

9  individual circumstances, including their age, intelligence,

10  education, experience, background, social status, immigration

11  status, any inequalities between that person and the

12  defendant, and any reasonable means of escape or terminating

13  the relationship.

14      Third, you must find that the defendant acted knowingly.

15  As defined above, an act was done knowingly if defendant was

16  aware of the act and did not act through ignorance, mistake,

17  or accident.

18      With respect to count two, all of you must be unanimous as

19  to at least one of the persons listed above.

20      All right?  So that concludes the initial instructions.

21      At this time, counsel may argue.  And traditionally we

22  start with government counsel followed by defense counsel and

23  then the government gets a final rebuttal.

24      So you may -- you may make your final arguments,

25  Mr. Narayan.

1              (Off-the-record discussion.)

2         MR. NARAYAN:  May I proceed?

3         THE COURT:  Yes, you may proceed.

4                    **CLOSING ARGUMENT**

5         MR. NARAYAN:  This is a case about exploitation.

6    That's what my colleague Mr. Lee said at the beginning of his

7    opening statement last Monday morning.

8         And as the victims have taken that witness stand and told

9    you about their experiences, that's what you've seen.  Painful

10   example after painful example of exploitation.  And this case

11   is about the victims sharing their experiences with you,

12   sharing what they went through at the hands of the defendant.

13        Now, you've heard that the defendant Job Torres Hernandez

14   recruited these men from Mexico to work in the United States.

15   And in order to get them here, he made promises regarding

16   their pay, regarding work permits, and regarding a better

17   life.

18        But you heard what those victims encountered when they

19   actually got here to Northern California.  And you heard that

20   what they encountered when they got here was a lot different

21   than what the defendant promised them.

22        You heard the defendant kept them in a warehouse on Dunn

23   Road in Hayward, California.  Dozens of men, sleeping in

24   attics, next to commercial machinery, sometimes in cars, vans

25   or the cabins of dump trucks on the commercial warehouse

1    property operated by the defendant.

2        You heard they had limited access to working bathrooms,

3    toilets, and showers.  Eight men slept in a single garage.

4    Four men slept in a trailer on a farm in Sacramento, drove

5    three hours each way to work at the defendant's construction

6    site in the Bay Area to work a 14-hour shift.

7        You heard about men working through the night at the

8    insistence of the defendant and then again working through the

9    night.

10       You heard that the defendant promised to pay them but that

11   when it came time to pay those men to whom he made those

12   promises, well, you heard what he said over and over again.

13   "I'll pay you tomorrow."  "I'll pay you next week."  "I'll pay

14   you later."  But when later came, the payment didn't.

15       And as this went on, the men, the victims, got frustrated,

16   desperate, tired, hungry.  And as the men got weaker, the

17   defendant's tactics got stronger.

18       You heard that he got to know them, that he identified

19   their vulnerabilities, that he internalized those

20   vulnerabilities and that he preyed on those vulnerabilities to

21   get what he wanted.  And what he wanted, members of the jury,

22   was their labor, their work on his construction projects.

23       He obtained that labor by exploitation with no regard for

24   the victims' suffering.

25       And that, members of the jury, is a crime.  And that is

1   why we're here.  So let's talk about why.

2      You've just been given instructions from the court about

3   the law that applies to the two crimes the defendant is

4   charged with:  Harboring aliens for his gain in count one, and

5   forced labor for count two.

6      So let's go through those instructions.  Let's do it

7   carefully and let's do it thoroughly.

8      Now, count one charges harboring illegal aliens for gain.

9   And the court has told you that there are four elements to

10   that offense.

11                  (Pause in the proceedings.)

12                  (Demonstrative published.)

13      **MR. NARAYAN:**  Now, the first two elements relate to

14   eight victims that you heard testify.

15      When you go through those names, you'll recall that each

16   and every one of those eight men listed in element one,

17   element two, element three, and element four took that witness

18   stand over the course of the last ten days and told you about

19   what happened.

20      The first and the second elements relate to the

21   immigration status of those victims.  The first element is

22   that each one of those victims was an alien, and the second is

23   that they were unlawfully in the United States.

24      Now, you know that both of those things are true because

25   each of the victims took the stand and told you that they came

1    here -- seven of them told you that they came here on a

2    tourist visa but that they worked.  And one told you that he

3    was smuggled into the United States by the defendant.  And

4    we'll talk more about that later.

5        But you also heard from Special Agent Saurwein that she

6    gathered the I94 document detail forms.  Those are Exhibits 20

7    through 26 in this case.  And she explained to you how those

8    demonstrate that these men were, in fact, aliens who were

9    unlawfully here in the United States.

10       And so that establishes count one -- excuse me -- element

11   one and element two with respect to the first count.

12       Now, the third element is that the defendant knew or was

13   in reckless disregard of the fact that at least one of these

14   eight people was unlawfully in the United States.  Now, you

15   heard a lot of evidence over the course of this trial that the

16   defendant knew that.

17       It starts with where he recruited the workers from.  You

18   heard that he placed an ad in newspapers in Mexico recruiting

19   workers from Mexico to come to the United States to work for

20   him.

21       You heard that when a number of victims came here and

22   arrived at the warehouse in Hayward, California, that, at the

23   defendant's request, they gave him a copy of their tourist

24   visa, alerting him to the fact that they were only there on a

25   tourist visa and that they did not have status to work.

CLOSING ARGUMENT \ NARAYAN

1          Multiple men told you that they told the defendant out

2    right that they were here illegally and that they were worried

3    about it.

4          One witness, Dave Noel Alvarez Nolazco, told you that he

5    gave his tourist visa to the defendant and that the defendant

6    replied and said, "Fine, no problem.  You can work."

7          You also know that the defendant knew about the

8    immigration status of these men because he referenced it over

9    and over again when he threatened them.  And we'll talk more

10   about that when we get to count two.

11         Also don't forget, members of the jury, that you heard

12   about an interview that Sergeant Ly with the San Francisco

13   Police Department conducted with the defendant at the Marriott

14   Hotel job site on August 24 of 2015 in which the defendant

15   admitted to him that he was employing workers, that they were

16   living at his warehouse on Dunn Road, and that he knew they

17   were undocumented.

18         So that takes us to the fourth and final element of count

19   one, which is whether the defendant harbored, concealed, or

20   shielded from detection at least one of these eight men.  You

21   heard about and you saw the properties of the defendant at

22   which these men were harbored and concealed.

23         You heard a lot about the property at Dunn Road.  And if

24   we can switch from the document camera and go to Exhibit 15,

25   page 75.

1              (Exhibit published.)

2          **MR. NARAYAN:**  You heard about this warehouse.  And

3    you saw dozens of photographs of this warehouse.  Specifically

4    with what you see here, you heard Jordan Ledesma, Arnoldo

5    Lopez Contreras, and Jose Leonardo Avila Cortes tell you about

6    what it was like living at this warehouse during the first

7    time period in August and September of 2015 while the victims

8    were working on at the Marriott job site.

9        You heard that that job required a number of workers, many

10   workers employed by the defendant.  And you heard that at

11   times in August and September of 2015, that there were as many

12   as 30 men sleeping in the attic depicted on this photo.

13       On Monday morning of this week, Alejandro Lopez Alcantar

14   testified about his experience living in this warehouse.  He

15   told you that he slept on a makeshift mattress next to that

16   tool box at the bottom of this image and that when he woke up

17   in the morning, he had to pick up the mattress and lean it up

18   against the wall so the rest of the workers the next day could

19   have access to the tools.  So you know that workers were

20   harbored at this location.

21       Let's go to 16-216.

22              (Exhibit published.)

23          **MR. NARAYAN:**  Fast forward two years at the same

24   location, August 2017 when Special Agent Saurwein and her

25   colleagues execute a search warrant at the Dunn Road warehouse

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

 1   and take these photographs, photographs of sleeping

 2   arrangements at the same warehouse where the defendant

 3   harbored these individuals.

 4       This is one of those photographs.  You saw dozens.  And

 5   you also heard Special Agent Saurwein tell you that when they

 6   got there to execute that warrant that morning, that a number

 7   of the men, including some of the men you heard from in this

 8   case and including some of the men listed in these jury

 9   instructions as part of the elements were there, sleeping,

10   living in the defendant's property.

11       Let's go to 17-149.

12                       (Exhibit published.)

13       **MR. NARAYAN:**  This is that garage on Folsom Road in

14   Hayward, California.  You heard a number of men tell you about

15   this garage.  In fact, you heard from that gentleman sitting

16   there in the white T-shirt in the photo that he lived in this

17   garage for months, that as many as eight men lived in the

18   defendant's garage at the defendant's direction, that

19   sometimes the garage got too full and that men slept in cars

20   outside the garage because they had nowhere else.  You know

21   that the defendant harbored men at this location.

22       We can take that off the screen, and I'll go back to the

23   document camera and the jury instruction.

24                     (Demonstrative published.)

25       **MR. NARAYAN:**  That takes us through all four elements

1    of count one.

2                    (Demonstrative published.)

3              **MR. NARAYAN:**  Now, there's -- there's one additional

4    point to make here with respect to harboring, and that's this

5    last sentence of this paragraph depicted on this page of the

6    jury instructions, that harboring does not require that the

7    defendant actively take steps to hide the alien from

8    immigration authorities.  It's sufficient that the defendant

9    provided the alien with shelter for financial gain.

10        We've talked about the fact that the defendant provided

11   the alien for shelter at these locations we've discussed.

12        And although it's not required that the defendant actively

13   take steps to hide aliens from immigration authorities, you

14   did hear throughout the trial that on many occasions in many

15   ways, the defendant did exactly that.

16        You heard from multiple witnesses about when the police

17   arrived at the Marriott Hotel site on August 24th of 2015 what

18   happened afterwards.  Two of the workers -- three of the

19   workers actually, Jordan Ledesma, Arnoldo Lopez Contreras, and

20   Jose Leonardo Avila Cortes told that you after the police

21   arrived at the Marriott Hotel, that they were told by the

22   defendant that they couldn't stay at the warehouse anymore,

23   that they were sent to a hotel.

24        Mr. Contreras told you that he slept under a bridge that

25   night in Hayward because he wasn't allowed to go back to the

CLOSING ARGUMENT \ NARAYAN

1    warehouse.

2        Two days later on August 26th of 2015, when Sergeant Ly

3    with the San Francisco Police Department showed up at that

4    warehouse in Hayward, all of the mattresses, all of the

5    personal effects, the evidence of the 30 or more men living in

6    that warehouse was gone.

7        Robert Bodine told you exactly what happened in that

8    interim period of 48 hours, that he got a text from the

9    defendant that said "call me now," that he called the

10   defendant and the defendant said, "get here and help."

11       And when he got to the warehouse, there were multiple of

12   the defendant's associates loading mattresses and bags of

13   personal effects on to trucks to take them out of the

14   warehouse before the police got there.

15       There was no reason for the defendant to do all of that if

16   he did not intend to conceal from law enforcement what he was

17   up to.  And, in fact, that's exactly what he was doing when he

18   did those things.

19       You heard many other examples of his intent to conceal

20   from law enforcement what he was up to.  The defendant told

21   Sabas Morales Alvarado that he wasn't allowed to hang his

22   laundry on the fence outside the warehouse because he didn't

23   want the neighbors to see the laundry because that would alert

24   the neighbors to the fact that people were living at the

25   warehouse.

1     You heard Bulmaro Garcia tell you that the defendant would

2  tell the workers to say that they weren't from Mexico but that

3  they were from Los Angeles or San Diego, again, in order to

4  conceal what the defendant was up to.

5     When Jordan Ledesma got hurt moving cars for the defendant

6  at 2:00 o'clock in the morning before the start of the work

7  day, the defendant told him he had to go to Tijuana for

8  medical treatment.  Think about why the defendant said that.

9     You know that the defendant harbored these men.  You know

10 that these men were not lawfully in the United States, and you

11 know that he took steps to intend -- he took steps to conceal

12 what he was doing.

13     And all of that, pursuant to this jury instruction, tells

14 you that the defendant is guilty of count one.

15     Now, once you get past count one, the court has told you

16 there's one additional question regarding that crime that you

17 are required to answer in this case, and that takes us to the

18 next jury instruction.

19                    (Demonstrative published.)

20        **MR. NARAYAN:**  If you find the defendant guilty of

21 count one, then you also must decide essentially why he

22 committed the offense and whether one of the purposes of the

23 offense was for commercial advantage or private financial

24 gain.

25     And so think about what you heard regarding why the

1    defendant did what we've talked about thus far.  And this is

2    where the evidence regarding the payment or, better put, the

3    lack thereof is particularly relevant.

4        You heard Arnoldo Lopez Contreras tell you that he worked

5    from July 25th of 2015 to September 15th of 2015.  It's about

6    52 days, little over 7 weeks.  He told you he worked 16 hours

7    a day at least 6 days a week.  That's 720 hours.  And he told

8    you that he was paid less than $3,000.  Do the math, members

9    of the jury.  That's $3.50 an hour.

10        Dave Noel Alvarez Nolazco told you that when he was living

11    in the trailer in Sacramento, and he was getting up at 3:00

12    o'clock in the morning to make it to the job site in Hayward

13    by 6:00 a.m. to work a 14-hour day for the defendant, only to

14    drive back 3 hours to that trailer at midnight in Sacramento,

15    that he got paid about 300 to $500 every other week, which was

16    just enough for him to send money to his family in Mexico and

17    not enough for him to eat.  That's $2.50 an hour that the

18    defendant paid Dave Noel Alvarez Nolazco.

19        Sabas Morales Alvarado told you that in 2017, he worked on

20    those Silvery Towers in San Jose.  That's 32 weeks.  He told

21    you he worked at least 40 hours a week, separate from the work

22    he did on other sites.  That's $1.50 an hour for Sabas Morales

23    Alvarado from this defendant.

24        Jordan Ledesma told you that he worked for this defendant

25    at the warehouse for 18 months, that he worked up to 100 hours

1    a week to get the job site ready before the work started,

2    getting up early in the morning, staying up late at night, all

3    at the defendant's direction.

4         $8,000 for 18 months of work at 100 hours per week is $1

5    an hour.  That's how much the defendant paid for the labor of

6    only -- of those four victims, and that tells you exactly how

7    he gained from what he was doing.

8         And so the answer to this question on this jury

9    instruction is yes.

10        Final thought on that point:  Think about the testimony of

11   Robert Bodine from last Tuesday.  He told you about a

12   conversation that the defendant was having with some of his

13   associates while they were sitting in the warehouse near the

14   defendant's office.  The defendant was talking about how he

15   was able to win contracts.  And one of the statements he made,

16   you can get three workers from Mexico for the price of one guy

17   from the U.S.  Tells you all you need to know about why the

18   defendant was doing what he was doing.

19        Keep in mind, members of the jury, thus far we've only

20   talked about a small portion of what you heard this defendant

21   did from 2015 to 2017, and so let's get to the rest of it.

22        Let's talk about count two, forced labor.

23                  (Demonstrative published.)

24        MR. NARAYAN:  The court has told you that count two

25   has three elements that the government's required to prove to

1    you.  First, that the defendant obtained labor or services

2    from at least one of these men.

3        There's no question that the defendant obtained labor or

4    services from at least one of these -- these men.  They all

5    told you why they were here and they told you they answered to

6    the defendant and they worked the defendant's construction

7    sites.

8        Let's skip for a second to the third element before we

9    talk about the second.

10       Demonstrative.

11           MR. NARAYAN:  The third element requires you to find

12   that the defendant acted knowingly with respect to the labor,

13   that he acted purposely without mistake.  There's no question

14   about that either.  You heard that the defendant recruited

15   workers from Mexico, that he had specific reasons for doing

16   it, that he directed them to work specific hours at specific

17   sites for his reasons.  And so, really, count two comes down

18   to you deciding the second element.

19                      (Demonstrative published.)

20           MR. NARAYAN:  And the second element is whether the

21   defendant obtained labor by a scheme to cause the victims to

22   believe that they would suffer serious harm if they did not

23   keep working, whether the defendant exploited the victims for

24   labor.

25       The jury instruction refers to a scheme, plan, or pattern.

1    And so consider what you heard from the eight victims that

2    testified in this case about what the defendant did with each

3    of them.  And you'll see that there was a scheme, that there

4    was a plan, that there was a pattern in this case, that the

5    defendant had a methodology to what he was doing.

6        It started with enticement.  You heard what the defendant

7    did to each and every one of those men to get them here, that

8    he made promises.  He told Jordan Ledesma that he would help

9    Mr. Ledesma get papers to work legally in the United States.

10       He gave Arnoldo Lopez a motivational speech, saying,

11   "you're going to make a lot of money here.  You're going to

12   have no problems."

13       When Jose Leonardo Avila Cortes was standing at the Plaza

14   Carrousel in Tijuana, he had a phone conversation with the

15   defendant.  The defendant told him, "This is honest work.  You

16   won't be paying for quarters or rides.  Everything you make

17   will be free and clear.  You won't pay rent.  You won't pay

18   gas.  You won't pay water."

19       The defendant told Jose Francisco Morales Alvarado that he

20   would help him get a work permit.  He promised the same thing

21   to Sabas Morales Alvarado.  He told Alejandro Lopez Alcantar

22   that he would make $10 an hour and get a work permit.

23       Mr. Alcantar told you that the defendant presented himself

24   as a trustworthy person and that he wanted to work for the

25   defendant based on the representations that the defendant made

1    at the beginning.

2        That's step one, enticement, getting these men to come

3    from Mexico to the United States to work for the defendant by

4    promising them these benefits.

5        Step two of the scheme is once those men got here based

6    upon those promises, he withheld pay.  Over and over again, he

7    withheld pay.

8        Dave Noel Alvarez Nolazco told you that the defendant kept

9    saying, "I'll pay you tomorrow" or "wait a couple days," and

10   that's the way it went on.  Mr. Nolazco is not the only person

11   that told you that.  That theme emerged from every single

12   witness you heard from in this case.

13       Jorge Hernandez told you that the defendant would never

14   pay him the full amount.  "He would just give me bits and

15   pieces."  "Pay you tomorrow."  "I'll pay you later."  "I'll

16   pay you next week."  But when later came, the defendant

17   wouldn't pay.

18       You heard Sabas Morales Alvarado tell you that at one

19   point he confronted defendant, asked him why he's not paying

20   these men what he promised to pay them.  He told you where

21   that conversation took place, and if we could go to Exhibit

22   17, page 259.

23                      (Exhibit published.)

24       MR. NARAYAN:  Took place at the defendant's house

25   where he was living when all of these activities were going

1    on.  Took place in a patio on the left side of this exhibit

2    that we see.  Conversation between Mr. Morales Alvarado and

3    the defendant in which the defendant responded to that

4    question posed to him by Mr. Morales Alvarado and said, "I'm

5    not paying them so that they'll stay."

6        You heard that the defendant had a similar conversation

7    with Jose Francisco Morales Alvarado where he told Jose

8    Francisco, "I'm not paying them because then they will leave.

9    And that way, I can keep them here."

10       Members of the jury, let's be clear, that alone is forced

11   labor.  Telling these men over and over again that they needed

12   to keep working to get paid for the work that they'd already

13   did -- just work more, work more, work more -- that in and of

14   itself, when you look at the elements of count two,

15   constitutes the offense.

16       But you know that it didn't stop there.  You know that

17   after enticing the men to come here and withholding pay, that

18   there was more.  That's when the defendant did whatever he

19   needed to do to get them working as long as he could get them

20   to work.  And he did it by identifying their vulnerabilities,

21   systematically identifying what he could take advantage of on

22   these victims.

23       For most of them, it was their immigration status.  The

24   fact that they weren't here legally.

25       Robert Bodine observed an interaction between the

1   defendant and one of the workers in which the defendant said

2   "You're not legal.  What are you going to do?  Who are you

3   going to see who's going to help you?"

4       The defendant told Jose Leonardo Avila Cortes that if he

5   sued the defendant, they weren't going to give him a lot of

6   money and they might take his visa away because suits against

7   the defendant won't do anything.

8       Once the defendant identified these vulnerabilities in

9   these men, he made the threats that he needed to make to keep

10  them working as long as he could keep them working.

11      He told Jordan Ledesma that he knew where Mr. Ledesma's

12  family lived and that if Mr. Ledesma kept complaining, there

13  would be consequences.

14      He said the same thing to Juan Manuel Nevares.  He made

15  the same reference to Jorge Hernandez.  He told Juan Manuel

16  Tavera, "I want you to get out.  And when you get out, I don't

17  want to see anyone outside, or do you want me to call

18  immigration?"

19      Bulmaro heard the defendant say, "I'm tired of all these

20  guys coming from Tijuana."  Maybe I should just call ICE on

21  them.

22      This is what the defendant did.  He enticed the workers to

23  come from Mexico with promises.  He systematically withheld

24  pay.  And when that was not sustainable, he identified these

25  mens' vulnerabilities and he preyed on them to keep them

1    working as long as he could to get as much labor as he could

2    out of them to help his companies.

3        It's exploitation.  It's exploitation, and it's forced

4    labor.  That's count two in this case.

5        Now, there's one other point -- two other points that are

6    important with respect to the jury instructions you've

7    received on count one and count two.

8                    (Demonstrative published.)

9        **MR. NARAYAN:**  And that's this point at the bottom of

10   this page, that in determining whether a particular type or

11   degree of harm is sufficient to obtain labor, you consider the

12   question from the perspective of the victims.

13       That's what that jury instruction says, consider their

14   immigration status, the situation they were in, what options

15   they had given where they came from and what resources they

16   had.

17       And so that question's evaluated from the perspective of

18   Arnoldo Lopez Contreras.  When he hasn't eaten for three days,

19   the defendant kicks his mattress, tells him to get to work.

20   He gets in the defendant's car, and the defendant brags to him

21   about the trip to Las Vegas he had the previous weekend.

22       That question's evaluated from the perspective of Jose

23   Leonardo Avila Cortes when he's sleeping in a dump truck

24   outside of the warehouse because there's not enough space for

25   him to sleep and he's not getting paid and he's hungry.  And

1    the defendant tells him if he keeps complaining and goes to

2    the authorities, they're just going to away his visa.  The

3    question you're answering is whether the defendant exploited

4    him for labor.

5        When you go through that exercise with each and every one

6    of the eight victims in this case, you'll find that the

7    defendant did exactly that, that he exploited the labor from

8    each and every one of them.

9        Now even though that's the case, that the defendant did

10   that with all eight of these men, you'll notice when you go

11   through these jury instructions that each and every element

12   has the phrase "at least one," and that's important.

13       It's important because if you find that the defendant

14   harbored one of these men, that's still a crime.  And if you

15   find that the defendant forced the labor of one of these men,

16   that's still a crime too.

17       Make no mistake, the government's proven that the

18   defendant did those things with all eight of these men.  But

19   it's important to understand what those jury instructions mean

20   with respect to what the defendant is charged with.

21       This is a case about exploitation, exploitation for labor.

22   It's what the defendant did.  He harbored these men for his

23   benefit, and he exploited their vulnerabilities to get as much

24   labor out of them as he could.  Those are crimes.

25       Find the defendant guilty.

```
1         THE COURT:  Thank you, Counsel.

2      I think at this time -- Mr. Dove, I think we'll take a

3   break.  Is that all right?

4         MR. DOVE:  Yes.

5         THE COURT:  Okay.  We're going to take our 15

6   minutes.

7      Please remember the court's usual admonitions, keep an

8   open mind, don't discuss the case, don't get any outside

9   information.

10      I'll see you in 15 minutes.  Thank you very much.

11      (Recess taken at 11:06 A.M.; proceedings resumed at 11:25

12   A.M.)

13      (The following proceedings were heard out of the presence

14   of the jury:)

15         THE CLERK:  Remain seated, come to order.  Court is

16   again in session.

17         THE COURT:  Please be seated.  Please bring in the

18   jury.

19              (Pause in the proceedings.)

20      (The following proceedings were heard in the presence of

21   the jury:)

22         THE COURT:  Please be seated.

23      Mr. Dove, you may proceed with your closing argument.

24         MR. DOVE:  Thank you, Your Honor.

25
```

**CLOSING ARGUMENT**

1

2          **MR. DOVE:**  Court, counsel, and ladies and gentlemen

3     of the jury, well, here we are.

4          You take a -- a snapshot of 2016 to -- 2015 and 2017, and

5     you think you know the whole story but you really don't.  What

6     you're to pay attention to in this case is the evidence that

7     you heard that was put before you, and it was -- it's apparent

8     that this case didn't really start in 2015.  This case

9     probably started as early as 2004 when Mr. Hernandez --

10    Mr. Torres Hernandez had a birthday party for his son.

11         Remember the time he said his son (sic) up -- had a son

12    that was celebrating after early birthday and he invited a

13    friend that he hadn't seen since the days of Baja California,

14    Tijuana, Mexico.  That friend was -- was Jorge Hernandez.

15         Jorge Hernandez at the time, if you remember, said he was

16    working down in Los Angeles and accepted the invitation from

17    his friend to come up for the party, celebrate the little

18    kid's -- think it was a fifth year birthday.

19         And it was after that, that Jorge said, Hey, you know,

20    maybe we can do some things together.  There was an exchange

21    between Mr. Torres and his old friend.  And he said, Well, I'm

22    just not -- I'm not doing great, but I'm working on some

23    vehicles.  I'm painting a truck.  You know, I'm doing some

24    kind of like this work.  I'm getting involved in painting.

25         And we know that painting was something that Mr. Torres

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    did because you heard Robert Bodine tell you that when the

2    defendant, in the early '90's, he said, which would have made

3    the defendant about 15 years old, was painting trucks in the

4    Alameda shipyard -- excuse me -- the hulls of ships in the

5    Alameda shipyard at just 15.

6        And when -- by the time later time rolls around and Jorge

7    Hernandez, his old friend, was kind of doing spot work, but he

8    said, why don't you come up here.  Let's make a run at it.

9    And he and Jorge start doing some little things together.

10   And -- projects mostly involving painting.

11       And Jorge decided, Yeah, I'll stay but I don't have a

12   place to stay.  Well, Mr. Torres said, that's not a problem.

13   I don't have a big place.  I've got a one-bedroom apartment.

14   I'm there with my wife and two kids, two young kids.  You just

15   came for one of their birthdays.  Why don't you come on up and

16   stay.

17       And Mr. Hernandez told you that he said okay.  He accepted

18   that invitation from Mr. Torres around 2005 and stayed in

19   the -- and stayed on the couch in the living room of

20   Mr. Torres's small apartment.

21       He stayed up here after.  And he continued to sort of

22   stay, Mr. Hernandez did, and decided to try to make a go at

23   making different businesses with Mr. Hernandez, Mr. Torres

24   Hernandez, while he was trying to kind of start his own thing

25   off.

CLOSING ARGUMENT \ DOVE

```
 1        And we know that Mr. Torres kept painting, kept working,
 2   and kept putting in the hours because even the truck that
 3   these two men were working on, the Peterbilt truck, took a lot
 4   of time.  Mr. Torres would come do the assembly as -- after
 5   Mr. Hernandez, Jorge, would break it down.
 6        And that's what he was doing, working, trying to figure
 7   out his craft, trying to get better at what he -- what he want
 8   to do pursuing his dream.
 9        And it was never -- I think I said this at the outset
10   wasn't really glamorous work.  It was gritty work, painting,
11   tearing down vehicles, going in and out of places, trying
12   figure out how to put things back together.  But he got good
13   at it, Mr. Torres did.
14        In fact, we know he got so good that he started getting
15   calls from people, calls to come out and do work.  Hey, you
16   know, we got a job.  Come do work.
17        We know that he continued to work and work and work until
18   opportunities started to come his way.  We know that before
19   2015, because Robin Strandberg told you that he was being
20   asked to do work by a number of people in the area.  And he
21   was doing his best to sort of supply that.
22        And then probably what looked like a dream job came along,
23   bigger than anything he'd done before, the Marriott Hotel.
24   All those years starting in the shipyards, working on cars,
25   painting vehicles, trying to -- had to rent a bay at some
```

1    garage just to be able to get truck in and try to fix it.

2        Now comes this -- thing.  Took 13 years, but here it was.

3    And Mr. Torres, well, he said, I'll take that opportunity.

4    I'll do my very best to meet the criteria of this very big,

5    very important job.

6        In fact, Jack Bell told you that there had been two people

7    before Mr. Torres who tried to do the -- get the painting

8    assignment at the Marriott who failed.  And he said to Jack

9    Bell, who knew Mr. Torres also from prior events and trusted

10   his -- his reputation as a skilled contractor or skilled

11   subcontractor -- he invited him in.

12       And that's when this case really began, because it was

13   like -- unlike anything Mr. Torres had ever done before,

14   hundreds of rooms -- over a hundred rooms, multiple stories,

15   and a need based upon the demands of Jack Bell, who we saw --

16   looks like he could be a good boss, a boss that would make

17   people get going.  Jack Bell told him, if you can pull it off,

18   let's try to make it happen.

19       Well, Mr. Torres was a small outfit at the time.  I think

20   they -- the testimony was there were about five -- according

21   to Ms. Strandberg, about six to eight people that would kind

22   of come on a regular basis.  But here, this gig comes along

23   and he's got to get more people involved.

24       So he doesn't do -- he doesn't have the resources himself.

25   He's not -- didn't -- there was no testimony that he had

1    access to some large labor pool that was just, you know,

2    readily available.  He calls his friend Jorge Tellez, who he'd

3    known for a long.  And he says, hey, Jorge, I don't have men

4    for this job.  Can you help me get men for this job, you know,

5    people to do this -- this important job?  This is really --

6    may be the opportunity of a lifetime.  And Jorge Tellez said,

7    okay, I'll do my best.  I'll try find a way to get you some

8    guys.

9         Meanwhile, Mr. Torres has to go every day out to the -- to

10   the work site and figure out how to keep this thing alive so

11   that he can actually supply the manpower.  He goes out and he

12   meets with -- with Jack Bell.  He goes out and he meets with

13   the other subs.  And eventually, this demand to fill a large

14   need in short period of time, Mr. Torres is able to somehow

15   pull it off through his friends and through his network and

16   people.

17        Someone, not Mr. Torres -- we know that from the

18   evidence -- put an ad in a paper in Tijuana.  We know it

19   wasn't Mr. Torres because you heard extensive testimony from

20   everyone to say who put that ad and where did that number

21   belong to.  Well, it was another man -- believe another man

22   named -- another Jorge that the ad responded to.

23        And what's interesting about the ad -- it's Exhibit 14,

24   you'll see it.  You'll have it back in the jury room.  What's

25   interesting and very specific about the ad as it relates to

1    these charges, is that the ad says, we're looking for people

2    who want to do work in the construction area.  The

3    requirements are two primary requirements:  One, that you have

4    a visa.  It very specifically says a visa, which means lawful

5    permission to be in the United States.  That was on the face

6    of the very first document that went out and launched this

7    thing.  Number two, it says you have to have a desire to work.

8        Now, I think it's interesting how in the very same

9    sentence, it says "want work," and "visa," which essentially

10   says, we want people that can come here who have the

11   permission to be here and can work and, more importantly, it

12   wasn't Mr. Torres who did that ad; it was someone else.

13       And the workers start coming up and coming up.  And in a

14   short period of time, Mr. Torres is actually able to start

15   sending men out to the location on -- on -- in -- on Post in

16   San Francisco to get the job done, to get the work done.

17       A lot of work, a lot of hours.  Mr. Bell told you they ran

18   two shifts, and he said that he had to look at his boss who

19   were the owners of the property and they were also saying, get

20   it done.  We got a tight time line.

21       Now, when -- there were a number of people who worked on

22   the job.  We never saw or heard evidence of -- that we can --

23   that was independent of people that had something to gain

24   about the number of people.  But we do know that early on in

25   the -- on the Marriott project, that Raul Bautista, who you --

1    who you heard from yesterday, one of the first witnesses

2    that -- that we put on and -- Mr. Torres put on, he said, I

3    went there too.  It was a good opportunity.

4        And -- and Mr. Bautista told you what it was like in that

5    work environment.  Now, Mr. Bautista, kind of a short guy, he

6    was very kind of polite in his -- I thought in his demeanor.

7    And he said, I went out there and I worked every day.  I

8    worked as much as I could.

9        I asked Mr. Bautista, what about overtime?  What was the

10   deal with overtime over there?  How did that go down?  So

11   Mr. Bautista said, well, overtime was an option.  If you

12   wanted to try to get it, you pursue it.  Otherwise, it was up

13   to you to work the shift that you wanted.

14       What about you, Bautista, what did you do, I asked

15   Mr. Bautista?

16       Well, sometimes I took it, and sometimes I just do my 6:00

17   to 8:00.

18       That job, the Marriott job, we have expanded into this

19   giant universe to make it sound like this was some persistent,

20   pervasive, and continuous use of men and abuse of men for the

21   time and their labor.  It lasted five and a half weeks.  And

22   the end of it actually came when they were doing the work and

23   the guys were getting out there -- and by the way, many of the

24   men were showing up and getting money the day they arrived.

25       Now, Bautista happened to have a situation or a set-up

1    where he didn't live -- he didn't need to live anywhere other

2    than where he was staying.  But a lot of men that came up,

3    they stayed where the -- where the place -- the best available

4    place was, which was at a place that was, you know, certainly

5    temporary, not permanent, certainly imperfect, but if you ask

6    Jack Bell, who lived in a trailer for a period of time when --

7    a man of his rank, it's what you do to get a job done.  You're

8    trying to make money.  You're focusing on work.

9        Bautista said something else that was interesting --

10   thought that was backed by other witnesses in this case.  He

11   said when it came to the lunch hour, what happened?  You know,

12   we heard from lots of people in different settings, that lunch

13   breaks were a normal part of the work course.  It's a social

14   time.  It's a get-away-from-the-labor time.  Everybody kind of

15   hangs out.

16       Well, Bautista said, well, I would just go down to one of

17   the several restaurants -- we're talking about Post in

18   San Francisco -- within a few minutes.  How far was the walk,

19   Mr. Bautista?

20       Five minutes.

21       Did you go with other workers?

22       All the time.  Sometimes alone.

23       He was in a position to see what his coworkers were doing

24   and how they were holding up.

25       Interestingly, one of the men on that website -- excuse

1   me -- that website -- that work site was Mr. Contreras,

2   Arnoldo Contreras.  His testimony -- it really did kind of

3   ring to me.  I thought -- he says that he was -- he's at this

4   Marriott.  That's the job he came up for, and he said -- but

5   you got to look later at when he said these things.  He said I

6   didn't eat.  I worked three days straight.  No one cut me a

7   break.

8       He was the only person, if you listened to the other

9   testimony, who said anything like that.  But the real big part

10  is he said he lived at the warehouse in that time period.  And

11  who else was showing up at the warehouse every day then?

12  Robin Strandberg, because she was doing another job.  Multiple

13  other people coming back.

14      So this is the beginning of United States versus Job

15  Torres.

16              (Demonstrative published.)

17          MR. DOVE:  When the -- and when the police officer,

18  Mr. Ly, came on to that -- that site, Marriott, he said, well,

19  there are some things that may not be going so -- so great.

20  Mr. Torres, you come talk to me.

21      Everyone knows that you don't have to talk to a police

22  officer when you're being -- certainly when you're being

23  investigated.  But Mr. Torres doesn't lawyer up.  Doesn't say

24  I have a right to remain silent.  He says what can I do?  Tell

25  me what I can do.  I'm running this crew.  I'm trying to get a

1    job done.  What should I do?

2        And he says -- and there's a long interview in a -- in one

3    of the bungalows, in one of the trailer bungalows with other

4    people present.  Mr. Torres says, All right.  You want me to

5    switch things up a little bit?  I'll do it.

6        The workers were showing up conspicuously, driving from

7    Hayward to San Francisco, a good distance, and certainly time

8    and exposed to public roads -- they're going back and forth to

9    that location.  That's about as open and unconcealed as you

10   can be.

11       But what's even more telling about that part, about the

12   lack of concealment, is that what the defendant did was really

13   reveal.  He didn't conceal.  He revealed.  He said Mr. Ly,

14   what can I do?

15       Well, I need to follow up with you.  I got to know more

16   about this.

17       Here's my address.  Here's my cell phone number.  This is

18   where we've been.  Come on by and I'll do the things that you

19   tell me to do.

20       And -- which is the very opposite of someone that has a

21   consciousness of illegal or -- or the belief that they're

22   running a scheme or a scam.

23       And Mr. Ly says, okay.

24       When can you come by, Mr. Ly?

25       A couple of days.

1      I asked Mr. Ly, that was your schedule?  You coordinated

2   with him?

3      Yes.

4      I said the next day after you saw him at the Marriott

5   location, did you reach out to him?

6      Yes.

7      You called him?

8      I did.

9      What did he say.

10     Come over.

11     Did you come over to the place?

12     Yes, I did.  The very next day.

13     I asked Mr. Ly some questions about what was the set-up at

14  the location over on Post.  I said, what -- what did you --

15  how was it arranged?  He says, well, I just walked in.

16     I said you mean you weren't checked?  No one stopped you?

17  No one said who are you?  You can't come in.  You can't come

18  out.

19     No.

20     He didn't say anything about wearing a police uniform.

21  And I said what was the flow of individuals.  He said lot of

22  people, lot of flow.

23     I asked him about whether he noticed anybody that appeared

24  to him, a police officer, trained in human trafficking, did

25  anyone appear to be in distress?  He said no.  And he was

1    there before any of this -- at the very tip of this

2    investigation.  Very beginning.

3        You're going to look for some things in this case, and I

4    think that you're going to find them to be important to your

5    consideration and evaluation of this case.

6                    (Demonstrative published.)

7        **MR. DOVE:**  First, I think you always have to look

8    for -- in evidence -- in terms of what we're looking for,

9    evidence, which is what you're here to judge.  The judge

10   judges the law.  You judge the facts or the evidence.

11       You have to say, well, it's not just what evidence is in

12   front of me.  It's how that evidence came before me and where

13   is evidence not there conspicuously that we should be seeing.

14       We also have to look through the lens of why.  Why is a

15   particular witness saying a particular thing.  Why is a

16   witness -- why would a witness's story go from one end of the

17   spectrum, I didn't get paid.  I'm a little bit short, to

18   something much more severe and dramatic?

19                    (Demonstrative published.)

20       **MR. DOVE:**  So, you know, in an investigation, all you

21   can do -- all we can do is sort of reconstruct what happened

22   back then.  And we know that we didn't have -- none of us had

23   access to be there.  I don't think anybody -- even if you knew

24   the locations, you didn't -- you weren't certainly part of

25   this.  You wouldn't be here.

1    So what you do is you say, well, what were the

2  investigators doing?  People who were plying through the

3  papers and looking through the evidence, what did they do to

4  help us back up the stories?  What supports it?

5    And one of the things that -- that we look for today -- I

6  asked one of the agents -- the special agent about this.  I

7  said, did you look at other things, like let's say, oh, text

8  messages.

9    Everyone that was involved in this was communicating with

10  you with a cell phone, right?

11    Yes.

12    I (sic) was talking to people?

13    Yes.

14    All of them had cell phones?

15    Yes.

16    Did you check anything that would back up any part of

17  their claims about this pattern?

18    And this is from a two-year period of time.  You started

19  the investigation in 2016.  It culminates in 2017 with an

20  arrest, June -- from June 2016 to August 2017, some 14 months

21  to look at and evaluate, what did you find?  Turn to physical

22  things that back these stories up independent of what they're

23  saying.

24    Well, I sent them to a database.  We looked through all

25  the stuff.

1    Nothing was reported to you of any merit or any note

2    because it would have been up there, like everything else that

3    could possibly be gleaned that was bad about the defendant.

4                    (Demonstrative published.)

5        **MR. DOVE:**  At the warehouse, which we saw probably --

6    for some of you, maybe even me, maybe too much of -- 2140,

7    I'll never forget that address, Dunn Road, Dunn Road, over and

8    over again.

9        What did we see at Dunn Road when we had even an

10   independent investigation happening?  We saw people, workers,

11   coming and going.  We saw the gate open and closed.  We saw

12   workers arriving when they wanted to and leaving when they

13   wanted to.

14       In fact, we even know more about the -- the nature of the

15   free flow of it because we know that there were different

16   shifts even according to the men that said they worked too

17   long.

18       They came and they left that warehouse because it was at

19   the time based on that singular project, that six-week project

20   in 2015, it was a project-based short-term place to stay just

21   to get the job done.

22       And I think it's normal -- I think Jack Bell intimated

23   this -- maybe he didn't say it, but I feel like maybe it was

24   something in there where he said, you kind of go -- he

25   mentioned going all the over the world for projects.  You stay

 1    where you are.  You know, if the project's far away.  It's too

 2    inconvenient, you find a way to be right where you are.

 3    Because the goal is to, a, get the work done and make your

 4    money, and get out.

 5        And sometimes the goal from the bigger boss we know that,

 6    the owner, is to do it in a certain time frame 'cause time is

 7    important for these owners.

 8                        (Demonstrative published.)

 9           MR. DOVE:  You will have this in evidence.  These

10    photographs.  And one of the things that you will note about

11    this property -- and I know that it got confusing sometimes,

12    but if you just kind of look at where that blue dot is, that's

13    a residential house.  The next one back is where that room was

14    where you saw -- you'll see -- I'll show you some photos --

15    where they just kind of had machine shop, offices, bathrooms

16    and other places to kind of free -- come in and out of.

17        But what's really notable is that the property right next

18    to this property, the one that is just -- if you look on the

19    photograph, to the right, it's got -- from above, you can see

20    it.  If you zoom in, you might see it better.  There are these

21    granite slabs.  It's the adjacent property.  Looks like

22    they're doing some -- some work and maybe industrial work, but

23    there's a little tiny -- and I'm only mentioning this because

24    I feel like there are things I didn't quite get about the

25    government's case.

1      I heard the suggestion of entrapments, of being kept away

2   and prevented from movement from a six-foot gate in front that

3   opens and closes day and night and this little fence between

4   those two properties, to being able to walk around to the

5   front of the residence and just climb over a little four-foot

6   basically picket fence.

7      The only lock on the property, because there was heavy

8   equipment and expensive tools there, was in the front of the

9   property.  And that was controlled by one of the -- one of the

10  men who says that, "I felt trapped."  We'll talk about him,

11  Jordan Ledesma.

12      It's interesting that Mr. Torres's parents also live

13  there.  And I found that to be somewhat ironic, maybe even

14  contradictory to suggest that you're operating a house of

15  horrors in the very same lot where your mother comes out and

16  interacts with people and cooks and has friendly exchanges

17  with.

18      Detective Ly told you that when he went out there,

19  Mr. Torre's mother came out and greeted him.  She didn't even

20  know who he was, but he said she was friendly and congenial

21  and just talking to him.  And he was a stranger.  Had never

22  been there before.

23      Perhaps an old-fashioned and missing kind of approach to

24  civility, just talking to people.  Don't have to know them,

25  don't have to have a reason, just talk to people.

1              (Demonstrative published.)

2          **MR. DOVE:**  This was also a -- it's one of -- I

3      apologize for not having the slide, but it's one of the slides

4      you have in evidence -- about what the machines -- one of the

5      machine shops look like, you know, a place that is designed

6      for work.  It's got -- you see hard hats around.  You see, you

7      know, saws and routers and power supply equipment, and so on,

8      you know, ladders -- just because that's where people went to

9      go work.  You see the -- the Sally port or the garage that

10     kind of comes up at the back, that was always open according

11     to Robin Strandberg.  Something that was a normal work place.

12     The pathway in and out, again, a little --

13             (Demonstrative published.)

14         **MR. DOVE:**  -- chain link fence to the left, notably

15     with these blocks on it that would -- if you were trying to

16     escape -- and I'm only addressing this again 'cause I don't

17     know where they're going with this whole they were penned in

18     idea -- easy to get in and out of.  The gate was on the other

19     side.

20             (Demonstrative published.)

21         **MR. DOVE:**  Another part of the shop.

22             (Demonstrative published.)

23         **MR. DOVE:**  This was surveillance, and this was -- it

24     was -- I can't recall the date.  I apologize.  I think it was

25     in 2015 to 2016, where they would -- mentioned seeing a

1   vehicle.  There was a Mercedes on spot.  It just happened to

2   be there because it was there all the time, the vehicle

3   belonging to Robin Strandberg, as described by them.

4       So we know, even when there was a -- an investigation

5   happening before any arrest, Robin Strandberg was there on a

6   regular basis.  That's her car.  Detective -- Agent

7   Saurwein -- Saurwein told you that the plate returned to a

8   Robin Strandberg.  She's there to see what's going on at that

9   location.

10                  (Demonstrative published.)

11          **MR. DOVE:**  I told you that already.

12      Now, look, unglamorous, not ideal, exactly what you do

13  when you have a construction project you're trying to get in

14  and out of.

15                  (Demonstrative published.)

16          **MR. DOVE:**  Trevor Van Cleave told you that he was

17  there.  And remember, we have to sort of -- I apologize.  I

18  have to cover both ends of this idea that there was in 2015,

19  this trafficking, harboring, abuse.  Then died down.  In 2017,

20  it happened all over again, right?  That's what the government

21  is telling you.

22      So the second project that they, I think, kind of are

23  alluding to is this all happened again -- this resurfaced

24  again in 2017, when this -- 2016 and 2017 when the Silvery

25  Towers project came up in San Jose.  That's what they told

 1   you.

 2        So Trevor said that I, look, this was a really, really

 3   interesting, I think, birds-eye view of construction.  I

 4   learned a lot from hearing him.  But what he did is he told

 5   you a lot about the operation.

 6        So here were men in -- in 2016 and 2017, mostly 2017

 7   saying, I went to this location.  It was horrific.  I was

 8   abused.  I couldn't stop working.  It was misery upon misery.

 9        By this time, by the way, no one -- pay attention to that

10   testimony -- is staying in the Dunn Road place anymore because

11   the defendant complied with the law enforcement request to

12   shut that down.

13        So now they've gone, and there's a smaller crew, and

14   they're living on Folsom in a kind of a -- maybe a crowded

15   dormitory room, but still bath, shower, sink, kitchenette,

16   open space.  Ran by Jorge Hernandez, who lived with his

17   growing family on the same property.

18        The warehouse, though -- and the reason why we're relating

19   this to the -- the Silvery Towers project is because that's

20   when Trevor came on.  Trevor described a fraternal atmosphere.

21   He said it was very -- he said for a workplace -- even though

22   we saw the inside of the facility, he said it was very

23   informal.  People just came and gone -- went, and it was a --

24   relaxed -- I think that's what the suggestion that he made --

25   a relaxed environment.

1    You'll have to be in this --

2              (Demonstrative published.)

3         **MR. DOVE:**  I'm saying this because we're looking for

4    something that supports the idea that someone is being abused

5    or trafficked or any outward physical corroboration of that,

6    something anybody can see that supports that.

7              (Demonstrative published.)

8         **MR. DOVE:**  Walking distance to -- and by the way,

9    before I leave Trevor, very knowledgeable.  We should talk

10   about Trevor for a moment.  He said -- and I -- I want to call

11   him "Trevor" -- Mr. Van Cleave, he said a lot about what

12   happens in construction and specifically at San Jose.

13        He said, well, this is -- this was a -- 640 residential

14   units.  It was 22 stories, 20 stories, side-by-side buildings.

15   We were starting -- I was there from the day they dug the

16   first mound of dirt out of the ground.  Trevor Van Cleave told

17   you that.

18        When did Mr. Torres come on?

19        We were having some basement issues.  We brought him in to

20   do some pumping and some irrigation work.

21        He talked about the level of compliance and the degree of

22   scrutiny at that work site for everyone who came in.

23        You don't hit there -- he says you can't go in that place

24   until you've had your orientation, which includes safety

25   training.  Probably a lot of common sense stuff, but also

1    specific rules of the site.

2        And he said that after that, you actually can't -- you get

3    a sticker that goes on to your hard hat.  That's actually part

4    of what you do to say you've been certified.

5        But what he really told you that was, I think, telling is

6    he said the hours were 7:00 a.m. to 7:00 p.m.  And during

7    those hours -- remember, now we're talking about just a

8    12-hour shift now, 12 hours -- he said, I came on, I walked

9    that place every day.  I was the project executive.  It was my

10   job -- Jack Bell was another person up there high, high

11   ranking -- I think higher than Mr. Van Cleave -- and he said,

12   I walked all the floors.  I talked to people.  I checked out

13   things.  This is my project.  It's got to go right.

14       And he said inspectors from the city of San Jose were

15   there daily.  Daily.

16       They went and checked out what was happening at the

17   location, and they wanted to see was everything okay.

18       Breaks, because there was a suggestion by even men who

19   worked there that they were famished and unable to eat and

20   deprived of basic human needs.  He says, well, there was a

21   lunch truck that showed up every day.  I saw everyone eating.

22       Who?  How do you know this?

23       Well, Mr. Torres's -- the people who worked with him had

24   conspicuous uniforms.  They were bright vests and jackets that

25   everyone can see what they were doing who they were.

1    And I said, did you see these same men?

2    Sometime.  I'd see a few of them at Dunn.  Some of them

3    were there.  Some of them may have slept crashed in their cars

4    some.  Some of them would take up a spot in the back, but the

5    they were just there working.

6                    (Demonstrative published.)

7        **MR. DOVE:**  The warehouse on Dunn, short distance to

8    restaurant, daily food trucks come on.

9        So even Mr. Contreras, who made a Academy Award winning

10   performance on -- you know, with the tears and the water works

11   and all that about how he couldn't -- he had to beg like a dog

12   for food.

13       Well, did you decide not to go 30 feet out to the food

14   trucks that were there every day?  You telling me that Robin

15   Strandberg looked at you and -- looked you in the eyes and you

16   walked past her and she ignored you and let you starve?

17       You're telling me that all your coworkers, nobody threw

18   you a bone?  That -- it's your suggestion that it was so bad?

19       It was a story he told you to promote getting what he

20   wanted, which was something he never had before, I want this

21   resident card.  I want legal status.  I've never had it.

22       He embellished the story so he can get something that he

23   can gain on.  And it's not a criticism.  It's probably a -- it

24   makes sense to want that.  And the only vehicle to get it was

25   to go in through a government source and saying, I can help

 1    with you a story.  What do I have to tell you?

 2        'Cause before it was all about a little bit of money owed.

 3                   (Demonstrative published.)

 4        **MR. DOVE:**  More stuff on Dunn.

 5        The day they show up, surprise, search warrant, here's a

 6    man with headphones speaking to an investigator, I believe it

 7    was established, showing his I.D.  Looks like he's smiling.

 8        That's the surprise raid that went on on August -- I think

 9    it was August 29th or 20 -- thereabout, 2017.  Surprise raid

10    with eating containers and water and couches and all this

11    stuff.

12        And by the way, bedding for a few people that was kind of,

13    like, maybe if you're just tired at work, you know, I'm just

14    going to just take a little nap because I been working on a

15    window or a column or a facade for construction all day.

16                   (Demonstrative published.)

17        **MR. DOVE:**  More of the same property.

18        You know, these witnesses, I -- I want to not be

19    insensitive because we are at the intersection of some really

20    important and significant events historically in the United

21    States right now about immigration, about fairness, about who

22    gets to be here and -- and those things matter to a lot of

23    people.  And they should.  They should matter to probably all

24    of us.

25        Not evidence, what I'm saying right now, but I've read

1    that there's upwards of 2 million undocumented individuals --

2              **MR. NARAYAN:**  Objection, Your Honor.

3              **THE COURT:**  Sustained.  Stick to the facts that came

4    out in the trial.

5              **MR. DOVE:**  The fact of the matter is that the

6    individuals that were arriving in the manners that they arove

7    (phonetic) -- they arrived, that they came, were here to find

8    opportunities that they hadn't -- that they felt that they

9    could get better here with respect to everybody who came on.

10        Arnoldo Lopez Contreras, what do we know about him?  Or,

11   again, he's the guy that had the water rep -- works.  He looks

12   unlike he was describing today.  He had a Navy pea coat that I

13   envied.  I don't know what kind of shoes those were, but they

14   also looked pretty slick.

15        But here he was back in 2017, saying that -- excuse me --

16   2015, where he said, I started work every day and I worked

17   till 8:00 or 9:00.  Contradicted by his coworkers, who say

18   people took -- at least Raul Bautista, Trevor, Jack Bell, all

19   of whom said breaks were regular.  Restaurants were nearby.

20        I did not have money for food.

21        Interestingly, in the first day, he got a hundred dollars.

22   He got another $500 six days after that.  He got a check for a

23   thousand dollars after -- another two weeks after that.

24   Without counting one that he couldn't remember, he had $2,632.

25   And I think that omits a 4- or 600-dollar payment, which I

1   think is worthy of a pause, because the government has told

2   you this is all about running a game on people and not paying

3   them.

4       And everybody who came and testified told you they got

5   paid.  Told you they received money.  He was short, and

6   there's an explanation for that.  But it boils down to what

7   we'll get to in a moment.  Intent.  What was his mind?  Did he

8   have -- a criminal intent to deprive people and run game

9   financially?

10      Meanwhile he's paying everybody when he can, when --

11  whenever he can, what he can, when he can.

12      That's just one guy, Arnoldo, who had a very dramatic

13  testimony.

14      Cortes Avila -- I took this from transcripts.  I wanted

15  money so I could leave, and he kept me here.  He kept me

16  there.

17      We pulled up the documents.  You'll see more of those.  He

18  traveled back and forth to Mexico four times during his time

19  of employment.  He made a choice every time, I could stay

20  home; I can come back.  Every time was his own choice.

21      He went from all I wanted was back pay to I'm a victim of

22  human trafficking, a common theme in this case, by the way.

23      Every witness I cross-examined and talked to, rather --

24  every witness that my colleague talked to, what was the --

25  what was the beef?  Money.

```
 1          I said, day one, I didn't want to waste your time.  It's

 2     not a breach of contract case.  We're not mere to settle up a

 3     financial score.  We're here to talk about real serious

 4     matters.  And I can submit to you that when you go from saying

 5     it's a -- you're in one setting and you say, look, I just want

 6     my payback.  You're aware of your status -- being out of

 7     status some people call it -- I don't like the word "alien",

 8     but whatever, you're in the process of trying to get some

 9     other form of residency, you end up going, well, how -- what's

10     the pathway to that?

11          And everyone was talking to each other, some of them at

12     the same time in the same interview, which was I thought, to

13     me, profoundly -- not a procedure I've seen happen in law

14     enforcement before, interviewing two witnesses at the same

15     time.

16              MR. NARAYAN:  Objection to that last comment.

17              THE COURT:  Sustained.

18              MR. NARAYAN:  Motion to strike.

19              THE COURT:  Granted.  Jury will disregard the last

20     comment of counsel.

21              MR. DOVE:  My experience -- my observation of that

22     evidence was that I believe that there were procedures that

23     would have given more integrity to an interview than to sit in

24     the -- two individuals down together at the same time and

25     interview them together.  More importantly, those same
```

1       individuals are in communication with one another, and the

2       telephone game happens and suddenly, everybody's lining up to

3       talk to Ms. Saurwein.

4           And what are they all getting?  Continued presence.  Tell

5       us something about him.  Oh, I know it was just about money --

6       oh, well, make this -- what else you got here?

7           Or, well, if they don't have a something else, there is no

8       deferred action.  There is no connection to Ruby's house and

9       resources.  There is no other thing that they have been

10      looking for all along, which is not a bad thing.  They just

11      got to get it how they could.

12                      (Demonstrative published.)

13          **MR. DOVE:**  I almost chuckled -- I didn't mean to be

14      disrespectful -- when Mr. Tavera -- Mr. Juan Manuel Nevares

15      Tavera came in and told you -- fit guy, a boxer, I grew up in

16      the tough part of Tijuana.  I take people on.  I do what I

17      have to do.

18          When we got to him, and I said, and he told -- not me.  He

19      told the government, he says, until they came and rescued me

20      from the place that his friend, Jorge Hernandez from childhood

21      was basically operating out of his garage at a property that

22      he rented and he claimed that it was this needle in a hey

23      stack, oh, I show up, and there's my friend in the car that I

24      knew since I was a kid driving me from LA bus station back up

25      here.  I had no idea how this happened.

1    I kept asking him time and again, Mr. Tavera, how did

2    you -- what's this network?  How -- you were smuggled.  Who

3    are these people?

4        I just know -- I went to a church --

5        Why you?  And I specifically said, did you have some

6    extraordinary construction skill or ability?  Were you like

7    "the man" in TJ?  Where you could figure out, like, how to do

8    things better than other people?  What were you bringing to

9    the table that made you so appealing that someone who was

10   short on money left and right was going to pay a guy almost

11   $9,000, $8500 to bring you up?  More importantly, two weeks

12   after you failed, got caught and booted back out.

13       He is not a credible witness.  This is not a source of

14   information that you can rely on.

15       And he's living here, that he wanted to -- he picked words

16   that he thought would appeal to this -- the charges in the

17   case and say, I was rescued.  You were no more rescued than

18   anybody.  It's false.

19       More --

20                   (Demonstrative published.)

21       MR. DOVE:  And you look at the picture when they --

22   I'm not sure what this came from, but this was -- Mr. Noel

23   Nolazco -- Dave Noel Alvarez Nolazco over here on the right,

24   that he said, oh, that's me, on the cell phone.  Texting.

25   Casual.  Relaxed.  At a place that he claims to have been

1    rescued from.

2        He used the word "rescue" because he thought, well, I got

3    to check off some boxes because I need this change of

4    residency status.

5                (Demonstrative published.)

6        MR. DOVE:  Ledesma is to me one of the most peculiar

7    because he goes way back to the beginning of the work.  And

8    he's talked about, oh, I had to work so many hours.  I started

9    my day at 2:00 a.m. moving cars.  How many cars was he moving?

10   We saw this a lot.  It probably fits five or six cars on it.

11   And then he also said, well, I was kept.  I felt trapped.

12   Believe he said something to that effect.

13       But what's interesting is, when did you get the keys,

14   Mr. Ledesma?

15       Well, I got them really early.  Couple weeks after I

16   started they made me in charge of HR, running the people.

17       And he said the door -- so if he's running -- it just

18   didn't make any sense.  I'm up at 2:00 a.m. but the thing

19   starts at 7:00, and I'm moving some cars.

20                (Demonstrative published.)

21       MR. DOVE:  Which would -- the only other

22   suggestion -- I think of it now -- would be that maybe

23   somebody was sleeping in their car and they decided that they

24   wanted to move them in.  I don't know.  They were talking

25   about getting tickets out there.

1        But he said -- he says we could not get out of that gate

2  without a key.

3        Well, I asked him, well, didn't you get a key?

4        Well, yeah, that was two weeks after I started there

5  though.  They gave me a key my second week, and I became the

6  person -- I was in charge of HR.

7        How long did you go without pay, Mr. Ledesma?

8        A month and a half.

9        But weren't you in charge of it?

10       Well, yes.  I was in charge of payroll.  I -- I took

11  collected timecards, went to job sites, checked on people.

12       Bulmaro Garcia, we heard him toward the end, he spoke fine

13  English that was -- that was clear.

14                    (Demonstrative published.)

15       **MR. DOVE:**  And he said I just -- you know, these are

16  contradictions that matter to credibility.

17       He says -- I asked him, did you ever take a -- a recording

18  device -- a -- I called it a wire first -- into the

19  government -- I mean, in to talk to Mr. Torres.

20       Never did it.  I used my cell phone once.

21       And then when Ms. Saurwein came on, she said that was --

22  that was something he did at my request on three separate

23  occasions.  She gave him a recording device.  It had a

24  little -- you stick it in your pocket.  It's small.  It's a

25  major contradiction because it shows you he was trying to tell

1    you something that wasn't true, which is a common, again, for

2    so many of the witnesses.

3       You have to be taking reliable testimony.  And if it's a

4    reliable, you don't switch your story up like that.

5                    (Demonstrative published.)

6          MR. DOVE:  You know, the standard.  It's beyond a

7    reasonable doubt.  It's -- it's much more of an idea than it

8    is something that you actually have to do in this case because

9    this is where the rubber meets the road.

10      So in law, there are various standards of proof for

11   different situations.  I only -- I'll mention only three of

12   them.

13         MR. NARAYAN:  Objection.

14         THE COURT:  Sustained.

15         MR. DOVE:  I haven't said anything, Your Honor.

16         THE COURT:  Stick with the standard that applies, not

17   other standards in other kinds of cases.

18         MR. DOVE:  It's the highest standard in the law.

19   It's the highest standard.  It is the reason why this country

20   is different, because it means that the proof has to be very

21   firm.  That's in the instructions itself.

22                    (Demonstrative published.)

23         MR. DOVE:  It's doubt based on reason and common

24   sense.  If you are not convinced beyond a reasonable doubt --

25   and I said, when you guys started, don't come here with a

1  mission because the presumption favors Mr. Torres.  So if

2  you're on a mission to try to fill in the box for the

3  government, then that's not what you're here to do.

4      You're here to look at the evidence and evaluate, did they

5  meet that very high standard.

6      Couple reasons why you know that.

7                    (Demonstrative published.)

8      **MR. DOVE:**  You get this package.  All the

9  instructions are important.  I am not purposely omitting

10 anything.  I just don't -- it would not make sense to read all

11 of this for you.

12     If you look at number 17 -- and I am if I may, switch up.

13     **THE CLERK:**  Go ahead.

14                    (Demonstrative published.)

15     **MR. DOVE:**  So this is the concealing or harboring one

16 you see at the top there.  This is the law.  And the law is

17 quite clear about something.  If you look at this second

18 count, the second count says that one of the following

19 people -- so it becomes like this like grid.  You know, you

20 almost need, like, a spreadsheet, 'cause they threw -- to make

21 a weak case strong, they said, let's marshal an army of people

22 and maybe one of them will be good enough.

23     If it wasn't such a weak case, they would have never done

24 all that.  But they decided to turn a -- try to make a weak

25 case strong by clustering you with all the confusion.

1          But in any event, they failed because you can't, on this

2    charge, number two, make the case.  It says, at least one of

3    following persons was not lawfully in the United States.

4          Now, we get into a little bit of the weeds here, because

5    lawfully in the United States means also sorts of things.

6    It's in the instructions.  Read them all, talks about status

7    talks about how -- your permission.

8          But every one of the witnesses -- each one of them said, I

9    was -- I came with either a border crossing card, lawfully

10   in -- or a visa, tourist visa, lawfully in the United States.

11         The only one who made up a story about being smuggled --

12   and we told you how absurd that was -- was Juan Manuel Nevares

13   Tavera who has enough game to outwit a border parole agent at

14   the border.  He said I had a fake I.D. and a fake birth

15   certificate and the guy looked down at his coffee cup, and I

16   shuffled past.

17         That's not a person that you want to believe in any sense

18   at all.  But in any event, he purported to be here legally

19   because he passed himself off to the highest degree of

20   scrutiny at the border.

21         So the idea that they make this -- and so, again, they put

22   all these names in here.  We had to read them each and every

23   time.  All of them came here lawfully.  All of them came here

24   except for the one who made up a story about being smuggled in

25   and being paid all this -- disproportionate amount of money

```
 1   when no one else -- when everyone else was -- even the guy who

 2   said he took it down there, Hernandez, says you owe me 3500

 3   bucks.  Oh, you took 8,000 down there and nothing to back that

 4   up.  Not a text message.  Not a GPS that linked him going to

 5   down there.  Nothing.

 6       If you fail on two, you fail on the whole thing.  This an

 7   "and" situation.  You have to have every one of the pluses in

 8   this system, so you don't even have a number two.

 9       Number four --

10                  (Demonstrative published.)

11       MR. DOVE:  -- equally important.  They're all

12   important.  I'm not dismissing anything.  I don't want --

13   sometimes the government will argue that, well, he left this

14   out.  I want you to pay attention to them all.  I can only

15   highlight certain ones.

16       Shielded from detection, the following person.  We've

17   already been through this.  I talked to it.

18       Where do you have -- you go from Sacramento to Hayward, to

19   San Francisco, to San Jose, back to San Francisco, open work

20   sites, people coming and going, milling about, interacting

21   with governmental officials at -- in San Francisco, city

22   inspectors in San Jose, talking to people left and right.

23   This is a -- wearing orange bright shirts.  You could not be

24   more conspicuous.

25       And if that was the defendant's design, to try to come up
```

1    with some way to keep people -- you know, to put them in the

2    back of a trailer and keep everybody quiet and turn the lights

3    low.  That never happened.  This was all done at daytime in

4    ways that he said everybody goes to this work site.  I showed

5    you that.  And sign up and get a safety certificate and put

6    your name on a list that the city gets to say.  There's no

7    concealment whatsoever.

8            THE COURT:  Counsel, is this a good time to take a

9    standing break?

10           MR. DOVE:  Yes, Your Honor.

11           THE COURT:  I don't want to interrupt.  Sorry.  Let's

12   take a standing break.  We've been going for a while.

13               (Pause in the proceedings.)

14           THE COURT:  Mr. Dove, how much more time do you have?

15           MR. DOVE:  Think I'm going to try to go by the

16   court's prior -- 59 minutes is my goal.

17           THE COURT:  Okay.  So how much more?  I haven't been

18   keeping track.

19           MR. DOVE:  I haven't either.  I had a little --

20           THE COURT:  Okay.  Fantastic.

21           MR. DOVE:  I'll try to get --

22           THE COURT:  I'm not trying to rush you.  I just want

23   to get an idea for the jury how long.

24           MR. DOVE:  Thank you, Your Honor.

25           THE COURT:  Thank you.

1    (Pause in the proceedings.)

2        **THE COURT:**  All right.  You may proceed, Mr. Dove.

3    Thank you.

4        **MR. DOVE:**  Thank you.

5        It gets -- this is a concealing -- it's two counts.  The

6    first one is concealing or harboring.  The "harboring"

7    definition gets thorny until you look at the -- the first of

8    all, always remember the standard.  It is the highest

9    standard, beyond a reasonable doubt.

10        The second thing you have to look at is the harboring

11    and -- so this is wordy.  This is how these laws are.  Conduct

12    tending to substantially facilitate alien remaining in the

13    United States.

14        Well, first of all, every person -- you'll see these

15    slides in a moment from me -- came and went multiple times

16    back and forth to different places, not just in the U.S.,

17    outside of the U.S.

18        The second thing is, what was the purpose of the

19    warehouse?  It was work related to get shifts done fast.  It

20    had nothing to do with hiding anybody.  In an open place that

21    you could get in and out of day and night.

22        Now, what the government, I suspect, will say, is they'll

23    say, well --

24    (Demonstrative published.)

25        **MR. DOVE:**  -- the -- we can prove this just by

1    showing that they live there.  False.  False.  It has to be

2    for the purpose -- that they're living there for the purpose

3    of concealing that is also driven by a financial gain.  That's

4    not there.

5        He's -- it's there as a -- as a interim work -- sleep

6    someplace, like a crash spot, while they're trying to get a

7    big project done.  And that was way back in 2015.

8        Second element, fourth element, either one of them, if

9    they miss, it's -- it's a failure.  It's a not guilty verdict.

10   It's the right verdict in that circumstance.

11       While I've got the device, I'll say -- I'll move to the

12   next one.

13                  (Demonstrative published.)

14           **MR. DOVE:**  Forced labor.  Right?

15       Again, this is akin to someone -- think they kept saying

16   exploiting, which is not the definition by the way under the

17   law.  Exploiting is not a crime alone unless you have all

18   these other things go with it.

19       What matters is, are you using serious threats to cause

20   people to work.  Again, go back to the filter, the lens of

21   who's saying what they're saying.  Go back to that.

22       The second factor -- and, again, I want to remind you that

23   that entire first -- when we're talking about concealing, that

24   entire group of names, eight individuals, we don't have

25   evidence that they were here unlawfully.

1    You can find that they were all here lawfully except for

2  Jordan -- except for Juan Manuel, who schemed his way in.

3    You know what's interesting about the -- this forced labor

4  issue, it goes through, like, the criteria, serious harm,

5  defendant acting knowingly -- what's interesting about this

6  particular element -- this particular count is that it

7  would -- it requires -- the testimony that led to this or said

8  this evolved.  It started off with a few dollars owed, more

9  dollars owed, a meeting with the special agent in 2017, two

10  years after some of these things happened, two years later,

11  suddenly, they can -- they can recount the story with great

12  detail about painstaking abuse and misery and deprivation that

13  was never there before they went and talked to someone at

14  office labor -- and then someone got an idea.

15    And -- and I'll be honest, as I said, I get it.  I get it.

16  This -- this is a beautiful country.  And at times, right now,

17  in comparison to other opportunities, there are great

18  opportunities here.

19        **MR. NARAYAN:**  Objection.

20        **THE COURT:**  Overruled.

21        **MR. DOVE:**  It makes sense.  It's not a criticism of

22  the individuals.  It just is an explanation that was driving

23  the behavior across the border.

24    May I go back, please?  Thank you.

25              (Demonstrative published.)

1    **MR. DOVE:**  I put this up at the beginning.  I'll put

2    it up again 'cause I want you to know it hasn't changed.  As

3    predicted, the government's case is based upon embellishment

4    of facts that went from pay me up to what -- tell me about

5    this guy.

6        Okay.  I'll tell you.  What do I get?  Well, I'll get you

7    a chance to stay in the U.S.  You can live at Ruby's Place.

8    You can -- you can have continued presence for a period of

9    time that it -- for years.  You can work.  You can come back

10   and forth.

11       Okay.  What I got to do?

12                    (Demonstrative published.)

13       **MR. DOVE:**  This is in the credibility instruction.

14   It's 3.9 in the instructions.  You just looked at this.  And

15   it is a laundry list of what individuals will tell you why

16   their testimony to a number is not reliable.

17       And what's eerie is the last part, is how the stories

18   started becoming the same, same.  He threatened me, he told

19   me -- and one of the witnesses -- I think he was Jorge

20   Hernandez -- the government was saying, what threat was made,

21   what threat was made?

22       Well, he said something about, you know, when are you

23   coming back?  You know, what's going on?

24       You know, it was like this regular conversation that did

25   not have any threats in it.  And they put him to task, put him

1    to task, he couldn't come up with anything, you know, so

2    because -- he even forgot what the script was.  Supposed to

3    say the man specifically threatened you and your family.  He

4    is going to do some bad things to you.

5        They have a interest in the outcome, each one of them.  We

6    all talked to them.  They said no testimony, no status.

7                    (Demonstrative published.)

8        MR. DOVE:  They were contradicted by everybody else

9    who went to that location, who had no ax to grind.  What does

10   Trevor Van Cleave have to gain?  He just came up here and told

11   you, I ran a site.  I'm not even there anymore.  The job's

12   over.  I was there all the time to see what happened.

13                    (Demonstrative published.)

14       MR. DOVE:  Each witness has a reason to say something

15   bad about Mr. Torres and a stake in the outcome, because if

16   you don't testify, you don't get what you want.

17       And some of them got straight up cash.  Bodine got money,

18   and he was angry at Mr. Torres because Mr. Torres brother and

19   him -- Mr. Torres's brother got into it with his brother and

20   he had to get a lawyer and it's all Torres's fault.

21                    (Demonstrative published.)

22       MR. DOVE:  We talked about this very specifically.  I

23   put the elements up 'cause I didn't want to mislead you at

24   all.  I wanted you to see the jury instructions.

25       Again, all these individuals had tourist visas, at the

1   least, a border-crossing card, which to me -- we could talk

2   about a lot of things about what it is to be in the United

3   States, but if you pass the border, are inspected and arrive,

4   that is a lawful status in the United States.

5                 (Demonstrative published.)

6           **MR. DOVE:**  Except for Juan Manuel who, again, had

7   some major con skills and took him up here with you, yes, sir,

8   yes, sir, and just ran game.

9       Torres is not a immigration expert.  He's asked people --

10  you fill out an employment application and ask them if they

11  have a visa and you give it back to them.  It's what you do

12  when you have someone start.

13      You know, you have the profile in ways that would be

14  really improper to say -- some person walks up to me, they

15  either speak Spanish -- Spanish only or they have an accent,

16  or maybe their particular, I don't know, appearance, and I'm

17  going to say, well, where are you from?  We don't do that.  I

18  think that might be illegal in itself.

19          **MR. NARAYAN:**  Objection.

20          **THE COURT:**  Sustained.

21          **MR. DOVE:**  It's something that nobody that's decent

22  would do.

23      We already talked about the ad.  We talked about --

24                 (Demonstrative published.)

25          **MR. DOVE:**  -- who did the -- bringing people.  Jordan

1    Ledesma at the front line when folks came up.  I'm the HR guy,

2    Human resources.  I check people in and out.

3        Torres never down there.  He's riding up on -- from a car,

4    a Greyhound bus in either LA or somewhere else.

5        We know about this.  We know with the distinct clothing.

6    All the elements are not there.  I pointed them out to you

7    painstakingly, what's in those charges, what you have to have.

8        And the shotgun approach, folks, doesn't fly.  I don't

9    care how many men they march up who they say, I'll pay you.

10   I'll give you a -- a permanent -- or some form of resident

11   status.  I'll house you.  I'll reward you.

12       Everybody got something.  That's -- that taints the

13   testimony.

14       And remember, there was nothing to back it up.  It's even

15   contradicted.

16       And they had Robin Strandberg on the stand.  I put her up.

17   They -- it was unchallenged.  They didn't even say -- I went

18   there for three years, Ms. Strandberg said.  I was there all

19   the time.  They didn't even so much as ask her, did you get

20   paid?  I'm not sure what that was.  You know, she's a

21   professional.

22       Many of the -- the men talked about getting paid being a

23   little bit.  So it's -- it's not even challenged testimony.

24   It just comes in.  I was there.  I saw the workers.  I know

25   who they are.  I know Jordan.  She said, I trained Jordan.

1   And he becomes somehow in the process a rescued victim.

2                  (Demonstrative published.)

3        **MR. DOVE:**  These are the forms that are in your

4   evidence.  This is a -- this happens to be for -- oh, it's --

5   oh, the name is not on that one.  Anyway, it's in the

6   evidence.  Oh, yeah, here it is.  Sorry.  Mr. Lopez Alcantar,

7   and his trips into the United States in July; you know, again

8   in May; and in January.  Four trips while he's under duress

9   and can get away.

10       Avila Cortes, Jose Leonardo.  Four trips while he can't

11  get away.  Dave Noel Alvarez Nolazco, multiple trips while he

12  can get away, on their I94 cards.

13                 (Demonstrative published.)

14       **MR. DOVE:**  Jose Francisco Morales Alvarado, I want to

15  go into his testimony because he's the one that him and his

16  brother came up to start a skateboard factory.  And the whole

17  issue was about how could they get this off the ground, pick

18  up some work from Mr. Torres while that's happening.  In and

19  out all the time.  Can't get away from Mr. Torres, though.

20       I -- I drive 450 miles away, but I'm still under the fear

21  of whatever he's got going up here, painting stuff.

22                 (Demonstrative published.)

23       **MR. DOVE:**  The same -- brother -- his brother -- I

24  think there were seven or eight trips his brother took.  Back

25  and forth, back and forth, back and forth.  This is not

1    someone who's threatened or harbored or concealed or -- or

2    terrorized.  It's the opposite of that.  There -- this is the

3    very essence of what it is to have freedom of movement to two

4    different countries.

5        Nine trips.

6            THE COURT:  Excuse me.  Mr. Dove, it's been 64

7    minutes.

8            MR. DOVE:  All right, Your Honor.  I'm wrapping up.

9    Thank you.

10           THE COURT:  Thank you very much.

11           MR. DOVE:  This one, Jordan Rene Ledesma, he was like

12   as prolific as anyone.  I wish I had this much on my passport,

13   14 trips.  You have to focus on intent.  And the intent is

14   borne out by what was Mr. Torres's idea.

15       And it's important to note two other things.  What

16   happened with the payments?  He got the job at the -- at the

17   Marriott in 2015.  It was 2016, and he still has Robin

18   Strandberg pursuing payment.  Jack Bell told you paperwork

19   wasn't in order.

20       So intent to not pay is very different from having sloppy

21   business -- billing practices.  You have to have the intent --

22   the desire specifically, I'm going to mislead these guys.

23   Instead he was just trying to catch up and get paid.  He

24   couldn't get paid.

25       You know, the result is not guilty.

1    You can scour this any which way, but I suggest to you --

2  I submit to you, pay careful attention to those witnesses, to

3  what Mr. Torres was trying to do for a short period of time,

4  to the incentives that were given to individuals to come up

5  and tell you a story that is false.

6    And the government has not made this case.  It is not

7  something to feel any second, you know, consideration about.

8  It's a not guilty verdict.

9        **THE COURT:**  Thank you, very much, Counsel.

10    All right, ladies and gentlemen.  We're going to take our

11  second 15-minute break, after which we'll hear rebuttal from

12  the government, a little bit more instruction, and then the

13  case will be in your hands.

14    So 15 minutes.  Remember the court's usual admonitions.

15  Thank you.

16    (Recess taken at 12:34 P.M.; proceedings resumed at 12:54

17  P.M.)

18    (The following proceedings were heard out of the presence

19  of the jury:)

20        **THE CLERK:**  Remain seated, come to order.  Court is

21  again in session.

22        **THE COURT:**  All right.  Please bring in the jury.

23    (The following proceedings were heard in the presence of

24  the jury:)

25        **THE COURT:**  All right.  Please be seated.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1      We'll now hear from the government for their final

2  rebuttal.

3      Proceed.

4          **MR. NARAYAN:**  Thank you, Your Honor.

5                  **REBUTTAL CLOSING ARGUMENT**

6          **MR. NARAYAN:**  The victims that testified under oath

7  testified for you to hear.  One of the instructions the court

8  has given you is that evaluations as to witness credibility is

9  your job and your job alone.  Doesn't matter what defense

10  counsel thinks about the witnesses.  It doesn't matter what I

11  think about the witnesses.  Witness credibility is your

12  province, it's your job.

13      You had a chance to look those men in the eyes when they

14  were testifying.  You saw the emotion on their faces and you

15  heard what they said.

16      Take your responsibility seriously with respect to that.

17      Now, one of the other instructions that you received was

18  that what the lawyers say in opening statements and closing

19  arguments is not evidence.  Think a lot of what we just heard

20  illustrates the importance of that point.  And I want to draw

21  your attention to two specific things.

22      One of the things you heard defense counsel talk about was

23  whether the victims in this case had legal status to be in the

24  United States.  The witness testimony you heard about that was

25  not only from the victims but from Special Agent Saurwein who

1    explained to you very clearly what those I94 forms mean, what

2    the admission status permitted the victims to do, and that

3    they were here unlawfully.

4         With respect to continued presence, you just heard a lot

5    of comments regarding continued presence.  Again, focus on the

6    witness testimony that you heard about it.  Special Agent

7    Saurwein gave a clear definition of what continued presence

8    is, what it comes with, what it doesn't come with, and the

9    criteria that go along with it.  And so trust your memory on

10   that.

11        Now, two witnesses in this case told you about what

12   happened with Juan Manuel Nevares Tavera.  You heard from

13   Mr. Nevares himself about coming across the border, that the

14   defendant paid his $8500 smuggling fee.  But you also heard

15   the person who met him in Los Angeles on behalf of the

16   defendant, Jorge Hernandez, who told you that that is what

17   happened.  That he took $8500 cash down with him to

18   Los Angeles and paid the coyote that money to bring

19   Mr. Nevares up to Hayward, California, that Mr. Nevares then

20   lived in that garage.  And that when the defendant failed to

21   pay him over and over and over again, the defendant started to

22   hold that $8500 over Mr. Nevares's head and said, you can't

23   leave because you have to pay this off.  You have to work this

24   off.

25        That alone, members of the jury -- that alone is both

1    counts that are charged in this case.  The defendant harbored

2    Mr. Nevares.  Mr. Nevares worked for the defendant to the

3    defendant's gain and he kept him here by holding a smuggling

4    fee over his head.

5         That's one example of dozens of examples that you heard

6    about in this case of both of the crimes that were charged.

7         I want to end by discussing something that we heard from

8    Alejandro Lopez Alcantar on Monday morning of this week when

9    he sat on that witness stand and testified.  He told you that

10   the workers were confronting the defendant about a lack of

11   payment, as they often had to do, and that the defendant told

12   the workers -- that the workers told the defendant -- excuse

13   me -- that they were going to accuse him or sue him with the

14   labor commission.

15        The defendant replied and said, let them do that and

16   they'll see what happens to them.

17        You now know that in 2017, these victims began speaking

18   with law enforcement.  They began speaking with Special Agent

19   Saurwein.  They started talking about what happened to them.

20   And now we're here.

21        From 2015 to 2017, the defendant controlled what happened

22   to them.  The defendant controlled what happens.  Now you do.

23        Find the defendant guilty.

24            **THE COURT:**  All right.  Thank you.

25        We'll now have the final instruction.  Please put it up.

```
 1            (Pause in the proceedings.)

 2        THE COURT:  Okay.  Ladies and gentlemen, this is your

 3    final instruction.  And I'm going to have some -- couple

 4    housekeeping instructions right after -- right after that.

 5    And then we'll go from there.

 6        So when you begin your deliberations, elect one member of

 7    the jury as your foreperson who will preside over the

 8    deliberations and speak for you here in court.

 9        You will then discuss the case with your fellow jurors to

10    reach agreement if you can do so.  Your verdict, whether

11    guilty or not guilty, must be unanimous.

12        Each of you must decide the case for yourself, but you

13    should do so only after you have considered all the evidence,

14    discussed it fully with the other jurors, and listened to the

15    views of your fellow jurors.

16        Do not be afraid to change your opinion if the discussion

17    persuades you that you should, but do not come to a decision

18    simply because other jurors think it is right.

19        It is important that you attempt to reach a unanimous

20    verdict but, of course, only if each of you can do so without

21    (sic) having made your own conscientious decision.  Do not

22    change an honest belief about the weight and effect of the

23    evidence simply to reach a verdict.

24        Perform these duties fairly and impartially.  Do not allow

25    personal likes or dislikes, sympathy, prejudice, fear, or
```

1  public opinion to influence you.  You should also not be

2  influenced by any person's race, color, religion, national

3  ancestry, or gender, sexual orientation, profession,

4  occupation, celebrity, economic circumstances, or position in

5  life or in the community.

6       It is your duty as jurors to consult with one another and

7  to deliberate with one another with a view towards reaching an

8  agreement if you can do so.

9       During your deliberations, you should not hesitate to

10 reexamining your own views and change your opinion if you

11 become persuaded that it is wrong.

12      Because you must base your verdict only on the evidence

13 received in the case and on these instructions, I remind you

14 that you must not be exposed to any other information about

15 the case or to the issues it involves.

16      Except for discussing the case with your fellow jurors

17 during deliberations, do not communicate with anyone in any

18 way, and do not let anyone else communicate with you in any

19 way about the merits of the case or anything to do with it.

20      This includes discussing the case in person, in writing,

21 by phone or electronic means, via email, text messaging or any

22 Internet chat room, blog, website or other feature.  This

23 applies to communicating with your family members, your

24 employer, the media or press, and the people involved in the

25 trial.

1    If you are asked or approached in any way about your jury

2    service or anything about this case, you must respond that

3    you've been ordered not to discuss the matter and to report

4    the contact to the court.

5    Do not read, watch, or listen to any news or media

6    accounts or commentary about the case or anything to do with

7    it.  Do not do any research such as consulting dictionaries,

8    searching the Internet, or using other reference materials.

9    And do not make any investigation or in any other way try to

10   learn about the case on your own.

11   The law requires these restrictions to ensure the parties

12   have a fair trial based on the same evidence that each party

13   has had an opportunity to address.

14   A juror who violates these restrictions jeopardizes the

15   fairness of these proceedings, and a mistrial could result

16   that would require the entire trial process to start over.

17   If any juror is exposed to any outside information, please

18   notify the court immediately.

19   Some of you have taken notes during the trial.  Whether or

20   not you took notes, you should rely on your own memory of what

21   was said.  Notes are only to assist your memory.  You should

22   not be overruled influenced by your notes or those of your

23   fellow jurors.

24   The punishment provided by law for these crimes is for the

25   court to decide.  You may not consider punishment in deciding

1  whether the government has proved its case beyond a reasonable

2  doubt.

3      A verdict form has been prepared for you.  After you've

4  reached unanimous agreement on a verdict, your foreperson

5  should complete the verdict form according to your

6  deliberations, sign and date it, and advise the courtroom

7  deputy that you are ready to return to the courtroom.

8      If it becomes necessary during your deliberations to

9  communicate with me, you may send a note through the clerk

10 signed by any one or more of you.  No member of the jury

11 should ever attempt to communicate with me except by a signed

12 writing, and I will respond to the jury concerning the case

13 only in writing or here in open court.

14     If you send out a question, I will consult with the

15 lawyers before answering it, which may take some time.  You

16 may continue your deliberations while waiting for the answer

17 to any question.

18     Remember, you are not to tell anyone, including me, how

19 the jury stands numerically or otherwise or any -- on any

20 question submitted to you, including the question of the guilt

21 of the defendant, until after you have reached a unanimous

22 verdict or have been discharged.

23     So that is the instruction.

24     Now, the next -- the next business that we have had is to

25 finally reveal who the -- the alternates are.  And before I do

1    that -- I know once I do that, there'll be a lot of, you know,

2    shuffling around and maybe sighs of relief, whatever, so I'm

3    not going to tell you yet.

4        But I am going to tell you that for those alternates,

5    there -- the conduct of the jury instruction that I just gave

6    you and that I gave you every evening before you retired for

7    the evening and even during jury selection -- the conduct of

8    jury instruction applies to the alternates, who I'm about to

9    reveal, and even though they will not be deliberating with the

10   group of 12, they are -- for those of you who follow

11   basketball -- like the fifth person on the bench or in

12   baseball the designated hitter, because if for some reason

13   during the deliberations something happens that requires some

14   action involving a juror, you may be called upon to join the

15   deliberations.

16       And under those circumstances, the law requires that the

17   deliberations start all over again with the new juror in

18   there.  Not the trial.  Just the deliberations.  So you can

19   imagine that if you're going to be one of those alternates who

20   gets called back in and you've gone on the Internet and done

21   something different than what I told you in my -- in my

22   conduct of the jury instruction, then you would not be capable

23   of being a fair and impartial juror.

24       So what will happen is when the jury reaches a verdict or

25   the case is otherwise over and the jury's discharged, the

1    court will communicate with you and you will be given

2    instructions that say, you're now free to go about your lives

3    and case is over and you can, you know, talk to whoever you

4    want and do whatever you want and -- without the strictures of

5    the court.

6         So -- and then when I identify the alternates, the four

7    alternates, I would appreciate if they would file out of the

8    courtroom, follow Ms. Ottolini, and then she'll -- and you'll

9    be taking your personal belongings and leaving the court

10   because at that point, you're not allowed to be communicating

11   with the 12 jurors for the reasons that I mentioned.

12        So we're not trying to shuffle you out of here for the

13   sake of that we don't want to see you anymore.  It's just that

14   we have to separate you at that point from the main jury

15   panel.

16        So the alternates are as follows:  Juror number 14, Jamese

17   Walters is number -- alternate number 1; Mary Jean Beck is

18   alternate number 2 -- Juror number 1 is alternate number 2.

19   That's two.  Number 3 is Jeffrey Tang, juror number 9.  You

20   are alternately number 3.  And Craig Mole, you are alternate

21   number 4 and juror number 5.

22        So will those please -- and before you leave, I want to

23   thank you because your being here and ready to go has been

24   just awesome, important for this process 'cause we lose jurors

25   occasionally.  We haven't here.  And you guys have done a

1    really great service as citizens and very important.

2        And we thank for your time, your punctuality, and your

3    attention.  And we wish you all the best.  And, hopefully, we

4    won't have to see you again, but if so, we will.  If not,

5    thank you so much and enjoy the rest of your lives.

6        Thank you very much.  Please rise everybody as they leave.

7                    (Alternates leave the courtroom.)

8            **THE COURT:**  And, Ms. Ottolini, I'm going to give the

9    jury final instructions.

10        Okay.  So the -- the first -- your first order of business

11   is as follows, and this is something that I alluded to

12   yesterday, which is to elect your foreperson, and then decide

13   as a group what your schedule is going to be to deliberate.

14        As I mentioned before, the deliberation schedule is

15   largely up to you.

16        So what does that mean?  What are your choices?

17        So it's now roughly 1:10, pretty close to our normal

18   quitting time, but now that you have the case, if you wish to

19   deliberate beyond the 1:30 -- you know, the cutoff that we

20   typically use for our regular trial day other than Tuesday's,

21   you're free to do that.  That's alternate -- alternate choice

22   number one.

23        Alternate choice number two is you can -- is about

24   tomorrow.  Now, again, you're under no obligation.  We

25   normally -- we don't have trial on Friday.  However, if you as

1   a group unanimously decide that you can do -- can and want to

2   deliberate tomorrow, Friday, you may do so.

3       Going back to today, if you wanted to deliberate today,

4   you can go for as short, as long as you wish.  And tomorrow,

5   it's -- you know, it's up to you what you want to do.

6       And whenever you decide that you next are going to begin

7   to deliberate, or next day, typically, what we do is we don't

8   have any kind of, you know, warmup or exercise or ceremony or

9   instructions.  You just congregate at the regular -- we ask

10  you to come in at the usual time by no later than 8:00, to

11  sort of generally follow the courtroom day -- and let's say

12  it's -- whether it's tomorrow or Monday and, then you -- you

13  deliberate as long as you want -- as long as you want and/or

14  and feel you need with no pressure from the court, and then

15  you -- you just leave for the day.

16      I would ask that when you come in in the morning, since

17  obviously you're not arriving all at the same moment, some

18  earlier than others, that you not begin your deliberations or

19  discussions about the case until all of you are there.

20  Because you're now, like, a 12-headed being.  As Justice

21  Douglas said, you're occupying a government office as jurors

22  here.  And so we'd like all of you to go together.

23      And as soon as you're all here, start your deliberations,

24  set your own breaks, set your own -- if you want to take

25  lunch, or whatever.  We'll still have breakfast.  And then you

```
 1   set the date.
 2       So what I would like you to do in a moment is to go back
 3   to the jury room -- and you don't need to come out.  Talk
 4   about it for a while.  Give Ms. Ottolini your schedule --
 5   proposed schedule, given the choices I mentioned, and -- and
 6   then you'll either start your deliberations now, follow
 7   your -- your schedule.
 8       And then that way, we as the court and counsel and the
 9   parties can be -- you know, we want to be available when you
10   are actually deliberating so that if anything comes up that
11   requires counsel, and -- and the parties and the court, we'll
12   all be around and close by and not keep you waiting for an
13   undue period of time.
14       So at this point, I'm going to ask you to go back with
15   Ms. Ottolini, figure out what you're going to do, tell her in
16   a note only, remember, signed by one of you, and then we'll
17   abide by your -- by your instructions to us.
18       Thank you very much.
19       (The following proceedings were heard out of the presence
20   of the jury:)
21           THE COURT:  All right.  Please be seated.
22       So we'll await -- we'll -- Ms. Ottolini will let you know
23   informally what you -- what they -- what they desire.
24       And do the parties have any matters before we -- 'cause I
25   won't be coming out on the bench?
```

1          **MR. NARAYAN:**  No, Your Honor.

2          **MR. DOVE:**  No, Your Honor.

3          **THE COURT:**  All right.

4      Well, I have -- I have one matter.  I want to discuss

5  briefly for reasons that will become obvious what I just heard

6  in the closing argument of the defense counsel, which I

7  thought in many instances was inappropriate, bordering on

8  unethical and -- and there were objections that I sustained.

9  There were others that were not made.

10     Three examples -- and there are several examples.  One is

11 to begin talking about the immigration situation in the United

12 States, which is outside the record.

13     The second one is showing a photograph, for example, of a

14 car that's not in evidence, the -- the witness who was

15 testifying that -- with the binder.  It was never admitted

16 into evidence.

17     The third is giving a personal opinion concerning

18 counsel's view of law enforcement techniques.

19     And fourth is making an absolutely erroneous statement

20 about legal status.  The statement that people who are here on

21 a -- on a -- a tourist visa are legally in the United States

22 for purposes of the statute is wrong, incorrect, and not

23 founded by the law.

24     And -- and I had considered but -- but refused -- but

25 refused the urge to give a curative instruction that as a

1    matter of law, if somebody comes here on a tourist visa and is

2    more than 90 miles from the border and/or they work, they are

3    illegally in the United States.  And so -- that was an

4    erroneous statement of the law.  I'm not going give a curative

5    instruction, 'cause I think it would -- could inject error in

6    the case to do it at this point.

7        But I will tell you that those instances, Mr. Dove, are --

8    I have been on the bench for many years.  I have not seen

9    anything like that.  It's inappropriate.  I'm not taking any

10   action.  But I'm warning you and anybody else in this court if

11   I see that again, I will take severe action.

12       I don't want to hear any argument, I don't want to hear

13   any defense because I'm not taking any action.  This is what I

14   believe.

15       If you want to file a written paper, you can file it.  But

16   there's no doubt in my mind that the things you did were

17   inappropriate.

18       All right.  We're adjourned.

19           (Proceedings were concluded at 1:17 P.M.)

20                           --o0o--

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4

5          I certify that the foregoing is a correct transcript

6    from the record of proceedings in the above-entitled matter.

7    I further certify that I am neither counsel for, related to,

8    nor employed by any of the parties to the action in which this

9    hearing was taken, and further that I am not financially nor

10   otherwise interested in the outcome of the action.

11

12   _____

13          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

14              Thursday, March 14, 2019

15

16

17

18

19

20

21

22

23

24

25